UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
L & L PAINTING CO., INC.,

                                  Plaintiff,

                  - against -

ODYSSEY CONTRACTING CORP.,

                                 Defendant.
------------------------------------------------------------------------x

08 Civ. 3559

**AFFIRMATION IN
OPPOSITION**

      Michael McDermott, an attorney duly admitted to practice before this Court, affirms the following under penalty of perjury:

      1.      I am an associate with the law firm of Georgoulis & Associates PLLC, attorneys for defendant Odyssey Contracting Corp. ("Odyssey Contracting"), and as such I am fully familiar with the facts and circumstances herein.

      2.      I make this affirmation in opposition to the motion by plaintiff L & L Painting Co., Inc. ("L & L Painting") to remand this action to the Supreme Court, New York County.

      3.      Removal was proper pursuant to 28 U.S.C. § 1441(a). The provision relied upon by L & L Painting in seeking a remand expressly sets forth an exception which permits Odyssey Contracting to remove this action. According to that provision, Odyssey Contracting did not waive its right to remove to federal court cases that are subject to the prime contract. This action **is** subject to the prime contract.


A.      <u>Background</u>

      4.      As a preliminary matter, I note that there is a related case currently pending in this Court. On April 10, 2008 Odyssey Contracting commenced an action against L & L Painting

and its surety, Federal Insurance Company, concerning the same subject matter under Case # 08 Civ. 3491 (Exhibit F to moving papers). The subject matter of the two actions is or will be identical, and it is expected that the two actions will be consolidated or only one action will proceed. Accordingly, for the purpose of simplifying the discussion of the issues on this motion, Odyssey Contracting's complaint in the other action will be treated as if it were a pleading in this action.

5.     L & L Painting is the prime contractor on a public improvement project with the City of New York, acting by the New York City Department of Transportation ("NYCDOT"), to perform work on the Queensboro Bridge known as Queensboro Bridge Protective Coating together with all work incidental thereto, Boroughs of Queens and Manhattan, Contract No. 20040013406 (DOT Project BRC-231P), PIN # 81499MBBR589 ("the project").

6.     L & L Painting's contract with the NYCDOT had an original contract price of one hundred sixty-seven million seven hundred fifty thousand ($167,750,000.00) Dollars, and upon information and belief, the current adjusted contract price is in excess of one hundred seventy-three million ($173,000,000.00) Dollars ("the prime contract").

7.     A summons with notice was filed by L & L Painting on April 9, 2008 with the Supreme Court, New York County (Exhibit D to moving papers). There has been no further activity in the New York County Court, other than the filing of the Notice of Removal on April 14, 2008 (Exhibit G to moving papers).

8.     As noted above, Odyssey Contracting filed a summons and complaint against L & L Painting in this Court on April 10, 2008.

B.    Odyssey Contracting's Four Subcontracts

9.    Odyssey Contracting and L & L Painting entered into four (4) separate subcontracts for Odyssey Contracting to perform certain paint removal and re-painting on the project ("the four subcontracts")(Copies annexed as Exhibits 1 to 4).  The four subcontracts were executed on or about the following dates March 3, 2004 (two subcontracts), August 30, 2005, and March 17, 2006.

10.    The four subcontracts each covered work on a different portion of the bridge and divided the work that Odyssey Contracting was to perform on the project by "panel points" or sections.  Generally speaking, "panel points" are the locations where the vertical steel beams meet the bridge deck/roadway.  The four subcontracts divide the work into the following panel point groupings: (a) Subcontract I and IIA - panel points 77-123; (b) Subcontract IIB - panel points 30-47; (c) Subcontract III - panel points 1-30; and (d) Subcontract IV - panel points 47-76.

11.    Odyssey Contracting substantially completed its work on subcontracts I and IIA, IIB and III.  It began its work on subcontract IV.

12.    Contrary to L & L Painting's argument in footnote 1 of its affirmation in support, each of the four subcontracts created separate and distinct legal rights and obligations.  This central issue in the case, however, does not appear to be relevant to L & L Painting's remand motion because each of the four subcontracts contain identical venue provisions.


C.    L & L Painting's Failure to Pay Odyssey Contracting

13.    L & L Painting did not make timely payments to Odyssey Contracting for work performed and did not release retainage when Odyssey Contracting had substantially completed its work on three of the four subcontracts.

14.    As a result of L & L Painting's failure to make payments and its other breaches, by letter dated April 1, 2008 Odyssey Contracting advised L & L Painting that it was terminating the subcontracts (Exhibit E to moving papers).  In the same letter, Odyssey Contracting advised L & L Painting that, before ceasing all work and removing its equipment, Odyssey Contracting would complete the punch-list work on subcontracts I and IIA, IIB and III.

D.    The Four Subcontracts and the Venue Provision

15.    Each of the four subcontracts provides at Sections 26(b) and (c) that:

(b)    With respect to any action between the Contractor and the Subcontractor in New York State Court, **that is not subject to the Prime Contract**, the Subcontractor hereby expressly waives and relinquishes any rights it might otherwise have … to remove to Federal Court ….

(c)    With respect to any action between the Contractor or the Subcontractor in Federal Court, **that is not subject to the Prime Contract**, the action should be venued in the Southern District of New York, New York City Courthouse.  The **Contractor** expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the Southern District, New York City Courthouse.

(emphasis added).

16.    Stated simply, section 26(b) provides that Odyssey Contracting may remove any action that is subject to the prime contract.  Section 26(c) provides that Odyssey Contracting may bring an action in this Court and L & L Painting waives any right that it may have to transfer the case to another federal court.  This latter provision precludes L & L Painting from transferring any case to the District Court for the Eastern District of New York, where it maintains its home office.  Section 26(d) further provides that any action will be transferred to a court located in New York County if it is commenced elsewhere.

4

E.      This Action is Subject to the Prime Contract

      17.      It is clear that this action is subject to the prime contract.  The four subcontracts

provide that payments by L & L Painting to Odyssey Contracting are governed, as to amount and

timing, by the prime contract.

      18.      Odyssey Contracting's first three causes of action seek payment for work

performed.  Sections 3(b) and 3(c) govern payments and provide as follows:

> (b)      Partial payments will be made to the Subcontractor each month in
> an amount equal to 95 percent of the value, computed on the basis of prices
> set forth above, of the quantity of the Work performed hereunder, as estimated
> by the Owner or Owner's Representative, less the aggregate of previous
> payments, but such partial payments shall not become due to the
> Subcontractor until seven (7) days after the Contractor receives payment for
> such Work from the Owner.  If the Contractor receives payment from the
> Owner for less than the full value of materials delivered to the site but not yet
> incorporated into the Work, the amount due to the Subcontractor on account
> of such materials delivered to the site shall be proportionately reduced.  No
> partial payment to the Subcontractor shall operate as approval or acceptance
> of Work furnished hereunder.

> (c)      Upon complete performance of this Subcontract by the
> Subcontractor and final approval and acceptance of Subcontractor's Work by
> the Owner, the Contractor will make final payment to the Subcontractor of the
> balance due it under this Subcontract within forty-five (45) days after full
> payment for such Work has been received by the Contractor from the Owner.

      19.      Section 12(c) of the four subcontracts and applicable statutory provisions such as

State Finance Law § 139-f further establish that payments from L & L Painting to Odyssey

Contracting are governed, at least in part, by the prime contract.

      20.      Based on the above-cited provisions, Odyssey Contracting's claims for payment

are subject to the prime contract in that the following facts, among others, will be relevant: (a)

the amounts approved by the NYCDOT for Odyssey Contracting's work; (b) the amounts paid by

the NYCDOT to L & L Painting for Odyssey Contracting's work; (c) the dates that the

NYCDOT made payments to L & L Painting that were, at least in part, for Odyssey

Contracting's work; and (d) any release of retainage by the NYCDOT to L & L Painting.

21.     There are also two claims by Odyssey Contracting that are dependent for their

resolution upon proceedings commenced by L & L Painting against the NYCDOT pursuant to

the prime contract's dispute resolution provisions.  These claims are subject to the prime

contract, even if L & L Painting's interpretation of the phrase "not subject to the prime contract"

is accepted.

22.     Odyssey Contracting's fifth cause of action arises out of a fire on the project site

that occurred on October 18, 2005.  Odyssey Contracting seeks to recover its costs incurred to

repair and repaint the areas that were damaged in the fire.  Odyssey Contracting seeks to recover

these monies from L & L Painting because it was L & L Painting's negligence that allowed the

fire to start and/or spread.  However, a claim was also submitted by L & L Painting to the

NYCDOT in which L & L Painting is seeking to recover both its increased costs as well as

Odyssey Contracting's increased costs due to the fire.  L & L Painting's claim against the

NYCDOT is based on its argument that it was the NYCDOT, and not L & L Painting, that was

not responsible for the fire.  The resolution of L & L Painting's claim against the NYCDOT

primarily involves a determination of L & L Painting's obligations under the prime contract to

protect the work area and related issues.  To the extent that L & L Painting succeeds against the

NYCDOT in obtaining payment for the extra work performed by Odyssey Contracting, it is

expected that L & L Painting will pay these monies to Odyssey Contracting and Odyssey

Contracting will reduce its claim against L & L Painting accordingly.

23.     As required by the prime contract, the fire claim was presented to the New York

City Office of Administrative Trials and Hearings, Contract Dispute Resolution Board

("CDRB") (See Exhibits A and H to moving papers). In a decision dated February 8, 2008, the CDRB denied the fire claim (Copy of Memorandum Decision annexed as Exhibit 5). L & L Painting is now preparing an Article 78 proceeding to challenge this decision.

24.     In sum, the resolution of Odyssey Contracting's fifth cause of action is dependent upon a final determination as called for in the prime contract's dispute resolution provisions.

25.     Similarly, Odyssey Contracting's sixth cause of action is subject to the prime contract's dispute resolution provisions. Odyssey Contracting's sixth cause of action seeks to recover for its increased costs to perform its work adjacent to the outer roadways due to L & L Painting's withholding and/or misrepresentation of the plans and designs for this work. Specifically, there was a dispute regarding the heights of the platforms that had to be constructed over the outer roadways. The NYCDOT required that the platforms be constructed 14 feet above the south outer roadway. This determination delayed Odyssey Contracting's work and required Odyssey Contracting to perform a substantial amount of extra work because many electrical cables and light posts had to be moved to construct the platforms at 14 feet as opposed to the lower height that Odyssey Contracting had anticipated. The resolution of this dispute requires an analysis of the prime contract's plans and specifications for this particular work as well as its general provisions, including L & L Painting's obligation to seek clarifications from the NYCDOT as to any ambiguities in the prime contract.

26.     As required by the prime contract (See Exhibits A and H to moving papers), a proceeding to challenge the NYCDOT's determination was commenced before the CDRB. The CDRB issued a decision dated July 27, 2006 denying the claim. The CDRB's decision was challenged in an Article 78 proceeding. Justice Marcy S. Friedman, Supreme Court, New York

County, denied L & L Painting's petition by an Order dated January 14, 2008 and an appeal has

been filed (Copy of January 14, 2008 Order and Notice of Appeal annexed as Exhibit 6).

27.    In the event that the outer roadways claim is successful and the NYCDOT

compensates L & L Painting for the extra work required to construct the platforms at 14 feet, it is

anticipated that L & L Painting will compensate Odyssey Contracting, rendering moot Odyssey

Contracting's sixth cause of action.  In short, the resolution of Odyssey Contracting's sixth cause

of action is dependent upon a final determination as called for in the prime contract's dispute

resolution provisions.

28.    Based on the foregoing, even accepting L & L Painting's interpretation of the

phrase "not subject to the prime contract" at pp. 4-6 of its Memorandum of Law as correct,

Odyssey Contracting claims are subject to the prime contract.

29.    In general, a review of the subcontracts in their entirety shows that most of the

rights and obligations are subject to the prime contract.

30.    After identifying the parties, the four subcontracts provide as follows:

> WHEREAS, the Contractor has entered into a Contract dated the 18th day
> of September, 2003 with New York City Department of Transportation,
> hereinafter called the Owner, for the construction of Queensboro Bridge
> Protective Coating, hereinafter called the Project, at Boroughs of Queens and
> Manhattan; and

> WHEREAS, copies of the Prime Contract are on file in the office of the
> Contractor and are available for examination by the Subcontractor; and

> WHEREAS, the Subcontractor desires to perform a portion of such Prime
> Contract.

> NOW, THEREFORE, it is agreed as follows:

> Section 1.    CONTRACT DOCUMENTS.

> (a)    The term "Prime Contract" as used herein refers to the
> Notice to Bidders, Information for Bidders, Contract Terms and Conditions

8

including all Addendum, general, supplementary and special conditions, drawings, specifications, amendments, modifications and all other documents forming or by reference made part of the contract between the Contractor and Owner.

(b) The Contract Documents including all of the terms and conditions of the Prime Contract shall be deemed expressly incorporated by reference into this Subcontract. The intent of the parties is that, with respect to the Work, and subject to the terms hereof, Subcontractor shall be under the same obligations to Contractor and bound by the same terms, conditions, and procedures that govern Contractor's relationship with the Owner, including, but not limited to, Chapters 1 through 11 of the Prime Contract which set forth, inter alia, the Dispute Resolution Procedure, the Change Order Procedure, Insurance and Indemnity Obligations. Accordingly, the term "Subcontractor" shall be deemed substituted for "Contractor", and "Contractor" or "Contractor's" for "Owner", etc. in the Contract Documents between Contractor and Owner and any other corresponding changes made whenever the context may require. The absence of a specific reference to a portion of the Contract Documents in no way diminishes the parties' reciprocal rights and obligations thereunder, as set forth in Paragraphs (c) and (d) below.

(c) Subcontractor shall be bound to Contractor by the terms of the Subcontract including all attachments hereto (collectively the Subcontract) and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which Contractor, by those Contract Documents, assumes to the Owner, and shall have the benefit of all rights, remedies and redress against Contractor which Contractor, by those Contract Document[s], has against the Owner, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between Owner and Contractor is inconsistent with any provision of this Subcontract, those Contract Documents between Owner and Contractor shall govern except if otherwise provided in the Subcontract.

* * *

(f) Subcontractor, by signing this Agreement, acknowledges that is has independently assured itself that all of the Prime Contract documents have been available to it and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto and the Subcontractor agrees to be bound to the Contractor and Owner by the terms and provision[s] thereof so far as they apply to the Work hereinafter described, unless otherwise provided herein.

9

31.     Thus, Odyssey Contracting and L & L Painting's rights and obligations are primarily governed by the prime contract. The apparent waiver of the right to remove relied upon by L & L Painting is much narrower than L & L Painting argues. The four subcontracts themselves recognize that most, if not all, disputes that may arise will be subject to the prime contract. The four subcontracts state as follows in section 26: "[A]ll disputes not subject to the Prime Contract, **if any**, shall be subject to the jurisdiction of the Supreme Court of New York, County of New York." (emphasis added).

32.     One category of cases that are not subject to the prime contract is personal injury actions in which responsibility and indemnity issues are disputed. In fact, at about the same time that this action was commenced, a personal injury action was commenced that named both Odyssey Contracting and L & L Painting (Copy of summons and complaint annexed as Exhibit 7).

WHEREFORE, L & L Painting's motion should be denied in its entirety for the reasons set forth above and in Odyssey Contracting's accompanying Memorandum of Law.

DATED:     New York, New York
           June 4, 2008

                              Michael McDermott
                              GEORGOULIS & ASSOCIATES, PLLC
                              Attorneys for Defendant
                              45 Broadway, 14th Floor
                              New York, New York 10006
                              (212) 425-7854

TO:     Thelen Reid Brown Raysman & Steiner LLP
        Attorneys for Plaintiff
        900 Third Avenue
        New York, New York 10022
        (212) 895-2000

u:\2008 cases\08-129\affm\20080529 aff in opp.doc

*III*
*PP 1-30*



ESTABLISHED 1949

# L & L PAINTING CO., INC.

900 SOUTH OYSTER BAY ROAD • P.O. BOX 9016 • HICKSVILLE, NEW YORK 11802-9016
TEL: 516-349-1900 • FAX: 516-349-0011

DATE: Friday, March 24, 2006

## TRANSMITTAL

TO: **Odyssey Contracting Corp.**
2435 West Pike Street
Houston, PA 15342

JOB: **Queensboro Bridge**

CONTRACT NO: **BRC 231P**

MAR 2 7 2006

ATTN: ☒ **Stavro Semanderes**

**President**

SUBJECT: **Fully Executed Contract -
Phase III**

TEL NO  (724) 745-1022

Gentlemen: We are sending you    ☒ HEREWITH        ☒ BY MAIL        ☐ BY MESSENGER

| ARTICLE CODE | | |
|---|---|---|
| ☐ Drawings | ☐ Material Catalog Cut | ☐ For Approval |
| ☐ Shop Drawings | ☐ Equipment Catalog Cut | Submission |
| ☐ Calculation Sheets | ☐ Data Sheets | ☒ For Your Information |
| ☐ Specifications | ☐ M.S.D.S. | ☐ For Your Use |
| ☐ Brochure | ☐ Draw downs | ☐ For Your File |
| ☒ Letter | ☐ Samples | ☐ For Distribution |
| ☐ Memorandum | ☐ Schedule | |
| ☐ Proposal | ☐ Payment Requisition | |
| ☐ With Revision | ☐ Progress Photos | |

☐ First
☐ Resubmission

FEDERAL EXPRESS NO. 855763135617

## REMARKS:

| 1 | Original | Fully Executed Contract – Phase III |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Sincerely,

L & L  PAINTING CO., INC.

SCOTT M. EARL
Project Manager

MAR 27 2006

P43

# SUBCONTRACT

THIS AGREEMENT, made this 3rd day of March, 2004, by and between Odyssey Contracting Corp., hereinafter called the Subcontractor, Address: P.O. Box 97, Houston, PA 15342; and L&L Painting Co., Inc., hereinafter called the Contractor, Address: 900 South Oyster Bay Road, Hicksville, New York 11801.

## WITNESSETH:

WHEREAS, the Contractor has entered into a Contract dated the 18th day of September, 2003 with New York City Department of Transportation, hereinafter called the Owner, for the construction of Queensboro Bridge Protective Coating, hereinafter called the Project, at Boroughs of Queens and Manhattan; and

WHEREAS, copies of the Prime Contract are on file in the office of the Contractor and are available for examination by the Subcontractor; and

WHEREAS, the Subcontractor desires to perform a portion of such Prime Contract.

NOW, THEREFORE, it is agreed as follows:

Section 1.    CONTRACT DOCUMENTS.

(a)    The term "Prime Contract" as used herein refers to the Notice to Bidders, Information for Bidders, Contract Terms and Conditions including all Addendum, general, supplementary and special conditions, drawings, specifications, amendments, modifications and all other documents forming or by reference made a part of the contract between the Contractor and Owner.

(b)    The Contract Documents including all of the terms and conditions of the Prime Contract shall be deemed expressly incorporated by reference into this Subcontract.  The intent of the parties is that, with respect to the Work, and subject to the terms hereof, Subcontractor shall be under the same obligations to Contractor and bound by the same terms, conditions, and procedures that govern Contractor's relationship with the Owner, including, but not limited to, Chapters 1 through 11 of the Prime Contract which set forth, *inter alia*, the Dispute Resolution Procedure, the Change Order Procedure, Insurance and Indemnity Obligations.  Accordingly, the term "Subcontractor" shall be deemed substituted for "Contractor", and "Contractor" or "Contractor's" for

47744v1

"Owner", etc. in the Contract Documents between Contractor and Owner and any other corresponding changes made whenever the context may require. The absence of a specific reference to a portion of the Contract Documents in no way diminishes the parties' reciprocal rights and obligations thereunder, as set forth in Paragraphs (c) and (d) below.

(c)    Subcontractor shall be bound to Contractor by the terms of the Subcontract including all attachments hereto (collectively the Subcontract) and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which Contractor, by those Contract Documents, assumes toward the Owner, and shall have the benefit of all rights, remedies and redress against Contractor which Contractor, by those Contract Document, has against the Owner, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision of this Subcontract, those Contract Documents between Owner and Contractor shall govern except if otherwise provided in the Subcontract.

(d)    Contractor shall be bound to Subcontractor by the terms of this Subcontract and of the Contract Documents between the Owner and Contractor and shall assume toward Subcontractor all the obligations and responsibilities that the Owner, by those Contract Documents, assumes toward Contractor, and shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by those Contract Documents, has against Contractor, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision in this Subcontract, those Contract Documents between Owner and Contractor shall govern.

(e)    This Subcontract is subject to Subcontractor approval by the Owner, to the extent required under the Prime Contract.

(f)    Subcontractor, by signing this Agreement, acknowledges that it has independently assured itself that all of the Prime Contract documents have been available to it and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto and the Subcontractor agrees to be bound to the Contractor and Owner by the terms and provision thereof so far as they apply to the Work hereinafter described, unless otherwise provided herein.

47744v1                                                    2

(g)    It has been made very clear to Subcontractor that time is of the essence and Subcontractor is to proceed immediately with any and all shop drawing preparation and submittals, all sample submittals, and fabrication of materials to comply with the project schedule so as to achieve Substantial Completion on or before the date depicted in the project schedule for the Subcontracted work.

(h)    Subcontractor shall layout and establish all lines, dimensions and levels required for the proper installation of the Work using the established lines and benchmark elevation.  Subject to latent conditions, Subcontractor shall compare existing conditions with working points and measurements at the site, and compare the construction drawings to ascertain that they are in agreement to the extent same interface with the Work.  Any difference shall be brought to the immediate attention of Contractor.

Section 2.    THE WORK.  The Subcontractor agrees to furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform the following described work attached hereto as Exhibit 1 (hereinafter called the Work) in accordance with the terms and conditions of all Construction Documents including but not limited to the Prime Contract and this Subcontract and in accordance with the reasonable discretion of Contractor.

See attached Exhibit 1 which is made a part hereof.

Materials furnished but not installed by Subcontractor shall be delivered F.O.B. job site unless otherwise provided in other provisions of this Subcontract .

Section 3.    PAYMENT.  Subcontractor shall submit an invoice to Contractor on a monthly basis for Work performed during the prior month.  The Subcontractor's invoice shall be based on an itemized breakdown of the Work scope as approved by the Contractor.  Invoicing will not be recognized until full compliance with invoice breakdown requirements are reasonably fulfilled.  One copy of each of the following forms must be attached to the invoice.

Billing Breakdown Form A.I.A. G702-G703
Properly executed Partial or Final Waiver Form - (Supplied by Contractor)

(a)    The Contractor agrees to pay the Subcontractor for the performance of this Subcontract as specified herein, the sum of eight million eight hundred eighty two thousand five hundred ($8,882,500.00) from P.P. 1-30, adjusted as required by differences between estimated and actual quantities for unit price Work and subject to additions and deductions for changes agreed upon or determined, as hereinafter provided.

47744v1                                              3

    (b)    Partial payments will be made to the Subcontractor each month in an amount equal to 95 percent of the value, computed on the basis of the prices set forth above, of the quantity of the Work performed hereunder, as estimated by the Owner or Owner's Representative, less the aggregate of pervious payments, but such partial payments shall not become due to the Subcontractor until seven (7) days after the Contractor receives payment for such Work from the Owner.  If the Contractor receives payment from the Owner for less than the full value of materials delivered to the site but not yet incorporated into the Work, the amount due to the Subcontractor on account of such materials delivered to the site shall be proportionately reduced.  No partial payment to the Subcontractor shall operate as approval or acceptance of Work furnished hereunder.

    (c)    Upon complete performance of this Subcontract by the Subcontractor and final approval and acceptance of Subcontractor's Work by the Owner, the Contractor will make final payment to the Subcontractor of the balance due to it under this Subcontract within forty-five (45) days after full payment for such Work has been received by the Contractor from the Owner.

    (d)    If at any time prior to final payment hereunder the Owner reduces the amount of retainage withheld from the Contractor, the Contractor may, in its sole discretion, with the consent of the Subcontractor's surety, reduce accordingly, the retained percentage withheld from the Subcontractor.

    (e)    The Contractor may deduct from any amounts due or to become due to the Subcontractor any sum or sums owed by the Subcontractor or Subcontractor's affiliated entities to the Contractor or Contractor's affiliated entities; and in the event of any breach by the Subcontractor of any provision or obligation to this Subcontract, or in the event of the assertion by other parties of any claim or lien against the Contractor or the premises arising out of the Subcontractor's performance of this Subcontract, the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage or expense therefrom, until the situation has been satisfactorily remedied or adjusted to the Subcontractor.

    (f)    Before any payments will be made under this Subcontract, the Subcontractor shall file in the office of the Chief Fiscal Officer of the Contracting Party verified statements provided for in Section 220-a of the Labor Law, or any applicable Federal Law including any applicable Davis-Bacon Related Act certifying to the amounts then due and owing from the Subcontractor for daily or weekly wages or supplements on

account of labor performed upon the Work under this Subcontract, and setting forth therein the names of the persons whose wages or supplements are unpaid and the amount due to each respectively. Subcontractor shall set forth in his statement the names of all its subcontractors. If Subcontractor has no subcontractors, it shall so state in his statement. Subcontractor may not subcontract any painting work he is contracted to perform. If there be nothing due and owing to any laborer for daily or weekly wages or supplements on account of labor performed, verified statements to that effect shall be filed by the Subcontractors before any payments are made under this Subcontract. The statements required shall be verified by the oath of the Subcontractor as the case may be that it has read such statements subscribed by it and knows the contents thereof, and that the same is true of its own knowledge.

    (g)    The Owners Chief Fiscal Officer may deduct, from any amount certified under the Subcontract to be due to the Subcontractor, the sum or sums admitted in the aforesaid statements to be due and owing on account of the aforesaid daily or weekly wages or supplements as provided in Section 220-b of the Labor Law or other applicable Labor Laws including any applicable Federal Law.

    (h)    The Subcontractor shall keep a record card of every employee engaged in the performance of the Work under this Subcontract employed by Subcontractor, on which shall be given:

Subcontract _____

Project and Location_____

Employee=s Name _____ Payroll or Badge No.

_____

Employee=s Address

_____

Title of position _____ Hourly Wage $_____

Classification _____ Fringe Benefits_____
              (Journeyman, Reg. Apprentice, Etc.)

Resided in New York State since _____

Where born _____

Naturalized_____
         (Date)         (Court)         (Location)

Employed by _____
(To be signed by Contractor=s representative)

    Said cards shall be kept in the office of the Subcontractor and shall be available for reasonable inspection by duly authorized representatives of the Contractor/Owner during

business hours of the day. If required, the Subcontractor shall file with the Contractor/ Owner the above information on duplicate cards to be furnished by the Subcontractor.

(i) The Subcontractor shall also submit to the Contractor/Owner the completed weekly payroll report forms issued by the office of the Comptroller and furnished by the Owner. However, on Federally funded projects or where the Contractor produces a computerized payroll printout, the Contractor may, with the permission of the Owner, submit the same payroll information on Federal regulation forms or copies of his computerized payroll in lieu of the payroll report forms issued by the Comptroller.

Section 4.    BONDING.

(a) The Subcontractor shall furnish a Performance and Payment Bond in an amount equal to the full Subcontract price. Such bond shall be on form furnished by, and with a surety satisfactory to, the Contractor. Premium for such bonds shall be paid by the Subcontractor unless otherwise agreed upon in writing by the parties hereto.

(b) By signing this Subcontract, the Subcontractor certifies that it has the bonding capacity and has made arrangements for furnishing said Performance and Payment Bond to Contractor prior to beginning performance of the Work and that the time required to prepare and furnish said bond will not delay the start of the Work. Should Subcontractor proceed with the Work without first furnishing said Performance and Payment bond, whether or not such performance was permitted or encouraged by Contractor's job site representative, Subcontractor shall be deemed to have waived its right to partial payment and agrees to look to the Contractor for payment of the amount due hereunder only upon furnishing said bond or on completion of the entire Work and the furnishing of the releases described in Section 12. The furnishing of said bond by the Subcontractor is a condition precedent to the Subcontractor's right to receive partial payment for Work performed hereunder. The waiver of partial payment shall not constitute an excuse or reason for nonperformance of this Subcontract by Subcontractor.

(c) See Schedule A for applicable terms for exceptions or deviations from above requirements.

Section 5.    CHANGES.

(a) The Contractor may at any time by written order of Contractor's authorized representative and with the Subcontractor's approval, make changes in, additions to and omissions from the Work to be performed under this Subcontract, and

the Subcontractor shall promptly proceed with the performance of this Subcontract as so changed.

(b)    For changes in the Prime Contract that have been initiated by the Owner or Owners Representative and for acts or omissions of the Owner or Owners Representative and/or defects in the Prime Contract documents, the Subcontractor shall submit any claims it may have including notice thereof for adjustment in the price, schedule or other provisions of the Subcontract to the Contractor in writing in sufficient time and form to allow the Contractor to process such claims within the time and in the manner provided for an in accordance with the applicable provisions of the Prime Contract documents.  Subcontract adjustments shall be made only to the extent and in the manner that the Contractor is entitled to relief from or must grant relief to the Owner.

(c)    For changes directed by the Contractor which were not initiated by the Owner or Owners Representative and do not arise out of acts, errors or omissions of the Owner or Owners Representative or defects in the Prime Contract documents. Subcontractor shall be entitled to equitable adjustment in the Subcontract price, provided Subcontractor gives Contractor written notice of its intent to claim such an adjustment prior to performing such changed Work. Any extra work that is performed directly for Contractor, may not include overhead and profit.   Failure to provide such notice shall be deemed to prejudice the Contractor and constitute a waiver of such claims by Subcontractor.

(d)    No time extension shall be granted to the Subcontractor by reason of the issuance of any change order unless it is expressly stated therein and approved by Owner.

Section 6.    PROSECUTION OF WORK.
(a)    The Subcontractor shall furnish all labor, supervision, tools, equipment, materials and supplies necessary for the performance of this Subcontract in a proper, efficient and workmanlike manner.  The Subcontractor shall prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, or at such other time or times as the Contractor may direct, and so as to promote the general progress of the entire construction, and shall not, by delay or otherwise, interfere with or hinder the Work of the Contractor or any other Subcontractor.  Any materials that are to be furnished by the Subcontractor hereunder shall be furnished in sufficient time to enable the Subcontractor to perform and complete its Work within the time or times provided for herein.  The time of performance of the Work by the Subcontractor is of the essence and the Subcontractor agrees to reimburse the Contractor for any and all liquidated or actual damages that may be assessed by the Owner against

and collected from the Contractor which are attributable to or caused by the Subcontractor's failure to perform the Work required by this Subcontract within the time fixed or in the manner provided for herein. Subcontractor also agrees to pay to the Contractor any increased costs or other damages the Contractor may sustain by reason of such delay by the Subcontractor whether or not liquidated or actual damages are assessed and collected by the Owner. The payment of such damages shall not release the Subcontractor from its obligation to otherwise fully perform this Subcontract. Upon written request by the Contractor, the Subcontractor shall furnish to the Contractor such evidence as the Contractor may require relating to the Subcontractor=s ability to fully perform this Subcontract in the manner and within the time specified herein.

(b)     Subcontractor shall submit Material Status reports on a monthly basis. This report shall show all purchase orders placed and scheduled to be placed including scheduled/actual dates of order placement and scheduled/actual dates of material and equipment deliveries. This report shall also include the name of the supplier for each purchase order and the associates detailed cost breakdown item number. Subcontractor shall provide Contractor a schedule for the Work and monthly update reports showing current progress of the work as well as a plan and schedule of the completion of their remaining work. Subcontractor shall familiarize itself with the Project schedule and other update requirements.

(c)     In the event the Subcontractor fails to comply or becomes disabled from complying with the provisions herein as to character or time of performance, including but not limited to payment for all materials furnished and Work and labor performed under this Subcontract, and the failure is not attended to within fifteen (15) days and corrected in thirty (30) days, after written request by the Contractor to the Subcontractor, the Contractor, by this Subcontract or otherwise, may without prejudice to any other right or remedy, terminate this Subcontract for default and take over and complete the performance of this Subcontract at the expense of the Subcontractor, or without terminating the Subcontract, take over the Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the situation at the expense of the Subcontractor.

(d)     The Subcontractor shall keep, on the Project site during the progress of the Work, a competent superintendent who shall be authorized representative of the Subcontractor. Directions and communications to the superintendent from the Contractor in connection with the Work shall be treated as directions and communications to the Subcontractor. Any items that are considered a non-compliance notice will be forwarded to the Subcontractor's main headquarters.

47744v1                                        8

(e)     It is recognized that if Subcontractor becomes insolvent, or institutes or has instituted against it bankruptcy proceedings, or makes a general assignment for the benefit of creditors, of if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such event or events could impair or frustrate Subcontractor's performance of this Subcontract. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its receiver or court-appointed successor adequate assurances of future performance. Pending receipt of adequate assurances of performance and actual performance in accordance therewith. Contractor shall be entitled to take over the Work pursuant to the provisions of Subsection 6(c) above without notice to Subcontractor.

(f)     If the Prime Contract is terminated for the convenience of the Owner, the termination settlement under this Subcontract shall be as provided in the Prime Contract. The Subcontractor shall not be entitled to receive any greater amount than the Contractor may on behalf of the Subcontractor recover from the Owner for such termination.

(g)     Upon a determination by a court of competent jurisdiction that termination of Subcontractor or its successor in interest pursuant to any provision of this Subcontract was wrongful, such termination will be deemed converted to a termination for convenience and the Subcontractor's remedies shall be limited to those set forth in Subsection 6(e).

Section 7.    DELAYS.

(a)     In the event the Subcontractor's performance of this Subcontract is delayed or interfered with by acts of the Owner, Contractor or other subcontractors, it may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delays or interference, except to the extent that the Prime Contract entitled the Contractor to compensation for such delays and then only to the extent of any amount that the Contractor may, on behalf of the Subcontractor recover from the Owner for such delays.

(b)     No allowance for an extension of time, for any cause whatever, shall be claimed by, or made to, the Subcontractor unless the Subcontractor shall have made written request upon the Contractor for such extension within five (5) days after the cause of such extension occurred, or, if the Prime Contract provides for a shorter period, within

sufficient time to permit the Contractor to give notice to the Owner or Owner's Representative within the time allowed by the Prime Contract for such notice.

(c)    No allowance for an extension of time shall, in any event, be made to the Subcontractor for delay by the Subcontractor in preparing drawings or in securing approval of the Owner or Owner's Representative thereto when such drawings are not properly prepared or when the Subcontractor, by the exercise of reasonable diligence and judgment, could have anticipated and avoided the delay.

Section 8.    LABOR.  The Subcontractor, in connection with all Work covered by this Subcontract, shall comply with and be bound by any labor agreements executed by the Contractor or on Contractor's behalf.  Failure at any time to comply with any of the provisions of such agreements will, at the option of the Contractor, provided failure is not attended to within fifteen days (15) and corrected in thirty (30) days after written request by the Contractor to the Subcontractor, be cause for immediate termination of this Subcontract for default and the Contractor shall have all of the rights contained in Section 6 with regard to such termination.  If, by reason of strikes, picketing or disputes of any nature between the Subcontractor and any individual, group or organization, the Subcontractor should be persistently, repeatedly, or for a period of five (5) consecutive days, unable to supply enough properly skilled workers or proper materials to execute the Work defined in this Subcontract, the Contractor may terminate the Subcontract for default and proceed in accordance with Section 6 hereof.

Section 9.    APPROVALS.  All drawings of the Subcontractor shall be submitted through the Contractor for approval of the Owner or Owner's Representative and all other communications between the Subcontractor and the Owner or Owner's Representative with respect to the Work shall be transmitted through the Contractor.

Section 10.   INSURANCE.  Prior to commencement of Work, Subcontractor shall procure and at all times thereafter maintain with insurers acceptable to Contractor the following minimum insurance protecting the Subcontractor, Owner and the Contractor against liability from damages because of injuries including death, suffered by persons, including employees of the Subcontractor, and liability from damages to property arising from and growing out of the Subcontractor=s operations, including its subcontractors' and suppliers' operations, in connection with the performance of this Subcontract.  If the terms of the Prime Contract require larger limits or additional coverage or both, Contractor reserves the right to require Subcontractor to provide, at Subcontractor's expense such larger limits or additional coverage or both.

<u>Limits</u>

47744v1                                  10

| | | |
|---|---|---|
| (a) | In the U.S., Worker=s Compensation, in state(s) of operation, and where applicable, U.S. Longshoremen=s and Harbor Workers' Compensation Act and Jones Act coverages, Employer's Liability; | Statutory |
| (b) | Comprehensive General Liability Bodily Injury including personal injury | $5,000,000.00/occurrence- $10,000,000.00 aggregate |
| | Property Damage | $5,000,000.00/occurrence- $10,000,000.00 aggregate or $10,000,000.00 combined single limit |
| | Premises Operations, "X.C.U." where applicable, Products/Completed Operations, Contractual Liability, Broad Form Property Damage and Independent Contractors; | |
| (c) | Excess Umbrella Liability | $10,000,000.00/occurrence $10,000,000.00 aggregate |
| (d) | Comprehensive Automobile Liability (including owned, hired and non-owned vehicles) | |
| | Bodily Injury | $1,000,000.00/person - $2,000,000.00/accident or |
| | Property Damage | $2,000,000.00 combined single limit |

Subcontractor shall provide Contractor with certificates evidencing such insurance as outlined above prior to beginning any Work under this Agreement.  Such certificates shall provide for thirty (30) days advance written notice to Contractor of cancellation, material change, reduction of coverage or non-renewal.  Subcontractor shall cause its subcontractor(s) to procure insurance as outlined above.  Subcontractor shall obtain policies or certificates for its subcontractor(s) and deliver them to Contractor, if requested to do so.  All policies should be endorsed to add the Indemnified Parties and their

respective partners, directors, officers, employees, agents and representatives as set forth in Article 11 as Additional Insureds.

Section 11.    INDEMNIFICATION.  The term AIndemnified Parties,@ whenever referred to in this Subcontract shall consist of the following parties including their officers, employees and agents:

1.    The City of New York;

2.    The New York City Department of Transportation;

3.    The Contractor; and

4.    Any other people required to be indemnified under the Prime Contract.

The Subcontractor further specifically obligates itself to the Contractor, Owner and any other party required to be indemnified under the Prime Contract, jointly and separately, in the following respects, to-wit:

(a)    to defend and indemnify them against and save them harmless from any and all claims, suits, liability, expense or damage for any alleged or actual infringement or violation of any patent or patented right, arising in connection with this Subcontract and anything done thereunder;

(b)    to defend and indemnify them against and same them harmless from any and all claims, suits or liability for damages to property including loss or use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of Subcontractor, or any of its subcontractors, suppliers, officers, agents, employees or servants, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such claims, suits or liability, injuries or death or other claim or suites are caused by the sole negligence of a party indemnified hereunder unless otherwise provided in the Prime Contract, Subcontractor's obligation hereunder shall not be limited by the provisions of any Workers' Compensation act or similar statute;

(c)    to pay for all materials furnished and Work and labor performed under this Subcontract, and to satisfy the Contractor thereupon whenever demand is made, and to defend and indemnify the Contractor, Owner and other indemnified parties

against and save them and the premises harmless from any and all claims, suits or liens therefor by others than the Subcontractor;

(d)     to obtain and pay for all permits, licenses and official inspections necessary for its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof;

(e)     the Subcontractor warrants and guarantees the Work covered by this Subcontract and agrees to make good, at its own expense, any defect in materials or workmanship which may occur or develop prior to the Contractor's release from responsibility to the Owner therefor; and

(f)     the Subcontractor assumes toward the Contractor all obligations and responsibilities that the Contractor assumes toward the Owner and others, set forth in the Prime Contract, insofar as applicable, generally or specifically, to Subcontractor's Work;

The Subcontractor shall defend and indemnify the Contractor, Owner and other indemnified parties against, and save them harmless from, any and all loss, damages, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract. Notwithstanding the above, Contractor, at is sole discretion, reserves the right to defend any one or all of the following: the Owner, other indemnified parties, Contractor=s surety and itself. Such election to defend by Contractor shall not in any way limit Subcontractor's responsibilities to indemnify and hold harmless as provided herein.

Section 12.    LIENS AND CLAIMS. Subcontractor shall, as and when requested, furnish evidence satisfactory to the Contractor, Owner and Owner's Representative that all amounts due for labor and material furnished the Subcontractor in connection with performance of the Subcontract have been paid including union health, welfare and pension fund payments and payroll taxes. Such evidence shall be furnished in such form and manner as requested by Contractor and all statements relative thereto shall, if called for by Contractor, be made by sworn affidavit. Subcontractor shall furnish to Contractor releases of both rights and lien rights by persons who have furnished labor, material or other things in the performance of this Subcontract, it being agreed that payment money otherwise due Subcontractor need not be made by Contractor until such releases are furnished. Subcontractor shall deliver its Work free from all claims encumbrances and liens.

(a)     Before each payment, upon demand of Contractor, Subcontractor shall furnish to Contractor an affidavit on a form satisfactory to Contractor indicating in

47744v1                              13

detail the unpaid obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract, to whom incurred, the amount due or to become due therefor, and, if demanded, procure the delivery to Contractor by the material supplier of duplicates of all material invoices and statements, and present receipts of all material invoices and statements, and present receipts, bills showing payment of all such obligations incurred and duly certified payrolls indicating full payment to each of its employees of wages earned during the preceding payroll periods. It is further provided that, prior to final payment, Subcontractor, if demanded, shall deliver to Contractor, in addition to the affidavits required, duly executed releases of liens from each of the persons/companies to whom obligations were incurred, together with a similar release executed by Subcontractor. Should Contractor pay the final payment or any part thereof without the presentation by Subcontractor of such release, then such payment, and the acceptance thereof, shall in itself constitute a release to Contractor by reason of any and all things done or performed or pertaining to or arising out of the relationship of the parties hereto as a result of this Subcontract, or the presence of Subcontractor on the site, whether in contract or tort;

(b)     In the event at any time any obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract are unpaid, if Subcontractor, after five (5) days' notice from Contractor, has not delivered to Contractor either a release, a receipt of payment in full or other evidence of payment satisfactory to Contractor, Contractor is authorized to make such payment directly out of any monies payable to Subcontractor. Notwithstanding the provisions of the Contract, if there shall be any lien, or other claim for monies due or to become due, Subcontractor shall immediately satisfy or bond same, or Contractor shall have the right to bond said lien or claim or otherwise discharge same and retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify Contractor against such lien or other claim, with interest, together with expenses incident to discharging such lien or claim or defending suit to enforce such lien or other claim, with interest, together with expenses incident to discharging such lienor claim or defending suit to enforce such lien or other claim, including any premiums charged for a bond and any attorneys' fees and disbursements, all of which the Subcontractor agrees to pay. Should Contractor give Subcontractor notice of any unpaid claim for obligations incurred by Subcontractor, Subcontractor shall be estopped from disputing liability for any such claim unless within five (5) days after such notice it indicates to Contractor, in writing, that there is some amount different than that demanded owing, or that there are no amounts owing. Should there prove to be any claim after all payments are made, Subcontractor shall refund to Contractor all monies that the latter may be compelled to pay in discharge and in defense of same. Any lien or other claim, until satisfied or withdrawn, shall preclude any payment or demand for any payment of said amount so claimed or demanded; and

47744v1                                              14

     (c)    It is specifically understood and agreed that the Subcontractor and Contractor acknowledge that there is a risk that Owner, in breach of its contract with Contractor, may make late payments or may, under certain circumstances such as lack of funding not make required payments to Contractor. The parties furthermore acknowledge their agreement that they shall share the risk of same. As a consequence of the foregoing understanding and consistent with that allocation of risk, the Subcontractor agrees that Contractor's receipt of payment from Owner on behalf of the Subcontractor's requisitions for payment (whether interim requisitions or final requisition, including retainage) shall be to the fullest extent provided by law, a condition precedent to the right of the Subcontractor to receive payment from Contractor. In the event that Contractor is not receiving proper payment from Owner on account of the work of the Subcontractor such that Contractor is not required to make payment to the Subcontractor hereunder, Contractor may, in its sole discretion and to the extent it is legally able to do so, formally and in writing assign to the Subcontractor the rights of Contractor to pursue claims against Owner for the payment due to Contractor on behalf of the Subcontractor=s entitlement under the terms of this Subcontract which assignment Subcontractor shall be obliged to accept in full and complete liquidation of the obligations to payment of Contractor to Subcontractor hereunder. The parties further acknowledge that the Subcontractor is entitled to pursue any and all rights to which it may be entitled under the New York Lien Law in the event that Contractor does not pay the Subcontractor amounts due hereunder, including non-payment resulting from delayed payments or non-payment by Owner to Contractor. To the extent that this clause is inconsistent with such lien rights, this clause is deemed waived for such purpose only in the event that Contractor advises Subcontractor that Contractor is unable to pay Subcontractor by reason of Owner's non-payment to Contractor. Subcontractor agrees that the filing of a lien in full accordance with the Lien Law and the complete prosecution of that lien claim to finality in the courts and collection therefrom, for the amount due to it shall be a condition precedent to the right of the Subcontractor to file an action in law or equity against Contractor or its surety in connection with the Project. In the event that Subcontractor files a claim against any or all of Contractor's sureties, Subcontractor agrees to stay any proceedings against Contractor's sureties pending the resolution of its mechanic=s lien action to finality in the courts, including collection therefrom. Furthermore, nothing herein is intended to limit or preclude the rights of the Contractor under other terms of this Subcontract to assert backcharges, set-offs, limits or other claims against the Subcontractor in regard to the matters addressed in this Clause or otherwise.

     Section 13.    POSSESSION PRIOR TO COMPLETION. Whenever it may be necessary for the Contractor to do so, the Contractor shall be permitted to occupy and/or use any portion of the Work which has been either partially or fully completed by the

47744v1                                   15

Subcontractor before final inspection and acceptance thereof by the Owner, but such use and/or occupation shall not relieve the Subcontractor of its guarantee of said Work nor of its obligation to make good at its own expense any defect in materials and/or workmanship which may occur or develop prior to Contractor's release from responsibility to the Owner.

Section 14.    OTHER CONTRACTS.  It is understood and agreed that the Work provided for in this Subcontract constitutes only a part of the Work being performed for the Owner by the Contractor and other subcontractors.  The Subcontractor, therefore, agrees to perform the Work called for in this Subcontract in such a manner that it will not injure, damage or delay any other Work performed by the Contractor to any other subcontractor or supplier, and further agrees to pay or reimburse the Contractor for any additional costs, damage or delay that may be caused to such other Work of the Contractor, subcontractors or suppliers, by the Subcontractor or by its agents or employees.

Section 15.    INDEPENDENT CONTRACTOR.  The Subcontractor specifically agrees that it is, or prior to the start of the Work will become, and will remain during the performance of this Subcontract, an independent contractor.

Section 16.    COMPLIANCE WITH LAW.  The Subcontractor agrees to fully comply with all applicable laws, ordinances and regulations.

Section 17.    SAFETY.  The Subcontractor shall take all reasonable safety precautions pertaining to its Work and the conduct thereof.  Without limit, the generality of the foregoing, it shall comply with all applicable laws, ordinances, rules, regulations and orders issued by any public or governmental body or authority, whether federal or otherwise, including, but not limited to, occupational safety and health legislation and, in addition, the safety measures called for the Contractor.  The failure of the Subcontractor to take all reasonable safety precautions shall be deemed by Contractor in its reasonable discretion to be a breach of this Subcontract subject to the termination provisions contained herein.

Section 18.    RESPONSIBILITY FOR INJURIES TO PERSONS AND PROPERTY

(a)    The Subcontractor shall be solely responsible for (1) all injuries (including death) to persons, including but not limited to employees of the Subcontractor and Indemnified Parties and (2) damage to property, including but not limited to property of the Indemnified Parties, the Contractor or the Subcontractor.  The liability hereunder

47744v1                                    16

shall be limited to such injuries or damage occurring on account of, or in connection with, the performance of the Work, whether or not the occurrence giving rise to such injury or such damage happens at the Project Site or whether or not sustained by persons or to property while at the Project Site, but shall exclude injuries to such persons or damage to such property to the extent caused by the negligence of the Contractor or the Subcontractor.

(b)    The Subcontractor=s liability hereunder includes any injury (including death) or damage to property related to the performance of, including the failure to perform, miscellaneous and incidental Work.

(c)    The Subcontractor expressly acknowledges that it has reviewed the Contract Documents and if the Work be done without fault or negligence on the part of the Subcontractor, such Work will not cause any damage to the foundations, walls or other parts of adjacent, abutting or overhead buildings, railroads, bridges, structures or surfaces. PROTECTION OF WORK. The Subcontractor specifically agrees that it is responsible for the protection of its Work until final completion and acceptance thereof by the Owner and that the Subcontractor will make good or replace, at no expense to the Contractor or the Owner, any damage to its Work which occurs prior to said final acceptance.

Section 19.    DISPUTES.

(a)    In case of any disputes between Subcontractor and the Contractor, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner both by the terms of the Prime Contract and by any and all decisions or determinations made thereunder by the party or board as authorized in the Prime Contract. It is agreed that in the event the Prime Contract contains a provision, hereinafter called "disputes" clause, whereby claims may be resolved under an administrative procedure or by arbitration, then as to any claims of Subcontractor for or on account of acts or omissions of the Owner or Owner's Representative which are not disposed of by agreement, the Contractor agrees to present to the Owner, in Contractor's name, all of Subcontractor's claims for additional monetary compensation or time extension; and to further invoke, on behalf, in advance of and even in the Prime Contract for determining disputes. Contractor shall have the option to present such claims on Subcontractor's behalf, in advance of and even without Subcontractor's written request, Subcontractor shall have full responsibility for preparation and presentation of such claims and shall ear all expenses thereof, including attorneys' fees. Subcontractor agrees to be bound by the procedure and final determinations as specified in any such Disputes clause, and agrees that it will not take, or will suspend, any other action or actions with respect to any such

claims and will pursue no independent litigation with respect thereto, pending final determination under such Disputes clause. Subcontractor shall not be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from the Owner on account of Subcontract's Work, less any markups or costs incurred by the Contractor and to which Contractor is otherwise entitled, and Subcontractor agrees that it will accept such amount, if any, received by Contractor from Owner as full satisfaction and discharge of all claims for or on account of acts or omissions of the Owner or Owner's Representative(s). Should the Owner determine that the work is not an extra, and awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and partial payment as payment in full. Contractor, however, at its sole and exclusive discretion, may appeal from any ruling or may institute a suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the work of the Subcontractor as permitted by the Prime Contract. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to Contractor, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by Contractor in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to Contractor and all expenses and attorneys fees and disbursements incurred by Contractor in prosecuting such appeal or suit. The Subcontractor agrees that no claim, invoice or payment requisition shall include any modifications to the Price, without an executed Change Order, pursuant to which such work is eligible for payment.

(b)    Subcontractor shall be bound by document's determination, made in good faith, as to apportionment of any amounts received from Owner for claimants, including Contractor and other subcontractors, whose work is affected by any act or omission of the Owner or Owner's Representative.

(c)    Should a dispute as to proper interpretation of this Subcontract, or Work or material performed or furnished hereunder arise which concerns the parties hereto only, or Subcontractor and other subcontractors or suppliers, but not the Owner or Owner's Representative, the same shall be decided by Contractor whose decision thereon shall be final and conclusive.

(d)    The Subcontractor shall proceed diligently with the Work, pending final determination pursuant to any Disputes clause or pursuant to any other action taken with respect to a claim or claims.

Section 20.   ATTORNEY FEES.  In the event either party institutes suit in court against the other party or against the surety of such party, in connection with any dispute or matter arising under this Subcontract, the prevailing party shall be entitled to recover reasonable attorney fees in addition to any other relief granted by the court.

Section 21.   TAXES.  Subcontractor shall pay all taxes, licenses and fees of every nature which may be imposed or charged by any governmental authority upon the labor, material, or other things used in the performance of the Work or upon the transaction between Contractor and Subcontractor.  Relating to the Work, Subcontractor hereby accepts exclusive liability for the payment of all taxes now or which may hereafter be imposed covering labor and/or materials to be furnished by Subcontractor hereunder including but not limited to sales tax, and any contributions under the New York State Unemployment Insurance Act, the Federal Social Security Act, and all legislation enacted either Federal, State, or Municipal, upon the payroll of employees engaged by him or materials purchased for the performance of this Subcontract, and agrees to meet all the requirements specified under the aforesaid Acts or legislation, or any acts or legislation which may hereafter be enacted affecting said labor and/or materials.  Subcontractor will furnish to Contractor any records Contractor may deem reasonably necessary to carry out the intent of said acts or legislation, and hereby authorizes Contractor to deduct the amount of such Taxes and contributions from any payments due Subcontractor and to pay same direct or take any precaution as may be deemed necessary to guarantee payment;  if after Contractor's receipt of written notice from the applicable taxing authority that such taxes or contributions are due and within thirty (30) days after receipt of such notice from Contractor, Subcontractor fails to pay same or provide Contractor with reasonable evidence refuting such obligation.

Section 22.   CONTRACTOR'S EQUIPMENT.  In the event that Subcontractor by rental, loan or otherwise, makes use of any of 's equipment, scaffolding, or other appliances, Subcontractor agrees to accept such "as is" and that such use shall be at the sole risk of Subcontractor and Subcontractor agrees to defend, hold harmless and indemnify Contractor against all claims of every nature arising from its use thereof.

Section 23.   FURNISHED MATERIAL.  In the event that the Contractor or Owner, or their suppliers, or subcontractors, elect to furnish material to the Subcontractor for use in connection with this Subcontract then the cost of handling, storing and installing such material shall be considered as included in the Subcontract price.  The Subcontractor shall be and become responsible for all such materials upon delivery to it, whether delivered F.O.B. point of origin or F.O.B. job site (except that any transportation charges paid by the Subcontractor, in the event of delivery F.O.B. point of origin, shall be reimbursed to Subcontractor) and shall pay all demurrage and storage charges which

accrue after delivery. Furnished material lost or damaged after delivery, from any cause whatsoever, shall be replaced by or at the expense of the Subcontractor. Subcontractor shall, within forty-eight (48) hours after delivery of furnished materials, inspect the same and immediately report, in writing, to the Contractor any shortages, damages or defects therein which are reasonably observable by proper inspection. Failure to inspect and report as specified shall be treated as unqualified acceptance by Subcontractor of the material involved.

Section 24.   EQUAL OPPORTUNITY. If the Prime Contract contains any provision which prohibits discrimination on the basis of race, color, religion, sex, or national origin, or if any law, regulation or order has any application thereto and is applicable to this Subcontract, then Subcontractor hereby agrees to comply with such provision, law, regulation or order. In the event that any such provision, law, regulation or order requires the physical attachment of specific wording to this Subcontract, then such attachments shall be furnished by the Contractor and shall be considered a part of this Subcontract by reference thereto or shall be physically attached thereto as called for by the Contractor.

Section 25.   OWNER=S REPRESENTATIVE. The words "Owner's Representative" as used herein include Owner's design engineer, architect or any person or entity appointed by the Owner (including the Engineer, Architect, Project Manager and/or Commissioner as noted in the Prime Contract) to supervise the Work of the Contractor on behalf of the Owner.

Section 26.   ASSIGNMENT. The Subcontractor shall obtain the written consent of the Contractor prior to assigning or subletting any of the Work, in whole or in part. Subcontractor may assign the proceeds of the Work after providing adequate assurances to Contractor that all its labor-suppliers and other creditors for the Work will be paid and upon obtaining the consent of Subcontractor=s surety and the acknowledgment of the assignee on forms provided by the Contractor.

Subject to any and all provisions of the Prime Contract's terms and conditions substituting "Subcontractor" for "Contractor" and "Contractor for Owner" or Authority, this Subcontract shall be governed by the laws of the State of New York without regard to choice of law or conflicts of law, and all disputes not subject to the Prime Contract, if any, shall be subject to the jurisdiction of the Supreme Court of New York, County of New York.

(a)   If the Contractor initiates any action against the Subcontractor in Federal Court or in New York State Court, service of process may be made on the

47744v1                                          20

Subcontractor either in person, wherever such Subcontractor may be found, or by registered mail addressed to the Subcontractor at its address as set forth in this Subcontract, or to such other address as the Subcontractor may provide to the Contractor in writing.

(b)    With respect to any action between the Contractor and the Subcontractor in New York State Court, that is not subject to the Prime Contract, the Subcontractor hereby expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of forum non conveniens, (ii) to remove to Federal Court; and (ii) to move for a change or venue to a New York State Court outside New York County.

(c)    With respect to any action between the Contractor or the Subcontractor in Federal Court, that is not subject to the Prime Contract, the action should be venued in the Southern District of New York, New York City Courthouse.  The Contractor expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the Southern District, New York City Courthouse.

(d)    If the underlying dispute is not subject to the Prime Contract and the Subcontractor commences any action against the Contractor in a court located other than in the State of New York, County of New York upon request of the Contractor, the Subcontractor shall either consent to a transfer of the action to a court of competent jurisdiction located in the State of New York, County of New York as above described or, if the court where the action is initially brought will not or cannot transfer the action the Subcontractor shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of competent jurisdiction in New York County as above stated.

Section 27.    PRIOR UNDERSTANDINGS OR REPRESENTATIONS.  The Contractor assumes no responsibility for any understandings or representations made by any of is officers or agents prior to the execution of this Subcontract, unless such understandings or representations by the Contractor are expressly stated in this Subcontract.

Section 28.    SEVERABILITY AND WAIVER.  The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision.  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a

47744v1                                        21

waive or relinquishment of such term, covenant, condition or right as respects further performance.

Subcontractor agrees to repair, replace or make good any damages, defects or faults to the extent resulting from defective Work Subcontractor performed or furnished which is not damaged by Contractor or its other subcontractors and suppliers, Owner or other parties, that may appear within one (1) year after the earlier of acceptance of the Work or beneficial use or occupancy of same by Contractor or Owner or for such additional period as may be required by Owner and/or the specifications relating to the work.

Section 29.    SETOFF.  If Subcontractor is, or hereafter begins performing any of the work hereunder and the unpaid balance of the Price becomes insufficient to complete such Work or compensate Contractor for any damages or deficiencies caused by the Subcontractor in the performance of the other Work, Subcontractor hereby consents and agrees to allow Contractor, in its sole discretion and judgment, to setoff any of Contractor=s claims against any amount due, or which may become due under this Subcontract or any other contract between Contractor and Subcontractor.  In such event Subcontractor shall continue to perform its obligation under the Subcontract.  No refusal or failure of Contractor to exercise its rights hereunder shall constitute the basis of any right or claim against Contractor.

Section 30.    PERFORMANCE OF WORK DURING THE PENDENCY OF DISPUTES.  Unless the parties hereto expressly agree otherwise in writing, in the event that a dispute shall arise under this Subcontract in connection with the Subcontract, including disputes related to payments to be made on any Requisition, or otherwise, Subcontractor shall continue during the pendency of such dispute to perform the Work and shall perform all other obligations required to be performed by it under this Subcontract as if no dispute shall have arisen.  During the pendency of any such dispute, and except as otherwise provided in this Subcontract, Subcontractor shall be entitled to receive payments from Contractor only on account of non-disputed items and payments on account of disputed items (except to the extent Contractor agrees on part of the disputed item) shall be deferred until the final resolution of the dispute.

Section 31.    CAPTIONS.  The captions at the beginning of each Section of this Subcontract are for convenience only and are to be given no weight in construing the provisions of this Subcontract.

Section 32.    NOTICES.  All notices shall be in writing addressed to the parties at the addresses set out in this Subcontract unless subsequently changed in conformance

with this notice provision and shall be considered as delivered on the third business day after the date of mailing if sent certified mail or when received in all other cases, including telecopy or other printed electronic medium or personal deliver.

Section 33.    INTEGRITY AND ETHICAL CONDUCT.  Contractor and Subcontractor acknowledge and understand that each is committed to have the Work performed in accordance with the highest ethical standards applicable to, or governing, the conduct of construction practices.  In furtherance thereof, Contractor and Subcontractor hereby agree to comply with and observe all applicable Federal, State and local laws, rules, regulations, requirements, trade standards and ethical guidelines governing said conduct, including those provided by Owner.

Section 34.    ADDITIONAL PROVISIONS. (Attach additional pages if necessary.)

See attached Additional Provisions which are made a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract by their proper officers or duly authorized agents.

By: _____            By: _____
        Contractor                              Subcontractor

Exhibit 1
Page 1 of 2

# Odyssey Contracting Corp

## Truss and Towers

### The scope of work shall include but not be limited to the following:

* Contract value had initial base value of $10,000,000.00. A $500,000.00 deduct
  has been taken for the absence of a bond at this time.  A 6.5% deduct has been taken on the
  $9,500,000.00 sales value of the balance for the Project provided wrap-up program
* (619.17) Temp Concrete Barrier
* (10619.0599) Lighting for Temp Barrier
* (619.2104) Construction Zone Pavement Marking Stripes, Removable Tape
* (635.0103) Cleaning and Preparation of Pavement Surface Lines
* (687.0101) White Thermoplastic Reflectorized Pavement Stripes
* Limits of work : All Steel from the top of Upper roadway to top of Truss, including **all** Tower steel **(P.P. 1-30)**
* All confined Space with in Odyssey's limits of work
* Odyssey is to provide their own HSO and QA/QC (Nace #1 Cert. )
* Any air monitoring for blasting operation is the responsibility of Odyssey
* Any Platform and or Scaffolding needed for the work in question is the responsibility of Odyssey
* All waste handling, Hazardous and or Non- Hazardous is the responsibility of Odyssey (inc.all taxes)
* Odyssey is responsible for all of their own engineering for platform,Scaffolds and Containment.
* Odyssey is responsible for all of their own security.
* Odyssey must use MAB Paint
* Protection of all necklace lighting, cameras,light fixtures etc .(as per spec.)
* 39831.0601 Caulking to be paid at $4.00 per LF.
* Special attention to Noise Controll Requirements.
* All Medical testing and training is the responsibility of Odyssey
* Any and all permits is the responsibility of Odyssey
* Odyssey is to provide a rigid roof system along the South outer roadway and the North walkway for their work.
Usage of this system by Alpha Contracting for performance of work in Alphas Subcontract shall be granted
at no charge.
* There will be an add to the Contract value of $467,500.00 for each phase that a 100% performance &
payment bond is provided to L&L prior to commencement of ANY work within the scope of that phase
* Should a bond be provided once work has commenced, the value of the add will be proportionate
to the % of requisitioned work completed after the bond has been submitted relative to the total value of the
potential add of $467,500.00
* Odyssey will receive 4% mobilization after 10% of work is complete or if a payment & performance bond is
submitted prior to commencement of work L&L will forward 4% mobilization upon receipt from NYCDOT.
* A 6.5% deduct from the Contract has been instituted for wrap-up insurance. Any rebates received shall be
dispersed proportionately to Subcontract value relative to total prime contract value.
* Premiums associated with the furnishing of all performance and payment bonds will be the responsibility
of the Subcontractor.

Initial _____    Initial _____

**Exhibit 1**
**Page 2 of 2**

L&L Painting will provide the following.

* Maintenance and Protection of Traffic ( MPT will be coordinated with others )
* Engineer's office is the the responsibility of L&L Painting
* Progress Photos and Progress Video is the responsibility of L&L Painting
* Graffiti Removal is the responsibility of L&L Painting
* Community Notifacation is the responsibility of L&L Painting
* Job CPM is the responsibility of L&L Painting (Odyssey must submit their schedule)
* Job Project Manager by L&L Painting ( Odyssey must have their own supervision)
* Job Security to be provided by L&L Painting Co Inc. (not personal property)
* Storage yard to be provided by L&L.

**Initial**                    **Initial**

*Pu4*
*PP 47-77*

# SUBCONTRACT

THIS AGREEMENT, made this 3rd day of March, 2004, by and between Odyssey Contracting Corp., hereinafter called the Subcontractor, Address: P.O. Box 97, Houston, PA 15342; and L&L Painting Co., Inc., hereinafter called the Contractor, Address: 900 South Oyster Bay Road, Hicksville, New York 11801.

## WITNESSETH:

WHEREAS, the Contractor has entered into a Contract dated the 18th day of September, 2003 with New York City Department of Transportation, hereinafter called the Owner, for the construction of Queensboro Bridge Protective Coating, hereinafter called the Project, at Boroughs of Queens and Manhattan; and

WHEREAS, copies of the Prime Contract are on file in the office of the Contractor and are available for examination by the Subcontractor; and

WHEREAS, the Subcontractor desires to perform a portion of such Prime Contract.

NOW, THEREFORE, it is agreed as follows:                    JAN – 8 2007

Section 1.    CONTRACT DOCUMENTS.

(a)    The term "Prime Contract" as used herein refers to the Notice to Bidders, Information for Bidders, Contract Terms and Conditions including all Addendum, general, supplementary and special conditions, drawings, specifications, amendments, modifications and all other documents forming or by reference made a part of the contract between the Contractor and Owner.

(b)    The Contract Documents including all of the terms and conditions of the Prime Contract shall be deemed expressly incorporated by reference into this Subcontract. The intent of the parties is that, with respect to the Work, and subject to the terms hereof, Subcontractor shall be under the same obligations to Contractor and bound by the same terms, conditions, and procedures that govern Contractor's relationship with the Owner, including, but not limited to, Chapters 1 through 11 of the Prime Contract which set forth, *inter alia*, the Dispute Resolution Procedure, the Change Order Procedure, Insurance and Indemnity Obligations. Accordingly, the term "Subcontractor" shall be deemed substituted for "Contractor", and "Contractor" or "Contractor's" for

47744v1

"Owner", etc. in the Contract Documents between Contractor and Owner and any other corresponding changes made whenever the context may require. The absence of a specific reference to a portion of the Contract Documents in no way diminishes the parties' reciprocal rights and obligations thereunder, as set forth in Paragraphs (c) and (d) below.

(c)    Subcontractor shall be bound to Contractor by the terms of the Subcontract including all attachments hereto (collectively the Subcontract) and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which Contractor, by those Contract Documents, assumes toward the Owner, and shall have the benefit of all rights, remedies and redress against Contractor which Contractor, by those Contract Document, has against the Owner, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision of this Subcontract, those Contract Documents between Owner and Contractor shall govern except if otherwise provided in the Subcontract.

(d)    Contractor shall be bound to Subcontractor by the terms of this Subcontract and of the Contract Documents between the Owner and Contractor and shall assume toward Subcontractor all the obligations and responsibilities that the Owner, by those Contract Documents, assumes toward Contractor, and shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by those Contract Documents, has against Contractor, insofar as applicable to this  Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision in this Subcontract, those Contract Documents between Owner and Contractor shall govern.

(e)    This Subcontract is subject to Subcontractor approval by the Owner, to the extent required under the Prime Contract.

(f)    Subcontractor, by signing this Agreement, acknowledges that it has independently assured itself that all of the Prime Contract documents have been available to it and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto and the Subcontractor agrees to be bound to the Contractor and Owner by the terms and provision thereof so far as they apply to the Work hereinafter described, unless otherwise provided herein.

47744v1

2

(g)    It has been made very clear to Subcontractor that time is of the essence and Subcontractor is to proceed immediately with any and all shop drawing preparation and submittals, all sample submittals, and fabrication of materials to comply with the project schedule so as to achieve Substantial Completion on or before the date depicted in the project schedule for the Subcontracted work.

(h)    Subcontractor shall layout and establish all lines, dimensions and levels required for the proper installation of the Work using the established lines and benchmark elevation.  Subject to latent conditions, Subcontractor shall compare existing conditions with working points and measurements at the site, and compare the construction drawings to ascertain that they are in agreement to the extent same interface with the Work.  Any difference shall be brought to the immediate attention of Contractor.

Section 2.    THE WORK.  The Subcontractor agrees to furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform the following described work attached hereto as Exhibit 1 (hereinafter called the Work) in accordance with the terms and conditions of all Construction Documents including but not limited to the Prime Contract and this Subcontract and in accordance with the reasonable discretion of Contractor.

See attached Exhibit 1 which is made a part hereof.

Materials furnished but not installed by Subcontractor shall be delivered F.O.B. job site unless otherwise provided in other provisions of this Subcontract .

Section 3.    PAYMENT.  Subcontractor shall submit an invoice to Contractor on a monthly basis for Work performed during the prior month.  The Subcontractor's invoice shall be based on an itemized breakdown of the Work scope as approved by the Contractor.  Invoicing will not be recognized until full compliance with invoice breakdown requirements are reasonably fulfilled.  One copy of each of the following forms must be attached to the invoice.

Billing Breakdown Form A.I.A. G702-G703
Properly executed Partial or Final Waiver Form - (Supplied by Contractor)

(a)    The Contractor agrees to pay the Subcontractor for the performance of this Subcontract as specified herein, the sum of eight million eight hundred eighty two thousand five hundred ($8,882,500.00) from P.P. 77-47, adjusted as required by differences between estimated and actual quantities for unit price Work and subject to additions and deductions for changes agreed upon or determined, as hereinafter provided.

(b)     Partial payments will be made to the Subcontractor each month in an amount equal to 95 percent of the value, computed on the basis of the prices set forth above, of the quantity of the Work performed hereunder, as estimated by the Owner or Owner's Representative, less the aggregate of pervious payments, but such partial payments shall not become due to the Subcontractor until seven (7) days after the Contractor receives payment for such Work from the Owner.  If the Contractor receives payment from the Owner for less than the full value of materials delivered to the site but not yet incorporated into the Work, the amount due to the Subcontractor on account of such materials delivered to the site shall be proportionately reduced.  No partial payment to the Subcontractor shall operate as approval or acceptance of Work furnished hereunder.

(c)     Upon complete performance of this Subcontract by the Subcontractor and final approval and acceptance of Subcontractor's Work by the Owner, the Contractor will make final payment to the Subcontractor of the balance due to it under this Subcontract within forty-five (45) days after full payment for such Work has been received by the Contractor from the Owner.

(d)     If at any time prior to final payment hereunder the Owner reduces the amount of retainage withheld from the Contractor, the Contractor may, in its sole discretion, with the consent of the Subcontractor's surety, reduce accordingly, the retained percentage withheld from the Subcontractor.

(e)     The Contractor may deduct from any amounts due or to become due to the Subcontractor any sum or sums owed by the Subcontractor or Subcontractor's affiliated entities to the Contractor or Contractor's affiliated entities; and in the event of any breach by the Subcontractor of any provision or obligation to this Subcontract, or in the event of the assertion by other parties of any claim or lien against the Contractor or the premises arising out of the Subcontractor's performance of this Subcontract, the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage or expense therefrom, until the situation has been satisfactorily remedied or adjusted to the Subcontractor.

(f)     Before any payments will be made under this Subcontract, the Subcontractor shall file in the office of the Chief Fiscal Officer of the Contracting Party verified statements provided for in Section 220-a of the Labor Law, or any applicable Federal Law including any applicable Davis-Bacon Related Act certifying to the amounts then due and owing from the Subcontractor for daily or weekly wages or supplements on

account of labor performed upon the Work under this Subcontract, and setting forth therein the names of the persons whose wages and supplements are unpaid and the amount due to each respectively. Subcontractor shall set forth in his statement the names of all its subcontractors. If Subcontractor has no subcontractors, it shall so state in his statement. Subcontractor may not subcontract any painting work he is contracted to perform. If there be nothing due and owing to any laborer for daily or weekly wages or supplements on account of labor performed, verified statements to that effect shall be filed by the Subcontractors before any payments are made under this Subcontract. The statements required shall be verified by the oath of the Subcontractor as the case may be that it has read such statements subscribed by it and knows the contents thereof, and that the same is true of its own knowledge.

(g)    The Owners Chief Fiscal Officer may deduct, from any amount certified under the Subcontract to be due to the Subcontractor, the sum or sums admitted in the aforesaid statements to be due and owing on account of the aforesaid daily or weekly wages or supplements as provided in Section 220-b of the Labor Law or other applicable Labor Laws including any applicable Federal Law.

(h)    The Subcontractor shall keep a record card of every employee engaged in the performance of the Work under this Subcontract employed by Subcontractor, on which shall be given:

Subcontract _____

Project and Location_____

Employee=s Name _____ Payroll or Badge No.

_____

Employee=s Address

_____

Title of position _____ Hourly Wage $_____

Classification _____ Fringe Benefits_____
<br>          (Journeyman, Reg. Apprentice, Etc.)

Resided in New York State since _____

Where born _____

Naturalized _____
<br>          (Date)                    (Court)                    (Location)

Employed by _____
<br>(To be signed by Contractor=s representative)

Said cards shall be kept in the office of the Subcontractor and shall be available for reasonable inspection by duly authorized representatives of the Contractor/Owner during

business hours of the day.  If required, the Subcontractor shall file with the Contractor/ Owner the above information on duplicate cards to be furnished by the Subcontractor.

(i)    The Subcontractor shall also submit to the Contractor/Owner the completed weekly payroll report forms issued by the office of the Comptroller and furnished by the Owner.   However, on Federally funded projects or where the Contractor produces a computerized payroll printout, the Contractor may, with the permission of the Owner, submit the same payroll information on Federal regulation forms or copies of his computerized payroll in lieu of the payroll report forms issued by the Comptroller.

Section 4.    BONDING.

(a)    The Subcontractor shall furnish a Performance and Payment Bond in an amount equal to the full Subcontract price.  Such bond shall be on form furnished by, and with a surety satisfactory to, the Contractor.  Premium for such bonds shall be paid by the Subcontractor unless otherwise agreed upon in writing by the parties hereto.

(b)    By signing this Subcontract, the Subcontractor certifies that it has the bonding capacity and has made arrangements for furnishing said Performance and Payment Bond to Contractor prior to beginning performance of the Work and that the time required to prepare and furnish said bond will not delay the start of the Work. Should Subcontractor proceed with the Work without first furnishing said Performance and Payment bond, whether or not such performance was permitted or encouraged by Contractor's job site representative, Subcontractor shall be deemed to have waived its right to partial payment and agrees to look to the Contractor for payment of the amount due hereunder only upon furnishing said bond or on completion of the entire Work and the furnishing of the releases described in Section 12. The furnishing of said bond by the Subcontractor is a condition precedent to the Subcontractor's right to receive partial payment for Work performed hereunder.  The waiver of partial payment shall not constitute an excuse or reason for nonperformance of this Subcontract by Subcontractor.

_Exhibit 1_

(c)    See ~~Schedule A~~ for applicable terms for exceptions or deviations from above requirements.

Section 5.    CHANGES.

(a)    The Contractor may at any time by written order of Contractor's authorized representative and with the Subcontractor's approval, make changes in, additions to and omissions from the Work to be performed under this Subcontract, and

the Subcontractor shall promptly proceed with the performance of this Subcontract as so changed.

(b)    For changes in the Prime Contract that have been initiated by the Owner or Owners Representative and for acts or omissions of the Owner or Owners Representative and/or defects in the Prime Contract documents, the Subcontractor shall submit any claims it may have including notice thereof for adjustment in the price, schedule or other provisions of the Subcontract to the Contractor in writing in sufficient time and form to allow the Contractor to process such claims within the time and in the manner provided for an in accordance with the applicable provisions of the Prime Contract documents. Subcontract adjustments shall be made only to the extent and in the manner that the Contractor is entitled to relief from or must grant relief to the Owner.

(c)    For changes directed by the Contractor which were not initiated by the Owner or Owners Representative and do not arise out of acts, errors or omissions of the Owner or Owners Representative or defects in the Prime Contract documents. Subcontractor shall be entitled to equitable adjustment in the Subcontract price, provided Subcontractor gives Contractor written notice of its intent to claim such an adjustment prior to performing such changed Work. Any extra work that is performed directly for Contractor, may not include overhead and profit.  Failure to provide such notice shall be deemed to prejudice the Contractor and constitute a waiver of such claims by Subcontractor.

(d)    No time extension shall be granted to the Subcontractor by reason of the issuance of any change order unless it is expressly stated therein and approved by Owner.

Section 6.    PROSECUTION OF WORK.
(a)    The Subcontractor shall furnish all labor, supervision, tools, equipment, materials and supplies necessary for the performance of this Subcontract in a proper, efficient and workmanlike manner. The Subcontractor shall prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, or at such other time or times as the Contractor may direct, and so as to promote the general progress of the entire construction, and shall not, by delay or otherwise, interfere with or hinder the Work of the Contractor or any other Subcontractor. Any materials that are to be furnished by the Subcontractor hereunder shall be furnished in sufficient time to enable the Subcontractor to perform and complete its Work within the time or times provided for herein. The time of performance of the Work by the Subcontractor is of the essence and the Subcontractor agrees to reimburse the Contractor for any and all liquidated or actual damages that may be assessed by the Owner against

47744v1                                    7

and collected from the Contractor which are attributable to or caused by the Subcontractor's failure to perform the Work required by this Subcontract within the time fixed or in the manner provided for herein. Subcontractor also agrees to pay to the Contractor any increased costs or other damages the Contractor may sustain by reason of such delay by the Subcontractor whether or not liquidated or actual damages are assessed and collected by the Owner. The payment of such damages shall not release the Subcontractor from its obligation to otherwise fully perform this Subcontract. Upon written request by the Contractor, the Subcontractor shall furnish to the Contractor such evidence as the Contractor may require relating to the Subcontractor=s ability to fully perform this Subcontract in the manner and within the time specified herein.

(b)    Subcontractor shall submit Material Status reports on a monthly basis. This report shall show all purchase orders placed and scheduled to be placed including scheduled/actual dates of order placement and scheduled/actual dates of material and equipment deliveries. This report shall also include the name of the supplier for each purchase order and the associates detailed cost breakdown item number. Subcontractor shall provide Contractor a schedule for the Work and monthly update reports showing current progress of the work as well as a plan and schedule of the completion of their remaining work. Subcontractor shall familiarize itself with the Project schedule and other update requirements.

(c)    In the event the Subcontractor fails to comply or becomes disabled from complying with the provisions herein as to character or time of performance, including but not limited to payment for all materials furnished and Work and labor performed under this Subcontract, and the failure is not attended to within fifteen (15) days and corrected in thirty (30) days, after written request by the Contractor to the Subcontractor, the Contractor, by this Subcontract or otherwise, may without prejudice to any other right or remedy, terminate this Subcontract for default and take over and complete the performance of this Subcontract at the expense of the Subcontractor, or without terminating the Subcontract, take over the Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the situation at the expense of the Subcontractor.

(d)    The Subcontractor shall keep, on the Project site during the progress of the Work, a competent superintendent who shall be authorized representative of the Subcontractor. Directions and communications to the superintendent from the Contractor in connection with the Work shall be treated as directions and communications to the Subcontractor. Any items that are considered a non-compliance notice will be forwarded to the Subcontractor's main headquarters.

47744v1                                              8

(e)    It is recognized that if Subcontractor becomes insolvent, or institutes or has instituted against it bankruptcy proceedings, or makes a general assignment for the benefit of creditors, of if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such event or events could impair or frustrate Subcontractor's performance of this Subcontract.  Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its receiver or court-appointed successor adequate assurances of future performance.  Pending receipt of adequate assurances of performance and actual performance in accordance therewith.  Contractor shall be entitled to take over the Work pursuant to the provisions of Subsection 6(c) above without notice to Subcontractor.

(f)    If the Prime Contract is terminated for the convenience of the Owner, the termination settlement under this Subcontract shall be as provided in the Prime Contract.  The Subcontractor shall not be entitled to receive any greater amount than the Contractor may on behalf of the Subcontractor recover from the Owner for such termination.

(g)    Upon a determination by a court of competent jurisdiction that termination of Subcontractor or its successor in interest pursuant to any provision of this Subcontract was wrongful, such termination will be deemed converted to a termination for convenience and the Subcontractor's remedies shall be limited to those set forth in Subsection 6(e).

Section 7.    DELAYS.

(a)    In the event the Subcontractor's performance of this Subcontract is delayed or interfered with by acts of the Owner, Contractor or other subcontractors, it may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delays or interference, except to the extent that the Prime Contract entitled the Contractor to compensation for such delays and then only to the extent of any amount that the Contractor may, on behalf of the Subcontractor recover from the Owner for such delays.

(b)    No allowance for an extension of time, for any cause whatever, shall be claimed by, or made to, the Subcontractor unless the Subcontractor shall have made written request upon the Contractor for such extension within five (5) days after the cause of such extension occurred, or, if the Prime Contract provides for a shorter period, within

47744v1                                         9

sufficient time to permit the Contractor to give notice to the Owner or Owner's Representative within the time allowed by the Prime Contract for such notice.

(c)     No allowance for an extension of time shall, in any event, be made to the Subcontractor for delay by the Subcontractor in preparing drawings or in securing approval of the Owner or Owner's Representative thereto when such drawings are not properly prepared or when the Subcontractor, by the exercise of reasonable diligence and judgment, could have anticipated and avoided the delay.

Section 8.     LABOR. The Subcontractor, in connection with all Work covered by this Subcontract, shall comply with and be bound by any labor agreements executed by the Contractor or on Contractor's behalf. Failure at any time to comply with any of the provisions of such agreements will, at the option of the Contractor, provided failure is not attended to within fifteen days (15) and corrected in thirty (30) days after written request by the Contractor to the Subcontractor, be cause for immediate termination of this Subcontract for default and the Contractor shall have all of the rights contained in Section 6 with regard to such termination. If, by reason of strikes, picketing or disputes of any nature between the Subcontractor and any individual, group or organization, the Subcontractor should be persistently, repeatedly, or for a period of five (5) consecutive days, unable to supply enough properly skilled workers or proper materials to execute the Work defined in this Subcontract, the Contractor may terminate the Subcontract for default and proceed in accordance with Section 6 hereof.

Section 9.     APPROVALS. All drawings of the Subcontractor shall be submitted through the Contractor for approval of the Owner or Owner's Representative and all other communications between the Subcontractor and the Owner or Owner's Representative with respect to the Work shall be transmitted through the Contractor.

Section 10.     INSURANCE. Prior to commencement of Work, Subcontractor shall procure and at all times thereafter maintain with insurers acceptable to Contractor the following minimum insurance protecting the Subcontractor, Owner and the Contractor against liability from damages because of injuries including death, suffered by persons, including employees of the Subcontractor, and liability from damages to property arising from and growing out of the Subcontractor=s operations, including its subcontractors' and suppliers' operations, in connection with the performance of this Subcontract. If the terms of the Prime Contract require larger limits or additional coverage or both, Contractor reserves the right to require Subcontractor to provide, at Subcontractor's expense such larger limits or additional coverage or both.

Limits

47744v1                          10

(a) In the U.S., Worker=s Compensation, in state(s) of operation, and where applicable, U.S. Longshoremen=s and Harbor Workers' Compensation Act and Jones Act coverages, Employer's Liability;

    Statutory

(b) Comprehensive General Liability
Bodily Injury including personal injury

    $5,000,000.00/occurrence-
$10,000,000.00 aggregate

Property Damage

    $5,000,000.00/occurrence-
$10,000,000.00 aggregate
or
$10,000,000.00 combined single limit

Premises Operations, "X.C.U." where applicable, Products/Completed Operations, Contractual Liability, Broad Form Property Damage and Independent Contractors;

(c) Excess Umbrella Liability

    $10,000,000.00/occurrence
$10,000,000.00 aggregate

(d) Comprehensive Automobile Liability (including owned, hired and non-owned vehicles)

Bodily Injury

    $1,000,000.00/person -
$2,000,000.00/accident
or

Property Damage

    $2,000,000.00 combined single limit

      Subcontractor shall provide Contractor with certificates evidencing such insurance as outlined above prior to beginning any Work under this Agreement. Such certificates shall provide for thirty (30) days advance written notice to Contractor of cancellation, material change, reduction of coverage or non-renewal. Subcontractor shall cause its subcontractor(s) to procure insurance as outlined above. Subcontractor shall obtain policies or certificates for its subcontractor(s) and deliver them to Contractor, if requested to do so. All policies should be endorsed to add the Indemnified Parties and their

respective partners, directors, officers, employees, agents and representatives as set forth in Article 11 as Additional Insureds.

Section 11.   INDEMNIFICATION.  The term AIndemnified Parties,@ whenever referred to in this Subcontract shall consist of the following parties including their officers, employees and agents:

1.    The City of New York;

2.    The New York City Department of Transportation;

3.    The Contractor; and

4.    Any other people required to be indemnified under the Prime Contract.

The Subcontractor further specifically obligates itself to the Contractor, Owner and any other party required to be indemnified under the Prime Contract, jointly and separately, in the following respects, to-wit:

(a)    to defend and indemnify them against and save them harmless from any and all claims, suits, liability, expense or damage for any alleged or actual infringement or violation of any patent or patented right, arising in connection with this Subcontract and anything done thereunder;

(b)    to defend and indemnify them against and same them harmless from any and all claims, suits or liability for damages to property including loss or use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of Subcontractor, or any of its subcontractors, suppliers, officers, agents, employees or servants, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such claims, suits or liability, injuries or death or other claim or suites are caused by the sole negligence of a party indemnified hereunder unless otherwise provided in the Prime Contract, Subcontractor's obligation hereunder shall not be limited by the provisions of any Workers' Compensation act or similar statute;

(c)    to pay for all materials furnished and Work and labor performed under this Subcontract, and to satisfy the Contractor thereupon whenever demand is made, and to defend and indemnify the Contractor, Owner and other indemnified parties

47744v1                                    12

against and save them and the premises harmless from any and all claims, suits or liens therefor by others than the Subcontractor;

      (d)    to obtain and pay for all permits, licenses and official inspections necessary for its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof;

      (e)    the Subcontractor warrants and guarantees the Work covered by this Subcontract and agrees to make good, at its own expense, any defect in materials or workmanship which may occur or develop prior to the Contractor's release from responsibility to the Owner therefor; and

      (f)    the Subcontractor assumes toward the Contractor all obligations and responsibilities that the Contractor assumes toward the Owner and others, set forth in the Prime Contract, insofar as applicable, generally or specifically, to Subcontractor's Work;

The Subcontractor shall defend and indemnify the Contractor, Owner and other indemnified parties against, and save them harmless from, any and all loss, damages, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract. Notwithstanding the above, Contractor, at is sole discretion, reserves the right to defend any one or all of the following: the Owner, other indemnified parties, Contractor=s surety and itself. Such election to defend by Contractor shall not in any way limit Subcontractor's responsibilities to indemnify and hold harmless as provided herein.

Section 12.   LIENS AND CLAIMS. Subcontractor shall, as and when requested, furnish evidence satisfactory to the Contractor, Owner and Owner's Representative that all amounts due for labor and material furnished the Subcontractor in connection with performance of the Subcontract have been paid including union health, welfare and pension fund payments and payroll taxes. Such evidence shall be furnished in such form and manner as requested by Contractor and all statements relative thereto shall, if called for by Contractor, be made by sworn affidavit. Subcontractor shall furnish to Contractor releases of both rights and lien rights by persons who have furnished labor, material or other things in the performance of this Subcontract, it being agreed that payment money otherwise due Subcontractor need not be made by Contractor until such releases are furnished. Subcontractor shall deliver its Work free from all claims encumbrances and liens.

      (a)    Before each payment, upon demand of Contractor, Subcontractor shall furnish to Contractor an affidavit on a form satisfactory to Contractor indicating in

47744v1

detail the unpaid obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract, to whom incurred, the amount due or to become due therefor, and, if demanded, procure the delivery to Contractor by the material supplier of duplicates of all material invoices and statements, and present receipts of all material invoices and statements, and present receipts, bills showing payment of all such obligations incurred and duly certified payrolls indicating full payment to each of its employees of wages earned during the preceding payroll periods.  It is further provided that, prior to final payment, Subcontractor, if demanded, shall deliver to Contractor, in addition to the affidavits required, duly executed releases of liens from each of the persons/companies to whom obligations were incurred, together with a similar release executed by Subcontractor.  Should Contractor pay the final payment or any part thereof without the presentation by Subcontractor of such release, then such payment, and the acceptance thereof, shall in itself constitute a release to Contractor by reason of any and all things done or performed or pertaining to or arising out of the relationship of the parties hereto as a result of this Subcontract, or the presence of Subcontractor on the site, whether in contract or tort;

       (b)    In the event at any time any obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract are unpaid, if Subcontractor, after five (5) days' notice from Contractor, has not delivered to Contractor either a release, a receipt of payment in full or other evidence of payment satisfactory to Contractor, Contractor is authorized to make such payment directly out of any monies payable to Subcontractor.  Notwithstanding the provisions of the Contract, if there shall be any lien, or other claim for monies due or to become due, Subcontractor shall immediately satisfy or bond same, or Contractor shall have the right to bond said lien or claim or otherwise discharge same and retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify Contractor against such lien or other claim, with interest, together with expenses incident to discharging such lien or claim or defending suit to enforce such lien or other claim, with interest, together with expenses incident to discharging such lienor claim or defending suit to enforce such lien or other claim, including any premiums charged for a bond and any attorneys' fees and disbursements, all of which the Subcontractor agrees to pay.  Should Contractor give Subcontractor notice of any unpaid claim for obligations incurred by Subcontractor, Subcontractor shall be estopped from disputing liability for any such claim unless within five (5) days after such notice it indicates to Contractor, in writing, that there is some amount different than that demanded owing, or that there are no amounts owing.  Should there prove to be any claim after all payments are made, Subcontractor shall refund to Contractor all monies that the latter may be compelled to pay in discharge and in defense of same.  Any lien or other claim, until satisfied or withdrawn, shall preclude any payment or demand for any payment of said amount so claimed or demanded; and

(c)     It is specifically understood and agreed that the Subcontractor and Contractor acknowledge that there is a risk that Owner, in breach of its contract with Contractor, may make late payments or may, under certain circumstances such as lack of funding not make required payments to Contractor. The parties furthermore acknowledge their agreement that they shall share the risk of same. As a consequence of the foregoing understanding and consistent with that allocation of risk, the Subcontractor agrees that Contractor's receipt of payment from Owner on behalf of the Subcontractor's requisitions for payment (whether interim requisitions or final requisition, including retainage) shall be to the fullest extent provided by law, a condition precedent to the right of the Subcontractor to receive payment from Contractor. In the event that Contractor is not receiving proper payment from Owner on account of the work of the Subcontractor such that Contractor is not required to make payment to the Subcontractor hereunder, Contractor may, in its sole discretion and to the extent it is legally able to do so, formally and in writing assign to the Subcontractor the rights of Contractor to pursue claims against Owner for the payment due to Contractor on behalf of the Subcontractor=s entitlement under the terms of this Subcontract which assignment Subcontractor shall be obliged to accept in full and complete liquidation of the obligations to payment of Contractor to Subcontractor hereunder. The parties further acknowledge that the Subcontractor is entitled to pursue any and all rights to which it may be entitled under the New York Lien Law in the event that Contractor does not pay the Subcontractor amounts due hereunder, including non-payment resulting from delayed payments or non-payment by Owner to Contractor. To the extent that this clause is inconsistent with such lien rights, this clause is deemed waived for such purpose only in the event that Contractor advises Subcontractor that Contractor is unable to pay Subcontractor by reason of Owner's non-payment to Contractor. Subcontractor agrees that the filing of a lien in full accordance with the Lien Law and the complete prosecution of that lien claim to finality in the courts and collection therefrom, for the amount due to it shall be a condition precedent to the right of the Subcontractor to file an action in law or equity against Contractor or its surety in connection with the Project. In the event that Subcontractor files a claim against any or all of Contractor's sureties, Subcontractor agrees to stay any proceedings against Contractor's sureties pending the resolution of its mechanic=s lien action to finality in the courts, including collection therefrom. Furthermore, nothing herein is intended to limit or preclude the rights of the Contractor under other terms of this Subcontract to assert backcharges, set-offs, limits or other claims against the Subcontractor in regard to the matters addressed in this Clause or otherwise.

Section 13.     POSSESSION PRIOR TO COMPLETION. Whenever it may be necessary for the Contractor to do so, the Contractor shall be permitted to occupy and/or use any portion of the Work which has been either partially or fully completed by the

Subcontractor before final inspection and acceptance thereof by the Owner, but such use and/or occupation shall not relieve the Subcontractor of its guarantee of said Work nor of its obligation to make good at its own expense any defect in materials and/or workmanship which may occur or develop prior to Contractor's release from responsibility to the Owner.

Section 14.    OTHER CONTRACTS.  It is understood and agreed that the Work provided for in this Subcontract constitutes only a part of the Work being performed for the Owner by the Contractor and other subcontractors.  The Subcontractor, therefore, agrees to perform the Work called for in this Subcontract in such a manner that it will not injure, damage or delay any other Work performed by the Contractor to any other subcontractor or supplier, and further agrees to pay or reimburse the Contractor for any additional costs, damage or delay that may be caused to such other Work of the Contractor, subcontractors or suppliers, by the Subcontractor or by its agents or employees.

Section 15.    INDEPENDENT CONTRACTOR.  The Subcontractor specifically agrees that it is, or prior to the start of the Work will become, and will remain during the performance of this Subcontract, an independent contractor.

Section 16.    COMPLIANCE WITH LAW.  The Subcontractor agrees to fully comply with all applicable laws, ordinances and regulations.

Section 17.    SAFETY.  The Subcontractor shall take all reasonable safety precautions pertaining to its Work and the conduct thereof.  Without limit, the generality of the foregoing, it shall comply with all applicable laws, ordinances, rules, regulations and orders issued by any public or governmental body or authority, whether federal or otherwise, including, but not limited to, occupational safety and health legislation and, in addition, the safety measures called for the Contractor.  The failure of the Subcontractor to take all reasonable safety precautions shall be deemed by Contractor in its reasonable discretion to be a breach of this Subcontract subject to the termination provisions contained herein.

Section 18.    RESPONSIBILITY FOR INJURIES TO PERSONS AND PROPERTY

(a)    The Subcontractor shall be solely responsible for (1) all injuries (including death) to persons, including but not limited to employees of the Subcontractor and Indemnified Parties and (2) damage to property, including but not limited to property of the Indemnified Parties, the Contractor or the Subcontractor.  The liability hereunder

shall be limited to such injuries or damage occurring on account of, or in connection with, the performance of the Work, whether or not the occurrence giving rise to such injury or such damage happens at the Project Site or whether or not sustained by persons or to property while at the Project Site, but shall exclude injuries to such persons or damage to such property to the extent caused by the negligence of the Contractor or the Subcontractor.

(b)    The Subcontractor=s liability hereunder includes any injury (including death) or damage to property related to the performance of, including the failure to perform, miscellaneous and incidental Work.

(c)    The Subcontractor expressly acknowledges that it has reviewed the Contract Documents and if the Work be done without fault or negligence on the part of the Subcontractor, such Work will not cause any damage to the foundations, walls or other parts of adjacent, abutting or overhead buildings, railroads, bridges, structures or surfaces. PROTECTION OF WORK.  The Subcontractor specifically agrees that it is responsible for the protection of its Work until final completion and acceptance thereof by the Owner and that the Subcontractor will make good or replace, at no expense to the Contractor or the Owner, any damage to its Work which occurs prior to said final acceptance.

Section 19.    DISPUTES.

(a)    In case of any disputes between Subcontractor and the Contractor, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner both by the terms of the Prime Contract and by any and all decisions or determinations made thereunder by the party or board as authorized in the Prime Contract. It is agreed that in the event the Prime Contract contains a provision, hereinafter called "disputes" clause, whereby claims may be resolved under an administrative procedure or by arbitration, then as to any claims of Subcontractor for or on account of acts or omissions of the Owner or Owner's Representative which are not disposed of by agreement, the Contractor agrees to present to the Owner, in Contractor's name, all of Subcontractor's claims for additional monetary compensation or time extension; and to further invoke, on behalf, in advance of and even in the Prime Contract  for determining disputes.  Contractor shall have the option to present such claims on Subcontractor's behalf, in advance of and even without Subcontractor's written request, Subcontractor shall have full responsibility for preparation and presentation of such claims and shall ear all expenses thereof, including attorneys' fees.  Subcontractor agrees to be bound by the procedure and final determinations as specified in any such Disputes clause, and agrees that it will not take, or will suspend, any other action or actions with respect to any such

claims and will pursue no independent litigation with respect thereto, pending final determination under such Disputes clause. Subcontractor shall not be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from the Owner on account of Subcontract's Work, less any markups or costs incurred by the Contractor and to which Contractor is otherwise entitled, and Subcontractor agrees that it will accept such amount, if any, received by Contractor from Owner as full satisfaction and discharge of all claims for or on account of acts or omissions of the Owner or Owner's Representative(s). Should the Owner determine that the work is not an extra, and awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and partial payment as payment in full. Contractor, however, at its sole and exclusive discretion, may appeal from any ruling or may institute a suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the work of the Subcontractor as permitted by the Prime Contract. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to Contractor, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by Contractor in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to Contractor and all expenses and attorneys fees and disbursements incurred by Contractor in prosecuting such appeal or suit. The Subcontractor agrees that no claim, invoice or payment requisition shall include any modifications to the Price, without an executed Change Order, pursuant to which such work is eligible for payment.

(b)     Subcontractor shall be bound by document's determination, made in good faith, as to apportionment of any amounts received from Owner for claimants, including Contractor and other subcontractors, whose work is affected by any act or omission of the Owner or Owner's Representative.

(c)     Should a dispute as to proper interpretation of this Subcontract, or Work or material performed or furnished hereunder arise which concerns the parties hereto only, or Subcontractor and other subcontractors or suppliers, but not the Owner or Owner's Representative, the same shall be decided by Contractor whose decision thereon shall be final and conclusive.

(d)     The Subcontractor shall proceed diligently with the Work, pending final determination pursuant to any Disputes clause or pursuant to any other action taken with respect to a claim or claims.

47744v1                                    18

Section 20.   ATTORNEY FEES.  In the event either party institutes suit in court against the other party or against the surety of such party, in connection with any dispute or matter arising under this Subcontract, the prevailing party shall be entitled to recover reasonable attorney fees in addition to any other relief granted by the court.

Section 21.   TAXES.  Subcontractor shall pay all taxes, licenses and fees of every nature which may be imposed or charged by any governmental authority upon the labor, material, or other things used in the performance of the Work or upon the transaction between Contractor and Subcontractor.  Relating to the Work, Subcontractor hereby accepts exclusive liability for the payment of all taxes now or which may hereafter be imposed covering labor and/or materials to be furnished by Subcontractor hereunder including but not limited to sales tax, and any contributions under the New York State Unemployment Insurance Act, the Federal Social Security Act, and all legislation enacted either Federal, State, or Municipal, upon the payroll of employees engaged by him or materials purchased for the performance of this Subcontract, and agrees to meet all the requirements specified under the aforesaid Acts or legislation, or any acts or legislation which may hereafter be enacted affecting said labor and/or materials.  Subcontractor will furnish to Contractor any records Contractor may deem reasonably necessary to carry out the intent of said acts or legislation, and hereby authorizes Contractor to deduct the amount of such Taxes and contributions from any payments due Subcontractor and to pay same direct or take any precaution as may be deemed necessary to guarantee payment;  if after Contractor's receipt of written notice from the applicable taxing authority that such taxes or contributions are due and within thirty (30) days after receipt of such notice from Contractor, Subcontractor fails to pay same or provide Contractor with reasonable evidence refuting such obligation.

Section 22.   CONTRACTOR'S EQUIPMENT.  In the event that Subcontractor by rental, loan or otherwise, makes use of any of 's equipment, scaffolding, or other appliances, Subcontractor agrees to accept such "as is" and that such use shall be at the sole risk of Subcontractor and Subcontractor agrees to defend, hold harmless and indemnify Contractor against all claims of every nature arising from its use thereof.

Section 23.   FURNISHED MATERIAL.  In the event that the Contractor or Owner, or their suppliers, or subcontractors, elect to furnish material to the Subcontractor for use in connection with this Subcontract then the cost of handling, storing and installing such material shall be considered as included in the Subcontract price.  The Subcontractor shall be and become responsible for all such materials upon delivery to it, whether delivered F.O.B. point of origin or F.O.B. job site (except that any transportation charges paid by the Subcontractor, in the event of delivery F.O.B. point of origin, shall be reimbursed to Subcontractor) and shall pay all demurrage and storage charges which

accrue after delivery. Furnished material lost or damaged after delivery, from any cause whatsoever, shall be replaced by or at the expense of the Subcontractor. Subcontractor shall, within forty-eight (48) hours after delivery of furnished materials, inspect the same and immediately report, in writing, to the Contractor any shortages, damages or defects therein which are reasonably observable by proper inspection. Failure to inspect and report as specified shall be treated as unqualified acceptance by Subcontractor of the material involved.

Section 24.   EQUAL OPPORTUNITY. If the Prime Contract contains any provision which prohibits discrimination on the basis of race, color, religion, sex, or national origin, or if any law, regulation or order has any application thereto and is applicable to this Subcontract, then Subcontractor hereby agrees to comply with such provision, law, regulation or order. In the event that any such provision, law, regulation or order requires the physical attachment of specific wording to this Subcontract, then such attachments shall be furnished by the Contractor and shall be considered a part of this Subcontract by reference thereto or shall be physically attached thereto as called for by the Contractor.

Section 25.   OWNER=S REPRESENTATIVE. The words "Owner's Representative" as used herein include Owner's design engineer, architect or any person or entity appointed by the Owner (including the Engineer, Architect, Project Manager and/or Commissioner as noted in the Prime Contract) to supervise the Work of the Contractor on behalf of the Owner.

Section 26.   ASSIGNMENT. The Subcontractor shall obtain the written consent of the Contractor prior to assigning or subletting any of the Work, in whole or in part. Subcontractor may assign the proceeds of the Work after providing adequate assurances to Contractor that all its labor-suppliers and other creditors for the Work will be paid and upon obtaining the consent of Subcontractor=s surety and the acknowledgment of the assignee on forms provided by the Contractor.

Subject to any and all provisions of the Prime Contract's terms and conditions substituting "Subcontractor" for "Contractor" and "Contractor for Owner" or Authority, this Subcontract shall be governed by the laws of the State of New York without regard to choice of law or conflicts of law, and all disputes not subject to the Prime Contract, if any, shall be subject to the jurisdiction of the Supreme Court of New York, County of New York.

(a)      If the Contractor initiates any action against the Subcontractor in Federal Court or in New York State Court, service of process may be made on the

Subcontractor either in person, wherever such Subcontractor may be found, or by registered mail addressed to the Subcontractor at its address as set forth in this Subcontract, or to such other address as the Subcontractor may provide to the Contractor in writing.

(b)     With respect to any action between the Contractor and the Subcontractor in New York State Court, that is not subject to the Prime Contract, the Subcontractor hereby expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of forum non conveniens, (ii) to remove to Federal Court; and (ii) to move for a change or venue to a New York State Court outside New York County.

(c)     With respect to any action between the Contractor or the Subcontractor in Federal Court, that is not subject to the Prime Contract, the action should be venued in the Southern District of New York, New York City Courthouse. The Contractor expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the Southern District, New York City Courthouse.

(d)     If the underlying dispute is not subject to the Prime Contract and the Subcontractor commences any action against the Contractor in a court located other than in the State of New York, County of New York upon request of the Contractor, the Subcontractor shall either consent to a transfer of the action to a court of competent jurisdiction located in the State of New York, County of New York as above described or, if the court where the action is initially brought will not or cannot transfer the action the Subcontractor shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of competent jurisdiction in New York County as above stated.

Section 27.    PRIOR UNDERSTANDINGS OR REPRESENTATIONS.  The Contractor assumes no responsibility for any understandings or representations made by any of is officers or agents prior to the execution of this Subcontract, unless such understandings or representations by the Contractor are expressly stated in this Subcontract.

Section 28.    SEVERABILITY AND WAIVER.  The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision.  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a

waive or relinquishment of such term, covenant, condition or right as respects further performance.

Subcontractor agrees to repair, replace or make good any damages, defects or faults to the extent resulting from defective Work Subcontractor performed or furnished which is not damaged by Contractor or its other subcontractors and suppliers, Owner or other parties, that may appear within one (1) year after the earlier of acceptance of the Work or beneficial use or occupancy of same by Contractor or Owner or for such additional period as may be required by Owner and/or the specifications relating to the work.

Section 29.   SETOFF.  If Subcontractor is, or hereafter begins performing any of the work hereunder and the unpaid balance of the Price becomes insufficient to complete such Work or compensate Contractor for any damages or deficiencies caused by the Subcontractor in the performance of the other Work, Subcontractor hereby consents and agrees to allow Contractor, in its sole discretion and judgment, to setoff any of Contractor=s claims against any amount due, or which may become due under this Subcontract or any other contract between Contractor and Subcontractor.  In such event Subcontractor shall continue to perform its obligation under the Subcontract.  No refusal or failure of Contractor to exercise its rights hereunder shall constitute the basis of any right or claim against Contractor.

Section 30.   PERFORMANCE OF WORK DURING THE PENDENCY OF DISPUTES.  Unless the parties hereto expressly agree otherwise in writing, in the event that a dispute shall arise under this Subcontract in connection with the Subcontract, including disputes related to payments to be made on any Requisition, or otherwise, Subcontractor shall continue during the pendency of such dispute to perform the Work and shall perform all other obligations required to be performed by it under this Subcontract as if no dispute shall have arisen.  During the pendency of any such dispute, and except as otherwise provided in this Subcontract, Subcontractor shall be entitled to receive payments from Contractor only on account of non-disputed items and payments on account of disputed items (except to the extent Contractor agrees on part of the disputed item) shall be deferred until the final resolution of the dispute.

Section 31.   CAPTIONS.  The captions at the beginning of each Section of this Subcontract are for convenience only and are to be given no weight in construing the provisions of this Subcontract.

Section 32.   NOTICES.  All notices shall be in writing addressed to the parties at the addresses set out in this Subcontract unless subsequently changed in conformance

47744v1                                            22

with this notice provision and shall be considered as delivered on the third business day after the date of mailing if sent certified mail or when received in all other cases, including telecopy or other printed electronic medium or personal deliver.

Section 33.    INTEGRITY AND ETHICAL CONDUCT.  Contractor and Subcontractor acknowledge and understand that each is committed to have the Work performed in accordance with the highest ethical standards applicable to, or governing, the conduct of construction practices.  In furtherance thereof, Contractor and Subcontractor hereby agree to comply with and observe all applicable Federal, State and local laws, rules, regulations, requirements, trade standards and ethical guidelines governing said conduct, including those provided by Owner.

Section 34.    ADDITIONAL PROVISIONS. (Attach additional pages if necessary.)

See attached Additional Provisions which are made a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract by their proper officers or duly authorized agents.

By: _____          By: _____
         Contractor                                        Subcontractor

Exhibit 1
Page 1 of 2

# Odyssey Contracting Corp

### Truss and Towers

### The scope of work shall include but not be limited to the following:

* Contract value had initial base value of $10,000,000.00. A $500,000.00 deduct
  has been taken for the absence of a bond at this time.  A 6.5% deduct has been taken on the
  $9,500,000.00 sales value of the balance for the Project provided wrap-up program
* (619.17) Temp Concrete Barrier
* (10619.0599) Lighting for Temp Barrier
* (619.2104) Construction Zone Pavement Marking Stripes, Removable Tape
* (635.0103) Cleaning and Preparation of Pavement Surface Lines
* (687.0101) White Thermoplastic Reflectorized Pavement Stripes
* Limits of work : All Steel from the top of Upper roadway to top of Truss, including **all** Tower steel (**P.P. 77-47**)
* All confined Space with in Odyssey's limits of work
* Odyssey is to provide their own HSO and QA/QC (Nace #1 Cert. )
* Any air monitoring for blasting operation is the responsibility of Odyssey
* Any Platform and or Scaffolding needed for the work in question is the responsibility of Odyssey
* All waste handling, Hazardous and or Non- Hazardous is the responsibility of Odyssey (inc.all taxes)
* Odyssey is responsible for all of their own engineering for platform,Scaffolds and Containment.
* Odyssey is responsible for all of their own security.
* Odyssey must use MAB Paint
* Protection of all necklace lighting, cameras,light fixtures etc .(as per spec.)
* 39831.0601 Caulking to be paid at $4.00 per LF.
* Special attention to Noise Controll Requirements.
* All Medical testing and training is the responsibility of Odyssey
* Any and all permits is the responsibility of Odyssey
* Odyssey is to provide a rigid roof system along the South outer roadway and the North walkway for their work.
Usage of this system by Alpha Contracting for performance of work in Alphas Subcontract shall be granted
at no charge.
* There will be an add to the Contract value of $467,500.00 ~~for each phase that~~ a 100% performance &
payment bond is provided to L&L prior to commencement of ANY work within the scope of that phase
* Should a bond be provided once work has commenced, the value of the add will be proportionate
to the % of requisitioned work completed after the bond has been submitted relative to the total value of the
potential add of $467,500.00
* Odyssey will receive 4% mobilization after 10% of work is complete or if a payment & performance bond is
submitted prior to commencement of work L&L will forward 4% mobilization upon receipt from NYCDOT.
* A 6.5% deduct from the Contract has been instituted for wrap-up insurance. Any rebates received shall be
dispersed proportionately to Subcontract value relative to total prime contract value.
* Premiums associated with the furnishing of all performance and payment bonds will be the responsibility
of the Subcontractor.

Initial

Initial

Exhibit 1
Page 2 of 2

### L&L Painting will provide the following.

* Maintenance and Protection of Traffic ( MPT will be coordinated with others )
* Engineer's office is the the responsibility of L&L Painting
* Progress Photos and Progress Video is the responsibility of L&L Painting
* Graffiti Removal is the responsibility of L&L Painting
* Community Notifacation is the responsibility of L&L Painting
* Job CPM is the responsibility of L&L Painting (Odyssey must submit their schedule)
* Job Project Manager by L&L Painting ( Odyssey must have their own supervision)
* Job Security to be provided by L&L Painting Co Inc. (not personal property)
* Storage yard to be provided by L&L.

Initial _____        Initial _____

PH 2
PP 30-47

# SUBCONTRACT

THIS AGREEMENT, made this 3rd day of March, 2004, by and between Odyssey Contracting Corp., hereinafter called the Subcontractor, Address: P.O. Box 97, Houston, PA 15342; and L&L Painting Co., Inc., hereinafter called the Contractor, Address: 900 South Oyster Bay Road, Hicksville, New York 11801.

## WITNESSETH:

WHEREAS, the Contractor has entered into a Contract dated the 18th day of September, 2003 with New York City Department of Transportation, hereinafter called the Owner, for the construction of Queensboro Bridge Protective Coating, hereinafter called the Project, at Boroughs of Queens and Manhattan; and

WHEREAS, copies of the Prime Contract are on file in the office of the Contractor and are available for examination by the Subcontractor; and

WHEREAS, the Subcontractor desires to perform a portion of such Prime Contract.

NOW, THEREFORE, it is agreed as follows:

Section 1.    CONTRACT DOCUMENTS.

(a)    The term "Prime Contract" as used herein refers to the Notice to Bidders, Information for Bidders, Contract Terms and Conditions including all Addendum, general, supplementary and special conditions, drawings, specifications, amendments, modifications and all other documents forming or by reference made a part of the contract between the Contractor and Owner.

(b)    The Contract Documents including all of the terms and conditions of the Prime Contract shall be deemed expressly incorporated by reference into this Subcontract. The intent of the parties is that, with respect to the Work, and subject to the terms hereof, Subcontractor shall be under the same obligations to Contractor and bound by the same terms, conditions, and procedures that govern Contractor's relationship with the Owner, including, but not limited to, Chapters 1 through 11 of the Prime Contract which set forth, *inter alia*, the Dispute Resolution Procedure, the Change Order Procedure, Insurance and Indemnity Obligations. Accordingly, the term "Subcontractor" shall be deemed substituted for "Contractor", and "Contractor" or "Contractor's" for

47744v1

via FedEx w/No L&L Cover
DEC 2 2 2006
Rec'd 12/22/06 MK
650/QUEN

FAXED
12-22-06
QUEN FO

"Owner", etc. in the Contract Documents between Contractor and Owner and any other corresponding changes made whenever the context may require. The absence of a specific reference to a portion of the Contract Documents in no way diminishes the parties' reciprocal rights and obligations thereunder, as set forth in Paragraphs (c) and (d) below.

(c)    Subcontractor shall be bound to Contractor by the terms of the Subcontract including all attachments hereto (collectively the Subcontract) and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which Contractor, by those Contract Documents, assumes toward the Owner, and shall have the benefit of all rights, remedies and redress against Contractor which Contractor, by those Contract Document, has against the Owner, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision of this Subcontract, those Contract Documents between Owner and Contractor shall govern except if otherwise provided in the Subcontract.

(d)    Contractor shall be bound to Subcontractor by the terms of this Subcontract and of the Contract Documents between the Owner and Contractor and shall assume toward Subcontractor all the obligations and responsibilities that the Owner, by those Contract Documents, assumes toward Contractor, and shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by those Contract Documents, has against Contractor, insofar as applicable to this  Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision in this Subcontract, those Contract Documents between Owner and Contractor shall govern.

(e)    This Subcontract is subject to Subcontractor approval by the Owner, to the extent required under the Prime Contract.

(f)    Subcontractor, by signing this Agreement, acknowledges that it has independently assured itself that all of the Prime Contract documents have been available to it and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto and the Subcontractor agrees to be bound to the Contractor and Owner by the terms and provision thereof so far as they apply to the Work hereinafter described, unless otherwise provided herein.

(g)    It has been made very clear to Subcontractor that time is of the essence and Subcontractor is to proceed immediately with any and all shop drawing preparation and submittals, all sample submittals, and fabrication of materials to comply with the project schedule so as to achieve Substantial Completion on or before the date depicted in the project schedule for the Subcontracted work.

(h)    Subcontractor shall layout and establish all lines, dimensions and levels required for the proper installation of the Work using the established lines and benchmark elevation. Subject to latent conditions, Subcontractor shall compare existing conditions with working points and measurements at the site, and compare the construction drawings to ascertain that they are in agreement to the extent same interface with the Work. Any difference shall be brought to the immediate attention of Contractor.

Section 2.    THE WORK. The Subcontractor agrees to furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform the following described work attached hereto as Exhibit 1 (hereinafter called the Work) in accordance with the terms and conditions of all Construction Documents including but not limited to the Prime Contract and this Subcontract and in accordance with the reasonable discretion of Contractor.

See attached Exhibit 1 which is made a part hereof.

Materials furnished but not installed by Subcontractor shall be delivered F.O.B. job site unless otherwise provided in other provisions of this Subcontract .

Section 3.    PAYMENT. Subcontractor shall submit an invoice to Contractor on a monthly basis for Work performed during the prior month. The Subcontractor's invoice shall be based on an itemized breakdown of the Work scope as approved by the Contractor. Invoicing will not be recognized until full compliance with invoice breakdown requirements are reasonably fulfilled. One copy of each of the following forms must be attached to the invoice.

Billing Breakdown Form A.I.A. G702-G703
Properly executed Partial or Final Waiver Form - (Supplied by Contractor)

(a)    The Contractor agrees to pay the Subcontractor for the performance of this Subcontract as specified herein, the sum of eight million eight hundred eighty two thousand five hundred ($8,882,500.00) from P.P. 93-77 & from P.P. 30-47, adjusted as required by differences between estimated and actual quantities for unit price Work and subject to additions and deductions for changes agreed upon or determined, as hereinafter provided.

4,914,584.00
MV

3

(b)    Partial payments will be made to the Subcontractor each month in an amount equal to 95 percent of the value, computed on the basis of the prices set forth above, of the quantity of the Work performed hereunder, as estimated by the Owner or Owner's Representative, less the aggregate of pervious payments, but such partial payments shall not become due to the Subcontractor until seven (7) days after the Contractor receives payment for such Work from the Owner. If the Contractor receives payment from the Owner for less than the full value of materials delivered to the site but not yet incorporated into the Work, the amount due to the Subcontractor on account of such materials delivered to the site shall be proportionately reduced. No partial payment to the Subcontractor shall operate as approval or acceptance of Work furnished hereunder.

(c)    Upon complete performance of this Subcontract by the Subcontractor and final approval and acceptance of Subcontractor's Work by the Owner, the Contractor will make final payment to the Subcontractor of the balance due to it under this Subcontract within forty-five (45) days after full payment for such Work has been received by the Contractor from the Owner.

(d)    If at any time prior to final payment hereunder the Owner reduces the amount of retainage withheld from the Contractor, the Contractor may, in its sole discretion, with the consent of the Subcontractor's surety, reduce accordingly, the retained percentage withheld from the Subcontractor.

(e)    The Contractor may deduct from any amounts due or to become due to the Subcontractor any sum or sums owed by the Subcontractor or Subcontractor's affiliated entities to the Contractor or Contractor's affiliated entities; and in the event of any breach by the Subcontractor of any provision or obligation to this Subcontract, or in the event of the assertion by other parties of any claim or lien against the Contractor or the premises arising out of the Subcontractor's performance of this Subcontract, the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage or expense therefrom, until the situation has been satisfactorily remedied or adjusted to the Subcontractor.

(f)    Before any payments will be made under this Subcontract, the Subcontractor shall file in the office of the Chief Fiscal Officer of the Contracting Party verified statements provided for in Section 220-a of the Labor Law, or any applicable Federal Law including any applicable Davis-Bacon Related Act certifying to the amounts then due and owing from the Subcontractor for daily or weekly wages or supplements on

account of labor performed upon the Work under this Subcontract, and setting forth therein the names of the persons whose wages or supplements are unpaid and the amount due to each respectively.  Subcontractor shall set forth in his statement the names of all its subcontractors.  If Subcontractor has no subcontractors, it shall so state in his statement. Subcontractor may not subcontract any painting work he is contracted to perform.  If there be nothing due and owing to any laborer for daily or weekly wages or supplements on account of labor performed, verified statements to that effect shall be filed by the Subcontractors before any payments are made under this Subcontract.  The statements required shall be verified by the oath of the Subcontractor as the case may be that it has read such statements subscribed by it and knows the contents thereof, and that the same is true of its own knowledge.

      (g)    The Owners Chief Fiscal Officer may deduct, from any amount certified under the Subcontract to be due to the Subcontractor, the sum or sums admitted in the aforesaid statements to be due and owing on account of the aforesaid daily or weekly wages or supplements as provided in Section 220-b of the Labor Law or other applicable Labor Laws including any applicable Federal Law.

      (h)    The Subcontractor shall keep a record card of every employee engaged in the performance of the Work under this Subcontract  employed by Subcontractor, on which shall be given:

Subcontract _____

Project and Location_____

Employee=s Name _____ Payroll or Badge No. ____

_____

Employee=s Address

_____

Title of position _____ Hourly Wage $_____

Classification _____ Fringe Benefits_____
              (Journeyman, Reg. Apprentice, Etc.)

Resided in New York State since _____

Where born _____

Naturalized_____
      (Date)       (Court)       (Location)

Employed by _____
(To be signed by Contractor=s representative)

      Said cards shall be kept in the office of the Subcontractor and shall be available for reasonable inspection by duly authorized representatives of the Contractor/Owner during

47744v1

5

business hours of the day. If required, the Subcontractor shall file with the Contractor/ Owner the above information on duplicate cards to be furnished by the Subcontractor.

      (i)     The Subcontractor shall also submit to the Contractor/Owner the completed weekly payroll report forms issued by the office of the Comptroller and furnished by the Owner. However, on Federally funded projects or where the Contractor produces a computerized payroll printout, the Contractor may, with the permission of the Owner, submit the same payroll information on Federal regulation forms or copies of his computerized payroll in lieu of the payroll report forms issued by the Comptroller.

Section 4.    BONDING.

      (a)    The Subcontractor shall furnish a Performance and Payment Bond in an amount equal to the full Subcontract price. Such bond shall be on form furnished by, and with a surety satisfactory to, the Contractor. Premium for such bonds shall be paid by the Subcontractor unless otherwise agreed upon in writing by the parties hereto.

      (b)    By signing this Subcontract, the Subcontractor certifies that it has the bonding capacity and has made arrangements for furnishing said Performance and Payment Bond to Contractor prior to beginning performance of the Work and that the time required to prepare and furnish said bond will not delay the start of the Work. Should Subcontractor proceed with the Work without first furnishing said Performance and Payment bond, whether or not such performance was permitted or encouraged by Contractor's job site representative, Subcontractor shall be deemed to have waived its right to partial payment and agrees to look to the Contractor for payment of the amount due hereunder only upon furnishing said bond or on completion of the entire Work and the furnishing of the releases described in Section 12. The furnishing of said bond by the Subcontractor is a condition precedent to the Subcontractor's right to receive partial payment for Work performed hereunder. The waiver of partial payment shall not constitute an excuse or reason for nonperformance of this Subcontract by Subcontractor.

      (c)    See Schedule A for applicable terms for exceptions or deviations from above requirements.

Section 5.    CHANGES.

      (a)    The Contractor may at any time by written order of Contractor's authorized representative and with the Subcontractor's approval, make changes in, additions to and omissions from the Work to be performed under this Subcontract, and

the Subcontractor shall promptly proceed with the performance of this Subcontract as so changed.

(b)    For changes in the Prime Contract that have been initiated by the Owner or Owners Representative and for acts or omissions of the Owner or Owners Representative and/or defects in the Prime Contract documents, the Subcontractor shall submit any claims it may have including notice thereof for adjustment in the price, schedule or other provisions of the Subcontract to the Contractor in writing in sufficient time and form to allow the Contractor to process such claims within the time and in the manner provided for an in accordance with the applicable provisions of the Prime Contract documents.  Subcontract adjustments shall be made only to the extent and in the manner that the Contractor is entitled to relief from or must grant relief to the Owner.

(c)    For changes directed by the Contractor which were not initiated by the Owner or Owners Representative and do not arise out of acts, errors or omissions of the Owner or Owners Representative or defects in the Prime Contract documents. Subcontractor shall be entitled to equitable adjustment in the Subcontract price, provided Subcontractor gives Contractor written notice of its intent to claim such an adjustment prior to performing such changed Work. Any extra work that is performed directly for Contractor, may not include overhead and profit.   Failure to provide such notice shall be deemed to prejudice the Contractor and constitute a waiver of such claims by Subcontractor.

(d)    No time extension shall be granted to the Subcontractor by reason of the issuance of any change order unless it is expressly stated therein and approved by Owner.

Section 6.    PROSECUTION OF WORK.

(a)    The Subcontractor shall furnish all labor, supervision, tools, equipment, materials and supplies necessary for the performance of this Subcontract in a proper, efficient and workmanlike manner.  The Subcontractor shall prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, or at such other time or times as the Contractor may direct, and so as to promote the general progress of the entire construction, and shall not, by delay or otherwise, interfere with or hinder the Work of the Contractor or any other Subcontractor.  Any materials that are to be furnished by the Subcontractor hereunder shall be furnished in sufficient time to enable the Subcontractor to perform and complete its Work within the time or times provided for herein.  The time of performance of the Work by the Subcontractor is of the essence and the Subcontractor agrees to reimburse the Contractor for any and all liquidated or actual damages that may be assessed by the Owner against

and collected from the Contractor which are attributable to or caused by the Subcontractor's failure to perform the Work required by this Subcontract within the time fixed or in the manner provided for herein. Subcontractor also agrees to pay to the Contractor any increased costs or other damages the Contractor may sustain by reason of such delay by the Subcontractor whether or not liquidated or actual damages are assessed and collected by the Owner. The payment of such damages shall not release the Subcontractor from its obligation to otherwise fully perform this Subcontract. Upon written request by the Contractor, the Subcontractor shall furnish to the Contractor such evidence as the Contractor may require relating to the Subcontractor=s ability to fully perform this Subcontract in the manner and within the time specified herein.

(b)     Subcontractor shall submit Material Status reports on a monthly basis. This report shall show all purchase orders placed and scheduled to be placed including scheduled/actual dates of order placement and scheduled/actual dates of material and equipment deliveries. This report shall also include the name of the supplier for each purchase order and the associates detailed cost breakdown item number. Subcontractor shall provide Contractor a schedule for the Work and monthly update reports showing current progress of the work as well as a plan and schedule of the completion of their remaining work. Subcontractor shall familiarize itself with the Project schedule and other update requirements.

(c)     In the event the Subcontractor fails to comply or becomes disabled from complying with the provisions herein as to character or time of performance, including but not limited to payment for all materials furnished and Work and labor performed under this Subcontract, and the failure is not attended to within fifteen (15) days and corrected in thirty (30) days, after written request by the Contractor to the Subcontractor, the Contractor, by this Subcontract or otherwise, may without prejudice to any other right or remedy, terminate this Subcontract for default and take over and complete the performance of this Subcontract at the expense of the Subcontractor, or without terminating the Subcontract, take over the Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the situation at the expense of the Subcontractor.

(d)     The Subcontractor shall keep, on the Project site during the progress of the Work, a competent superintendent who shall be authorized representative of the Subcontractor. Directions and communications to the superintendent from the Contractor in connection with the Work shall be treated as directions and communications to the Subcontractor. Any items that are considered a non-compliance notice will be forwarded to the Subcontractor's main headquarters.

47744v1                                             8

(e)    It is recognized that if Subcontractor becomes insolvent, or institutes or has instituted against it bankruptcy proceedings, or makes a general assignment for the benefit of creditors, of if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such event or events could impair or frustrate Subcontractor's performance of this Subcontract. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its receiver or court-appointed successor adequate assurances of future performance. Pending receipt of adequate assurances of performance and actual performance in accordance therewith. Contractor shall be entitled to take over the Work pursuant to the provisions of Subsection 6(c) above without notice to Subcontractor.

(f)    If the Prime Contract is terminated for the convenience of the Owner, the termination settlement under this Subcontract shall be as provided in the Prime Contract. The Subcontractor shall not be entitled to receive any greater amount than the Contractor may on behalf of the Subcontractor recover from the Owner for such termination.

(g)    Upon a determination by a court of competent jurisdiction that termination of Subcontractor or its successor in interest pursuant to any provision of this Subcontract was wrongful, such termination will be deemed converted to a termination for convenience and the Subcontractor's remedies shall be limited to those set forth in Subsection 6(e).

Section 7.    DELAYS.

(a)    In the event the Subcontractor's performance of this Subcontract is delayed or interfered with by acts of the Owner, Contractor or other subcontractors, it may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delays or interference, except to the extent that the Prime Contract entitled the Contractor to compensation for such delays and then only to the extent of any amount that the Contractor may, on behalf of the Subcontractor recover from the Owner for such delays.

(b)    No allowance for an extension of time, for any cause whatever, shall be claimed by, or made to, the Subcontractor unless the Subcontractor shall have made written request upon the Contractor for such extension within five (5) days after the cause of such extension occurred, or, if the Prime Contract provides for a shorter period, within

47744v1                                9

sufficient time to permit the Contractor to give notice to the Owner or Owner's Representative within the time allowed by the Prime Contract for such notice.

      (c)    No allowance for an extension of time shall, in any event, be made to the Subcontractor for delay by the Subcontractor in preparing drawings or in securing approval of the Owner or Owner's Representative thereto when such drawings are not properly prepared or when the Subcontractor, by the exercise of reasonable diligence and judgment, could have anticipated and avoided the delay.

      Section 8.    LABOR.  The Subcontractor, in connection with all Work covered by this Subcontract, shall comply with and be bound by any labor agreements executed by the Contractor or on Contractor's behalf.  Failure at any time to comply with any of the provisions of such agreements will, at the option of the Contractor, provided failure is not attended to within fifteen days (15) and corrected in thirty (30) days after written request by the Contractor to the Subcontractor, be cause for immediate termination of this Subcontract for default and the Contractor shall have all of the rights contained in Section 6 with regard to such termination.  If, by reason of strikes, picketing or disputes of any nature between the Subcontractor and any individual, group or organization, the Subcontractor should be persistently, repeatedly, or for a period of five (5) consecutive days, unable to supply enough properly skilled workers or proper materials to execute the Work defined in this Subcontract, the Contractor may terminate the Subcontract for default and proceed in accordance with Section 6 hereof.

      Section 9.    APPROVALS.  All drawings of the Subcontractor shall be submitted through the Contractor for approval of the Owner or Owner's Representative and all other communications between the Subcontractor and the Owner or Owner's Representative with respect to the Work shall be transmitted through the Contractor.

      Section 10.    INSURANCE. Prior to commencement of Work, Subcontractor shall procure and at all times thereafter maintain with insurers acceptable to Contractor the following minimum insurance protecting the Subcontractor, Owner and the Contractor against liability from damages because of injuries including death, suffered by persons, including employees of the Subcontractor, and liability from damages to property arising from and growing out of the Subcontractor=s operations, including its subcontractors' and suppliers' operations, in connection with the performance of this Subcontract.  If the terms of the Prime Contract require larger limits or additional coverage or both, Contractor reserves the right to require Subcontractor to provide, at Subcontractor's expense such larger limits or additional coverage or both.

<u>Limits</u>

47744v1                            10

(a)  In the U.S., Worker=s Compensation,          Statutory
     in state(s) of operation, and where
     applicable, U.S. Longshoremen=s and
     Harbor Workers' Compensation Act and
     Jones Act coverages, Employer's Liability;

(b)  Comprehensive General Liability
     Bodily Injury including personal injury      $5,000,000.00/occurrence-
                                                  $10,000,000.00 aggregate

     Property Damage                              $5,000,000.00/occurrence-
                                                  $10,000,000.00 aggregate
                                                         or
                                                  $10,000,000.00 combined
                                                  single limit

     Premises Operations, "X.C.U." where
     applicable, Products/Completed
     Operations, Contractual Liability,
     Broad Form Property Damage and
     Independent Contractors;

(c)  Excess Umbrella Liability                    $10,000,000.00/occurrence
                                                  $10,000,000.00 aggregate

(d)  Comprehensive Automobile Liability
     (including owned, hired and non-owned
     vehicles)

     Bodily Injury                                $1,000,000.00/person -
                                                  $2,000,000.00/accident
                                                         or
     Property Damage                              $2,000,000.00 combined
                                                  single limit

Subcontractor shall provide Contractor with certificates evidencing such insurance as outlined above prior to beginning any Work under this Agreement. Such certificates shall provide for thirty (30) days advance written notice to Contractor of cancellation, material change, reduction of coverage or non-renewal. Subcontractor shall cause its subcontractor(s) to procure insurance as outlined above. Subcontractor shall obtain policies or certificates for its subcontractor(s) and deliver them to Contractor, if requested to do so. All policies should be endorsed to add the Indemnified Parties and their

respective partners, directors, officers, employees, agents and representatives as set forth in Article 11 as Additional Insureds.

Section 11.    INDEMNIFICATION.  The term AIndemnified Parties,@ whenever referred to in this Subcontract shall consist of the following parties including their officers, employees and agents:

1.    The City of New York;

2.    The New York City Department of Transportation;

3.    The Contractor; and

4.    Any other people required to be indemnified under the Prime Contract.

The Subcontractor further specifically obligates itself to the Contractor, Owner and any other party required to be indemnified under the Prime Contract, jointly and separately, in the following respects, to-wit:

(a)    to defend and indemnify them against and save them harmless from any and all claims, suits, liability, expense or damage for any alleged or actual infringement or violation of any patent or patented right, arising in connection with this Subcontract and anything done thereunder;

(b)    to defend and indemnify them against and same them harmless from any and all claims, suits or liability for damages to property including loss or use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of Subcontractor, or any of its subcontractors, suppliers, officers, agents, employees or servants, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such claims, suits or liability, injuries or death or other claim or suites are caused by the sole negligence of a party indemnified hereunder unless otherwise provided in the Prime Contract, Subcontractor's obligation hereunder shall not be limited by the provisions of any Workers' Compensation act or similar statute;

(c)    to pay for all materials furnished and Work and labor performed under this Subcontract, and to satisfy the Contractor thereupon whenever demand is made, and to defend and indemnify the Contractor, Owner and other indemnified parties

47744v1                                            12

against and save them and the premises harmless from any and all claims, suits or liens therefor by others than the Subcontractor;

(d)  to obtain and pay for all permits, licenses and official inspections necessary for its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof;

(e)  the Subcontractor warrants and guarantees the Work covered by this Subcontract and agrees to make good, at its own expense, any defect in materials or workmanship which may occur or develop prior to the Contractor's release from responsibility to the Owner therefor; and

(f)  the Subcontractor assumes toward the Contractor all obligations and responsibilities that the Contractor assumes toward the Owner and others, set forth in the Prime Contract, insofar as applicable, generally or specifically, to Subcontractor's Work;

The Subcontractor shall defend and indemnify the Contractor, Owner and other indemnified parties against, and save them harmless from, any and all loss, damages, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract. Notwithstanding the above, Contractor, at is sole discretion, reserves the right to defend any one or all of the following: the Owner, other indemnified parties, Contractor=s surety and itself. Such election to defend by Contractor shall not in any way limit Subcontractor's responsibilities to indemnify and hold harmless as provided herein.

Section 12.  LIENS AND CLAIMS. Subcontractor shall, as and when requested, furnish evidence satisfactory to the Contractor, Owner and Owner's Representative that all amounts due for labor and material furnished the Subcontractor in connection with performance of the Subcontract have been paid including union health, welfare and pension fund payments and payroll taxes. Such evidence shall be furnished in such form and manner as requested by Contractor and all statements relative thereto shall, if called for by Contractor, be made by sworn affidavit. Subcontractor shall furnish to Contractor releases of both rights and lien rights by persons who have furnished labor, material or other things in the performance of this Subcontract, it being agreed that payment money otherwise due Subcontractor need not be made by Contractor until such releases are furnished. Subcontractor shall deliver its Work free from all claims encumbrances and liens.

(a)  Before each payment, upon demand of Contractor, Subcontractor shall furnish to Contractor an affidavit on a form satisfactory to Contractor indicating in

47744v1                                         13

detail the unpaid obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract, to whom incurred, the amount due or to become due therefor, and, if demanded, procure the delivery to Contractor by the material supplier of duplicates of all material invoices and statements, and present receipts of all material invoices and statements, and present receipts, bills showing payment of all such obligations incurred and duly certified payrolls indicating full payment to each of its employees of wages earned during the preceding payroll periods. It is further provided that, prior to final payment, Subcontractor, if demanded, shall deliver to Contractor, in addition to the affidavits required, duly executed releases of liens from each of the persons/companies to whom obligations were incurred, together with a similar release executed by Subcontractor. Should Contractor pay the final payment or any part thereof without the presentation by Subcontractor of such release, then such payment, and the acceptance thereof, shall in itself constitute a release to Contractor by reason of any and all things done or performed or pertaining to or arising out of the relationship of the parties hereto as a result of this Subcontract, or the presence of Subcontractor on the site, whether in contract or tort;

(b)    In the event at any time any obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract are unpaid, if Subcontractor, after five (5) days' notice from Contractor, has not delivered to Contractor either a release, a receipt of payment in full or other evidence of payment satisfactory to Contractor, Contractor is authorized to make such payment directly out of any monies payable to Subcontractor. Notwithstanding the provisions of the Contract, if there shall be any lien, or other claim for monies due or to become due, Subcontractor shall immediately satisfy or bond same, or Contractor shall have the right to bond said lien or claim or otherwise discharge same and retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify Contractor against such lien or other claim, with interest, together with expenses incident to discharging such lien or claim or defending suit to enforce such lien or other claim, with interest, together with expenses incident to discharging such lien or claim or defending suit to enforce such lien or other claim, including any premiums charged for a bond and any attorneys' fees and disbursements, all of which the Subcontractor agrees to pay. Should Contractor give Subcontractor notice of any unpaid claim for obligations incurred by Subcontractor, Subcontractor shall be estopped from disputing liability for any such claim unless within five (5) days after such notice it indicates to Contractor, in writing, that there is some amount different than that demanded owing, or that there are no amounts owing. Should there prove to be any claim after all payments are made, Subcontractor shall refund to Contractor all monies that the latter may be compelled to pay in discharge and in defense of same. Any lien or other claim, until satisfied or withdrawn, shall preclude any payment or demand for any payment of said amount so claimed or demanded; and

(c)    It is specifically understood and agreed that the Subcontractor and Contractor acknowledge that there is a risk that Owner, in breach of its contract with Contractor, may make late payments or may, under certain circumstances such as lack of funding not make required payments to Contractor. The parties furthermore acknowledge their agreement that they shall share the risk of same. As a consequence of the foregoing understanding and consistent with that allocation of risk, the Subcontractor agrees that Contractor's receipt of payment from Owner on behalf of the Subcontractor's requisitions for payment (whether interim requisitions or final requisition, including retainage) shall be to the fullest extent provided by law, a condition precedent to the right of the Subcontractor to receive payment from Contractor. In the event that Contractor is not receiving proper payment from Owner on account of the work of the Subcontractor such that Contractor is not required to make payment to the Subcontractor hereunder, Contractor may, in its sole discretion and to the extent it is legally able to do so, formally and in writing assign to the Subcontractor the rights of Contractor to pursue claims against Owner for the payment due to Contractor on behalf of the Subcontractor=s entitlement under the terms of this Subcontract which assignment Subcontractor shall be obliged to accept in full and complete liquidation of the obligations to payment of Contractor to Subcontractor hereunder. The parties further acknowledge that the Subcontractor is entitled to pursue any and all rights to which it may be entitled under the New York Lien Law in the event that Contractor does not pay the Subcontractor amounts due hereunder, including non-payment resulting from delayed payments or non-payment by Owner to Contractor. To the extent that this clause is inconsistent with such lien rights, this clause is deemed waived for such purpose only in the event that Contractor advises Subcontractor that Contractor is unable to pay Subcontractor by reason of Owner's non-payment to Contractor. Subcontractor agrees that the filing of a lien in full accordance with the Lien Law and the complete prosecution of that lien claim to finality in the courts and collection therefrom, for the amount due to it shall be a condition precedent to the right of the Subcontractor to file an action in law or equity against Contractor or its surety in connection with the Project. In the event that Subcontractor files a claim against any or all of Contractor's sureties, Subcontractor agrees to stay any proceedings against Contractor's sureties pending the resolution of its mechanic=s lien action to finality in the courts, including collection therefrom. Furthermore, nothing herein is intended to limit or preclude the rights of the Contractor under other terms of this Subcontract to assert backcharges, set-offs, limits or other claims against the Subcontractor in regard to the matters addressed in this Clause or otherwise.

Section 13.    POSSESSION PRIOR TO COMPLETION. Whenever it may be necessary for the Contractor to do so, the Contractor shall be permitted to occupy and/or use any portion of the Work which has been either partially or fully completed by the

47744v1                                    15

Subcontractor before final inspection and acceptance thereof by the Owner, but such use and/or occupation shall not relieve the Subcontractor of its guarantee of said Work nor of its obligation to make good at its own expense any defect in materials and/or workmanship which may occur or develop prior to Contractor's release from responsibility to the Owner.

Section 14.     OTHER CONTRACTS.  It is understood and agreed that the Work provided for in this Subcontract constitutes only a part of the Work being performed for the Owner by the Contractor and other subcontractors.  The Subcontractor, therefore, agrees to perform the Work called for in this Subcontract in such a manner that it will not injure, damage or delay any other Work performed by the Contractor to any other subcontractor or supplier, and further agrees to pay or reimburse the Contractor for any additional costs, damage or delay that may be caused to such other Work of the Contractor, subcontractors or suppliers, by the Subcontractor or by its agents or employees.

Section 15.     INDEPENDENT CONTRACTOR.  The Subcontractor specifically agrees that it is, or prior to the start of the Work will become, and will remain during the performance of this Subcontract, an independent contractor.

Section 16.     COMPLIANCE WITH LAW.  The Subcontractor agrees to fully comply with all applicable laws, ordinances and regulations.

Section 17.     SAFETY.  The Subcontractor shall take all reasonable safety precautions pertaining to its Work and the conduct thereof.  Without limit, the generality of the foregoing, it shall comply with all applicable laws, ordinances, rules, regulations and orders issued by any public or governmental body or authority, whether federal or otherwise, including, but not limited to, occupational safety and health legislation and, in addition, the safety measures called for the Contractor.  The failure of the Subcontractor to take all reasonable safety precautions shall be deemed by Contractor in its reasonable discretion to be a breach of this Subcontract subject to the termination provisions contained herein.

Section 18.     RESPONSIBILITY FOR INJURIES TO PERSONS AND PROPERTY

(a)     The Subcontractor shall be solely responsible for (1) all injuries (including death) to persons, including but not limited to employees of the Subcontractor and Indemnified Parties and (2) damage to property, including but not limited to property of the Indemnified Parties, the Contractor or the Subcontractor.  The liability hereunder

47744v1                                              16

shall be limited to such injuries or damage occurring on account of, or in connection with, the performance of the Work, whether or not the occurrence giving rise to such injury or such damage happens at the Project Site or whether or not sustained by persons or to property while at the Project Site, but shall exclude injuries to such persons or damage to such property to the extent caused by the negligence of the Contractor or the Subcontractor.

(b)    The Subcontractor=s liability hereunder includes any injury (including death) or damage to property related to the performance of, including the failure to perform, miscellaneous and incidental Work.

(c)    The Subcontractor expressly acknowledges that it has reviewed the Contract Documents and if the Work be done without fault or negligence on the part of the Subcontractor, such Work will not cause any damage to the foundations, walls or other parts of adjacent, abutting or overhead buildings, railroads, bridges, structures or surfaces. PROTECTION OF WORK. The Subcontractor specifically agrees that it is responsible for the protection of its Work until final completion and acceptance thereof by the Owner and that the Subcontractor will make good or replace, at no expense to the Contractor or the Owner, any damage to its Work which occurs prior to said final acceptance.

Section 19.    DISPUTES.

(a)    In case of any disputes between Subcontractor and the Contractor, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner both by the terms of the Prime Contract and by any and all decisions or determinations made thereunder by the party or board as authorized in the Prime Contract. It is agreed that in the event the Prime Contract contains a provision, hereinafter called "disputes" clause, whereby claims may be resolved under an administrative procedure or by arbitration, then as to any claims of Subcontractor for or on account of acts or omissions of the Owner or Owner's Representative which are not disposed of by agreement, the Contractor agrees to present to the Owner, in Contractor's name, all of Subcontractor's claims for additional monetary compensation or time extension; and to further invoke, on behalf, in advance of and even in the Prime Contract  for determining disputes. Contractor shall have the option to present such claims on Subcontractor's behalf, in advance of and even without Subcontractor's written request, Subcontractor shall have full responsibility for preparation and presentation of such claims and shall ear all expenses thereof, including attorneys' fees. Subcontractor agrees to be bound by the procedure and final determinations as specified in any such Disputes clause, and agrees that it will not take, or will suspend, any other action or actions with respect to any such

claims and will pursue no independent litigation with respect thereto, pending final determination under such Disputes clause. Subcontractor shall not be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from the Owner on account of Subcontract's Work, less any markups or costs incurred by the Contractor and to which Contractor is otherwise entitled, and Subcontractor agrees that it will accept such amount, if any, received by Contractor from Owner as full satisfaction and discharge of all claims for or on account of acts or omissions of the Owner or Owner's Representative(s). Should the Owner determine that the work is not an extra, and awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and partial payment as payment in full. Contractor, however, at its sole and exclusive discretion, may appeal from any ruling or may institute a suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the work of the Subcontractor as permitted by the Prime Contract. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to Contractor, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by Contractor in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to Contractor and all expenses and attorneys fees and disbursements incurred by Contractor in prosecuting such appeal or suit. The Subcontractor agrees that no claim, invoice or payment requisition shall include any modifications to the Price, without an executed Change Order, pursuant to which such work is eligible for payment.

(b)     Subcontractor shall be bound by document's determination, made in good faith, as to apportionment of any amounts received from Owner for claimants, including Contractor and other subcontractors, whose work is affected by any act or omission of the Owner or Owner's Representative.

(c)     Should a dispute as to proper interpretation of this Subcontract, or Work or material performed or furnished hereunder arise which concerns the parties hereto only, or Subcontractor and other subcontractors or suppliers, but not the Owner or Owner's Representative, the same shall be decided by Contractor whose decision thereon shall be final and conclusive.

(d)     The Subcontractor shall proceed diligently with the Work, pending final determination pursuant to any Disputes clause or pursuant to any other action taken with respect to a claim or claims.

47744v1                                            18

Section 20.    ATTORNEY FEES.  In the event either party institutes suit in court against the other party or against the surety of such party, in connection with any dispute or matter arising under this Subcontract, the prevailing party shall be entitled to recover reasonable attorney fees in addition to any other relief granted by the court.

Section 21.    TAXES.  Subcontractor shall pay all taxes, licenses and fees of every nature which may be imposed or charged by any governmental authority upon the labor, material, or other things used in the performance of the Work or upon the transaction between Contractor and Subcontractor.  Relating to the Work, Subcontractor hereby accepts exclusive liability for the payment of all taxes now or which may hereafter be imposed covering labor and/or materials to be furnished by Subcontractor hereunder including but not limited to sales tax, and any contributions under the New York State Unemployment Insurance Act, the Federal Social Security Act, and all legislation enacted either Federal, State, or Municipal, upon the payroll of employees engaged by him or materials purchased for the performance of this Subcontract, and agrees to meet all the requirements specified under the aforesaid Acts or legislation, or any acts or legislation which may hereafter be enacted affecting said labor and/or materials.  Subcontractor will furnish to Contractor any records Contractor may deem reasonably necessary to carry out the intent of said acts or legislation, and hereby authorizes Contractor to deduct the amount of such Taxes and contributions from any payments due Subcontractor and to pay same direct or take any precaution as may be deemed necessary to guarantee payment;  if after Contractor's receipt of written notice from the applicable taxing authority that such taxes or contributions are due and within thirty (30) days after receipt of such notice from Contractor, Subcontractor fails to pay same or provide Contractor with reasonable evidence refuting such obligation.

Section 22.    CONTRACTOR'S EQUIPMENT.  In the event that Subcontractor by rental, loan or otherwise, makes use of any of 's equipment, scaffolding, or other appliances, Subcontractor agrees to accept such "as is" and that such use shall be at the sole risk of Subcontractor and Subcontractor agrees to defend, hold harmless and indemnify Contractor against all claims of every nature arising from its use thereof.

Section 23.    FURNISHED MATERIAL.  In the event that the Contractor or Owner, or their suppliers, or subcontractors, elect to furnish material to the Subcontractor for use in connection with this Subcontract then the cost of handling, storing and installing such material shall be considered as included in the Subcontract price.  The Subcontractor shall be and become responsible for all such materials upon delivery to it, whether delivered F.O.B. point of origin or F.O.B. job site (except that any transportation charges paid by the Subcontractor, in the event of delivery F.O.B. point of origin, shall be reimbursed to Subcontractor) and shall pay all demurrage and storage charges which

47744v1                                        19

accrue after delivery. Furnished material lost or damaged after delivery, from any cause whatsoever, shall be replaced by or at the expense of the Subcontractor. Subcontractor shall, within forty-eight (48) hours after delivery of furnished materials, inspect the same and immediately report, in writing, to the Contractor any shortages, damages or defects therein which are reasonably observable by proper inspection. Failure to inspect and report as specified shall be treated as unqualified acceptance by Subcontractor of the material involved.

Section 24.    EQUAL OPPORTUNITY. If the Prime Contract contains any provision which prohibits discrimination on the basis of race, color, religion, sex, or national origin, or if any law, regulation or order has any application thereto and is applicable to this Subcontract, then Subcontractor hereby agrees to comply with such provision, law, regulation or order. In the event that any such provision, law, regulation or order requires the physical attachment of specific wording to this Subcontract, then such attachments shall be furnished by the Contractor and shall be considered a part of this Subcontract by reference thereto or shall be physically attached thereto as called for by the Contractor.

Section 25.    OWNER=S REPRESENTATIVE. The words "Owner's Representative" as used herein include Owner's design engineer, architect or any person or entity appointed by the Owner (including the Engineer, Architect, Project Manager and/or Commissioner as noted in the Prime Contract) to supervise the Work of the Contractor on behalf of the Owner.

Section 26.    ASSIGNMENT. The Subcontractor shall obtain the written consent of the Contractor prior to assigning or subletting any of the Work, in whole or in part. Subcontractor may assign the proceeds of the Work after providing adequate assurances to Contractor that all its labor-suppliers and other creditors for the Work will be paid and upon obtaining the consent of Subcontractor=s surety and the acknowledgment of the assignee on forms provided by the Contractor.

Subject to any and all provisions of the Prime Contract's terms and conditions substituting "Subcontractor" for "Contractor" and "Contractor for Owner" or Authority, this Subcontract shall be governed by the laws of the State of New York without regard to choice of law or conflicts of law, and all disputes not subject to the Prime Contract, if any, shall be subject to the jurisdiction of the Supreme Court of New York, County of New York.

(a)    If the Contractor initiates any action against the Subcontractor in Federal Court or in New York State Court, service of process may be made on the

Subcontractor either in person, wherever such Subcontractor may be found, or by registered mail addressed to the Subcontractor at its address as set forth in this Subcontract, or to such other address as the Subcontractor may provide to the Contractor in writing.

(b)    With respect to any action between the Contractor and the Subcontractor in New York State Court, that is not subject to the Prime Contract, the Subcontractor hereby expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of forum non conveniens, (ii) to remove to Federal Court; and (ii) to move for a change or venue to a New York State Court outside New York County.

(c)    With respect to any action between the Contractor or the Subcontractor in Federal Court, that is not subject to the Prime Contract, the action should be venued in the Southern District of New York, New York City Courthouse.  The Contractor expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the Southern District, New York City Courthouse.

(d)    If the underlying dispute is not subject to the Prime Contract and the Subcontractor commences any action against the Contractor in a court located other than in the State of New York, County of New York upon request of the Contractor, the Subcontractor shall either consent to a transfer of the action to a court of competent jurisdiction located in the State of New York, County of New York as above described or, if the court where the action is initially brought will not or cannot transfer the action the Subcontractor shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of competent jurisdiction in New York County as above stated.

Section 27.    PRIOR UNDERSTANDINGS OR REPRESENTATIONS.  The Contractor assumes no responsibility for any understandings or representations made by any of is officers or agents prior to the execution of this Subcontract, unless such understandings or representations by the Contractor are expressly stated in this Subcontract.

Section 28.    SEVERABILITY AND WAIVER.  The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision.  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a

waive or relinquishment of such term, covenant, condition or right as respects further performance.

Subcontractor agrees to repair, replace or make good any damages, defects or faults to the extent resulting from defective Work Subcontractor performed or furnished which is not damaged by Contractor or its other subcontractors and suppliers, Owner or other parties, that may appear within one (1) year after the earlier of acceptance of the Work or beneficial use or occupancy of same by Contractor or Owner or for such additional period as may be required by Owner and/or the specifications relating to the work.

Section 29.    SETOFF.  If Subcontractor is, or hereafter begins performing any of the work hereunder and the unpaid balance of the Price becomes insufficient to complete such Work or compensate Contractor for any damages or deficiencies caused by the Subcontractor in the performance of the other Work, Subcontractor hereby consents and agrees to allow Contractor, in its sole discretion and judgment, to setoff any of Contractor=s claims against any amount due, or which may become due under this Subcontract or any other contract between Contractor and Subcontractor.  In such event Subcontractor shall continue to perform its obligation under the Subcontract.  No refusal or failure of Contractor to exercise its rights hereunder shall constitute the basis of any right or claim against Contractor.

Section 30.    PERFORMANCE OF WORK DURING THE PENDENCY OF DISPUTES.  Unless the parties hereto expressly agree otherwise in writing, in the event that a dispute shall arise under this Subcontract in connection with the Subcontract, including disputes related to payments to be made on any Requisition, or otherwise, Subcontractor shall continue during the pendency of such dispute to perform the Work and shall perform all other obligations required to be performed by it under this Subcontract as if no dispute shall have arisen.  During the pendency of any such dispute, and except as otherwise provided in this Subcontract, Subcontractor shall be entitled to receive payments from Contractor only on account of non-disputed items and payments on account of disputed items (except to the extent Contractor agrees on part of the disputed item) shall be deferred until the final resolution of the dispute.

Section 31.    CAPTIONS.  The captions at the beginning of each Section of this Subcontract are for convenience only and are to be given no weight in construing the provisions of this Subcontract.

Section 32.    NOTICES.  All notices shall be in writing addressed to the parties at the addresses set out in this Subcontract unless subsequently changed in conformance

with this notice provision and shall be considered as delivered on the third business day after the date of mailing if sent certified mail or when received in all other cases, including telecopy or other printed electronic medium or personal deliver.

Section 33.    INTEGRITY AND ETHICAL CONDUCT.  Contractor and Subcontractor acknowledge and understand that each is committed to have the Work performed in accordance with the highest ethical standards applicable to, or governing, the conduct of construction practices.  In furtherance thereof, Contractor and Subcontractor hereby agree to comply with and observe all applicable Federal, State and local laws, rules, regulations, requirements, trade standards and ethical guidelines governing said conduct, including those provided by Owner.

Section 34.    ADDITIONAL PROVISIONS. (Attach additional pages if necessary.)

See attached Additional Provisions which are made a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract by their proper officers or duly authorized agents.

By: _____  
Contractor

By: _____  
Subcontractor

47744v1                                           23

Exhibit 1
Page 1 of 2

# Odyssey Contracting Corp

## Truss and Towers

### The scope of work shall include but not be limited to the following:

* Contract value had initial base value of $10,000,000.00. A $500,000.00 deduct
  has been taken for the absence of a bond at this time.  A 6.5% deduct has been taken on the
  $9,500,000.00 sales value of the balance for the Project provided wrap-up program
* (619.17) Temp Concrete Barrier
* (10619.0599) Lighting for Temp Barrier
* (619.2104) Construction Zone Pavement Marking Stripes, Removable Tape
* (635.0103) Cleaning and Preparation of Pavement Surface Lines
* (687.0101) White Thermoplastic Reflectorized Pavement Stripes
* Limits of work : All Steel from the top of Upper roadway to top of Truss, including all Tower steel (P.P. 93-77 &
P.P. 30-47)
* All confined Space with in Odyssey's limits of work
* Odyssey is to provide their own HSO and QA/QC (Nace #1 Cert. )
* Any air monitoring for blasting operation is the responsibility of Odyssey
* Any Platform and or Scaffolding needed for the work in question is the responsibility of Odyssey
* All waste handling, Hazardous and or Non- Hazardous is the responsibility of Odyssey (inc.all taxes)
* Odyssey is responsible for all of their own engineering for platform,Scaffolds and Containment.
* Odyssey is responsible for all of their own security.
* Odyssey must use MAB Paint
* Protection of all necklace lighting, cameras,light fixtures etc .(as per spec.)
* 39831.0601 Caulking to be paid at $4.00 per LF.
* Special attention to Noise Controll Requirements.
* All Medical testing and training is the responsibility of Odyssey
* Any and all permits is the responsibility of Odyssey
* Odyssey is to provide a rigid roof system along the South outer roadway and the North walkway for their work.
Usage of this system by Alpha Contracting for performance of work in Alphas Subcontract shall be granted
at no charge.                                                $ 308,723.36
* There will be an add to the Contract value of $467,500.00 for each phase that a 100% performance &
payment bond is provided to L&L prior to commencement of ANY work within the scope of that phase
* Should a bond be provided once work has commenced, the value of the add will be proportionate
to the % of requisitioned work completed after the bond has been submitted relative to the total value of the
potential add of $467,500.00
* Odyssey will receive 4% mobilization after 10% of work is complete or if a payment & performance bond is
submitted prior to commencement of work L&L will forward 4% mobilization upon receipt from NYCDOT.
* A 6.5% deduct from the Contract has been instituted for wrap-up insurance. Any rebates received shall be
dispersed proportionately to Subcontract value relative to total prime contract value.
* Premiums associated with the furnishing of all performance and payment bonds will be the responsibility
of the Subcontractor.

Initial _____          Initial

**Exhibit 1**
**Page 2 of 2**

## L&L Painting will provide the following.

* Maintenance and Protection of Traffic ( MPT will be coordinated with others )
* Engineer's office is the the responsibility of L&L Painting
* Progress Photos and Progress Video is the responsibility of L&L Painting
* Graffiti Removal is the responsibility of L&L Painting
* Community Notifacation is the responsibility of L&L Painting
* Job CPM is the responsibility of L&L Painting (Odyssey must submit their schedule)
* Job Project Manager by L&L Painting ( Odyssey must have their own supervision)
* Job Security to be provided by L&L Painting Co Inc. (not personal property)
* Storage yard to be provided by L&L.

**Initial** _____          **Initial** _____

*I & II A*

*PP 77-123*

## SUBCONTRACT AMENDMENT #2

This amendment made this 30th of August, 2005 is to serve as dual party acknowledgement of the additional scope of work added to the contract. The "Contract" is the executed document between L&L painting Co., Inc. the "Contractor" and Odyssey Contracting Corp., the "Subcontractor" dated the 3rd of March, 2004, and as amended by Amendment #1 dated July 14th, 2005.

By this Amendment #2, 16 additional bays (PP107-PP123) are added to the work of the "Contract" for the additional compensation of $3,967,916.00. Additionally, the 4% mobilization of $158,716.44 will be added upon providing a bond for this work. These sums already account for the 6.5% wrap-up insurance deduction.

It is expressly understood and hereby clearly stated that there is no other amendments of any kind written or unwritten, other then the above listed amendments exactly as they are written, concerning the original contract dated the 3rd day of March, 2004. This amendment makes no changes to the original base contract other then the additional panel points, and the corresponding compensation of $4,126,632.44.

Summary of change:
16 additional bays (107-123)
16 bays x $247,994.75 per bay = $ 3,967,916.00
4% mobilization                        = $     158,716.64
Total of Amendment              = $ 4,126,632.64
Total 3/3/04 Contract w/ Bond = $ 9,350,000.00
New contact total                    = $13,476,632.64

Signature below by the proper officers of duty authorized agents of the parties hereto shall represent execution of this amendment into the "contract" language.

**L&L Painting Co., Inc.**

By _____
Contractor   9/1/05

**Odyssey Contracting Corp.**

By: _____
Subcontractor   9/1/05

# SUBCONTRACT AMENDMENT

This amendment, made this 14th of July, 2005 is to serve as dual party acknowledgement of the amended scope of work *pertaining only to work limits* represented in the contract. The "Contract" is the executed document between L&L Painting Co., Inc. the "Contractor" and Odyssey Contracting Corp., the "Subcontractor" dated the 3rd day of March, 2004.

In the "Contract" the limits of work to which Odyssey has contracted - page 3, Section (a) is hereby amended to:

(a) *The Contractor agrees to pay the Subcontractor . . . from PP 77 - PP 107, adjusted as required by differences between estimated and actual quantities for unit price Work and subject to additions and deductions for changes agreed upon or determined, as hereinafter provided.*

It is expressly understood and hereby clearly stated that there is no other amendments of any kind written or unwritten, other then the above amendment exactly as it is written, concerning the original subcontract dated the 3rd day of March, 2004. This amendment makes no changes to the original base subcontract other then the applicable panel points.

Signature below by the proper officers or duly authorized agents of the parties hereto shall represent execution of this amendment into the "contract" language.

By: _____
Contractor

By: _____
Subcontractor



# FAX

**DATE:** _July 21, 2005_

*Number of Pages (Including Cover)* 2

| TO: | Odyssey Contracting Corp | | FROM: | Scott M. Earl |
|---|---|---|---|---|
| | To: Stavro | | | **L & L PAINTING CO., INC.** |
| | | | | 900 South Oyster Bay Road |
| FAX No.'s | (724) 745-3220 | | | Hicksville, N.Y. 11801 |
| | (718) 752-469 | | PHONE: | (516) 349-1900 |
| | | | FAX: | (516) 349-0011 |

**Project:**  **Queensboro Bridge; Contract No. BRC 231P**

**Re:**  **Revised Subcontract Amendment**

☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please Comment   ☐ Forward to Engineer
☐ This original will be sent by:   ☐ Ordinary Mail   ☐ Messenger   ☐ Overnight
☐ This will be the only form of delivery of this document.

## FAX MEMORANDUM

Remarks:



Scott M. Earl
Project Manager


Cc:

651/QUEN

# SUBCONTRACT

THIS AGREEMENT, made this 3rd day of March, 2004, by and between Odyssey Contracting Corp., hereinafter called the Subcontractor, Address: P.O. Box 97, Houston, PA 15342; and L&L Painting Co., Inc., hereinafter called the Contractor, Address: 900 South Oyster Bay Road, Hicksville, New York 11801.

## WITNESSETH:

WHEREAS, the Contractor has entered into a Contract dated the 18th day of September, 2003 with New York City Department of Transportation, hereinafter called the Owner, for the construction of Queensboro Bridge Protective Coating, hereinafter called the Project, at Boroughs of Queens and Manhattan; and

WHEREAS, copies of the Prime Contract are on file in the office of the Contractor and are available for examination by the Subcontractor; and

WHEREAS, the Subcontractor desires to perform a portion of such Prime Contract.

NOW, THEREFORE, it is agreed as follows:

Section 1.    CONTRACT DOCUMENTS.

(a)    The term "Prime Contract" as used herein refers to the Notice to Bidders, Information for Bidders, Contract Terms and Conditions including all Addendum, general, supplementary and special conditions, drawings, specifications, amendments, modifications and all other documents forming or by reference made a part of the contract between the Contractor and Owner.

(b)    The Contract Documents including all of the terms and conditions of the Prime Contract shall be deemed expressly incorporated by reference into this Subcontract.  The intent of the parties is that, with respect to the Work, and subject to the terms hereof, Subcontractor shall be under the same obligations to Contractor and bound by the same terms, conditions, and procedures that govern Contractor's relationship with the Owner, including, but not limited to, Chapters 1 through 11 of the Prime Contract which set forth, *inter alia*, the Dispute Resolution Procedure, the Change Order Procedure, Insurance and Indemnity Obligations.  Accordingly, the term "Subcontractor" shall be deemed substituted for "Contractor", and "Contractor" or "Contractor's" for

47744v1

"Owner", etc. in the Contract Documents between Contractor and Owner and any other corresponding changes made whenever the context may require. The absence of a specific reference to a portion of the Contract Documents in no way diminishes the parties' reciprocal rights and obligations thereunder, as set forth in Paragraphs (c) and (d) below.

   (c) Subcontractor shall be bound to Contractor by the terms of the Subcontract including all attachments hereto (collectively the Subcontract) and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which Contractor, by those Contract Documents, assumes toward the Owner, and shall have the benefit of all rights, remedies and redress against Contractor which Contractor, by those Contract Document, has against the Owner, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision of this Subcontract, those Contract Documents between Owner and Contractor shall govern except if otherwise provided in the Subcontract.

   (d) Contractor shall be bound to Subcontractor by the terms of this Subcontract and of the Contract Documents between the Owner and Contractor and shall assume toward Subcontractor all the obligations and responsibilities that the Owner, by those Contract Documents, assumes toward Contractor, and shall have the benefit of all rights, remedies and redress against Subcontractor which the Owner, by those Contract Documents, has against Contractor, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision in this Subcontract, those Contract Documents between Owner and Contractor shall govern.

   (e) This Subcontract is subject to Subcontractor approval by the Owner, to the extent required under the Prime Contract.

   (f) Subcontractor, by signing this Agreement, acknowledges that it has independently assured itself that all of the Prime Contract documents have been available to it and confirms that it has examined all such documents and agrees that all of the aforesaid Prime Contract documents shall be considered a part of this Subcontract by reference thereto and the Subcontractor agrees to be bound to the Contractor and Owner by the terms and provision thereof so far as they apply to the Work hereinafter described, unless otherwise provided herein.

(g)    It has been made very clear to Subcontractor that time is of the essence and Subcontractor is to proceed immediately with any and all shop drawing preparation and submittals, all sample submittals, and fabrication of materials to comply with the project schedule so as to achieve Substantial Completion on or before the date depicted in the project schedule for the Subcontracted work.

(h)    Subcontractor shall layout and establish all lines, dimensions and levels required for the proper installation of the Work using the established lines and benchmark elevation. Subject to latent conditions, Subcontractor shall compare existing conditions with working points and measurements at the site, and compare the construction drawings to ascertain that they are in agreement to the extent same interface with the Work. Any difference shall be brought to the immediate attention of Contractor.

Section 2.    THE WORK. The Subcontractor agrees to furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform the following described work attached hereto as Exhibit 1 (hereinafter called the Work) in accordance with the terms and conditions of all Construction Documents including but not limited to the Prime Contract and this Subcontract and in accordance with the reasonable discretion of Contractor.

See attached Exhibit 1 which is made a part hereof.

Materials furnished but not installed by Subcontractor shall be delivered F.O.B. job site unless otherwise provided in other provisions of this Subcontract .

Section 3.    PAYMENT. Subcontractor shall submit an invoice to Contractor on a monthly basis for Work performed during the prior month. The Subcontractor's invoice shall be based on an itemized breakdown of the Work scope as approved by the Contractor. Invoicing will not be recognized until full compliance with invoice breakdown requirements are reasonably fulfilled. One copy of each of the following forms must be attached to the invoice.

Billing Breakdown Form A.I.A. G702-G703
Properly executed Partial or Final Waiver Form - (Supplied by Contractor)

(a)    The Contractor agrees to pay the Subcontractor for the performance of this Subcontract as specified herein, the sum of eight million eight hundred eighty two thousand five hundred ($8,882,500.00) from P.P. 123-93, adjusted as required by differences between estimated and actual quantities for unit price Work and subject to additions and deductions for changes agreed upon or determined, as hereinafter provided.

47744v1                                3

(b)    Partial payments will be made to the Subcontractor each month in an amount equal to 95 percent of the value, computed on the basis of the prices set forth above, of the quantity of the Work performed hereunder, as estimated by the Owner or Owner's Representative, less the aggregate of pervious payments, but such partial payments shall not become due to the Subcontractor until seven (7) days after the Contractor receives payment for such Work from the Owner.  If the Contractor receives payment from the Owner for less than the full value of materials delivered to the site but not yet incorporated into the Work, the amount due to the Subcontractor on account of such materials delivered to the site shall be proportionately reduced.  No partial payment to the Subcontractor shall operate as approval or acceptance of Work furnished hereunder.

(c)    Upon complete performance of this Subcontract by the Subcontractor and final approval and acceptance of Subcontractor's Work by the Owner, the Contractor will make final payment to the Subcontractor of the balance due to it under this Subcontract within forty-five (45) days after full payment for such Work has been received by the Contractor from the Owner.

(d)    If at any time prior to final payment hereunder the Owner reduces the amount of retainage withheld from the Contractor, the Contractor may, in its sole discretion, with the consent of the Subcontractor's surety, reduce accordingly, the retained percentage withheld from the Subcontractor.

(e)    The Contractor may deduct from any amounts due or to become due to the Subcontractor any sum or sums owed by the Subcontractor or Subcontractor's affiliated entities to the Contractor or Contractor's affiliated entities; and in the event of any breach by the Subcontractor of any provision or obligation to this Subcontract, or in the event of the assertion by other parties of any claim or lien against the Contractor or the premises arising out of the Subcontractor's performance of this Subcontract, the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage or expense therefrom, until the situation has been satisfactorily remedied or adjusted to the Subcontractor.

(f)    Before any payments will be made under this Subcontract, the Subcontractor shall file in the office of the Chief Fiscal Officer of the Contracting Party verified statements provided for in Section 220-a of the Labor Law, or any applicable Federal Law including any applicable Davis-Bacon Related Act certifying to the amounts then due and owing from the Subcontractor for daily or weekly wages or supplements on

account of labor performed upon the Work under this Subcontract, and setting forth therein the names of the persons whose wages or supplements are unpaid and the amount due to each respectively. Subcontractor shall set forth in his statement the names of all its subcontractors. If Subcontractor has no subcontractors, it shall so state in his statement. Subcontractor may not subcontract any painting work he is contracted to perform. If there be nothing due and owing to any laborer for daily or weekly wages or supplements on account of labor performed, verified statements to that effect shall be filed by the Subcontractors before any payments are made under this Subcontract. The statements required shall be verified by the oath of the Subcontractor as the case may be that it has read such statements subscribed by it and knows the contents thereof, and that the same is true of its own knowledge.

(g)    The Owners Chief Fiscal Officer may deduct, from any amount certified under the Subcontract to be due to the Subcontractor, the sum or sums admitted in the aforesaid statements to be due and owing on account of the aforesaid daily or weekly wages or supplements as provided in Section 220-b of the Labor Law or other applicable Labor Laws including any applicable Federal Law.

(h)    The Subcontractor shall keep a record card of every employee engaged in the performance of the Work under this Subcontract  employed by Subcontractor, on which shall be given:

Subcontract _____

Project and Location_____

Employee=s Name _____ Payroll or Badge No.

_____

Employee=s Address _____

_____

Title of position _____ Hourly Wage $_____

Classification _____ Fringe Benefits_____
        (Journeyman, Reg. Apprentice, Etc.)

Resided in New York State since _____

Where born _____

Naturalized_____
        (Date)                          (Court)                          (Location)

Employed by _____
(To be signed by Contractor=s representative)

Said cards shall be kept in the office of the Subcontractor and shall be available for reasonable inspection by duly authorized representatives of the Contractor/Owner during

business hours of the day. If required, the Subcontractor shall file with the Contractor/ Owner the above information on duplicate cards to be furnished by the Subcontractor.

(i)    The Subcontractor shall also submit to the Contractor/Owner the completed weekly payroll report forms issued by the office of the Comptroller and furnished by the Owner. However, on Federally funded projects or where the Contractor produces a computerized payroll printout, the Contractor may, with the permission of the Owner, submit the same payroll information on Federal regulation forms or copies of his computerized payroll in lieu of the payroll report forms issued by the Comptroller.

Section 4.    BONDING.

(a)    The Subcontractor shall furnish a Performance and Payment Bond in an amount equal to the full Subcontract price. Such bond shall be on form furnished by, and with a surety satisfactory to, the Contractor. Premium for such bonds shall be paid by the Subcontractor unless otherwise agreed upon in writing by the parties hereto.

(b)    By signing this Subcontract, the Subcontractor certifies that it has the bonding capacity and has made arrangements for furnishing said Performance and Payment Bond to Contractor prior to beginning performance of the Work and that the time required to prepare and furnish said bond will not delay the start of the Work. Should Subcontractor proceed with the Work without first furnishing said Performance and Payment bond, whether or not such performance was permitted or encouraged by Contractor's job site representative, Subcontractor shall be deemed to have waived its right to partial payment and agrees to look to the Contractor for payment of the amount due hereunder only upon furnishing said bond or on completion of the entire Work and the furnishing of the releases described in Section 12. The furnishing of said bond by the Subcontractor is a condition precedent to the Subcontractor's right to receive partial payment for Work performed hereunder. The waiver of partial payment shall not constitute an excuse or reason for nonperformance of this Subcontract by Subcontractor.

(c)    See Schedule A for applicable terms for exceptions or deviations from above requirements.

Section 5.    CHANGES.

(a)    The Contractor may at any time by written order of Contractor's authorized representative and with the Subcontractor's approval, make changes in, additions to and omissions from the Work to be performed under this Subcontract, and

47744v1                                           6

the Subcontractor shall promptly proceed with the performance of this Subcontract as so changed.

(b)    For changes in the Prime Contract that have been initiated by the Owner or Owners Representative and for acts or omissions of the Owner or Owners Representative and/or defects in the Prime Contract documents, the Subcontractor shall submit any claims it may have including notice thereof for adjustment in the price, schedule or other provisions of the Subcontract to the Contractor in writing in sufficient time and form to allow the Contractor to process such claims within the time and in the manner provided for an in accordance with the applicable provisions of the Prime Contract documents.  Subcontract adjustments shall be made only to the extent and in the manner that the Contractor is entitled to relief from or must grant relief to the Owner.

(c)    For changes directed by the Contractor which were not initiated by the Owner or Owners Representative and do not arise out of acts, errors or omissions of the Owner or Owners Representative or defects in the Prime Contract documents. Subcontractor shall be entitled to equitable adjustment in the Subcontract price, provided Subcontractor gives Contractor written notice of its intent to claim such an adjustment prior to performing such changed Work. Any extra work that is performed directly for Contractor, may not include overhead and profit.   Failure to provide such notice shall be deemed to prejudice the Contractor and constitute a waiver of such claims by Subcontractor.

(d)    No time extension shall be granted to the Subcontractor by reason of the issuance of any change order unless it is expressly stated therein and approved by Owner.

Section 6.    PROSECUTION OF WORK.

(a)    The Subcontractor shall furnish all labor, supervision, tools, equipment, materials and supplies necessary for the performance of this Subcontract in a proper, efficient and workmanlike manner.  The Subcontractor shall prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, or at such other time or times as the Contractor may direct, and so as to promote the general progress of the entire construction, and shall not, by delay or otherwise, interfere with or hinder the Work of the Contractor or any other Subcontractor.  Any materials that are to be furnished by the Subcontractor hereunder shall be furnished in sufficient time to enable the Subcontractor to perform and complete its Work within the time or times provided for herein.  The time of performance of the Work by the Subcontractor is of the essence and the Subcontractor agrees to reimburse the Contractor for any and all liquidated or actual damages that may be assessed by the Owner against

47744v1                                    7

and collected from the Contractor which are attributable to or caused by the Subcontractor's failure to perform the Work required by this Subcontract within the time fixed or in the manner provided for herein. Subcontractor also agrees to pay to the Contractor any increased costs or other damages the Contractor may sustain by reason of such delay by the Subcontractor whether or not liquidated or actual damages are assessed and collected by the Owner. The payment of such damages shall not release the Subcontractor from its obligation to otherwise fully perform this Subcontract. Upon written request by the Contractor, the Subcontractor shall furnish to the Contractor such evidence as the Contractor may require relating to the Subcontractor=s ability to fully perform this Subcontract in the manner and within the time specified herein.

(b)    Subcontractor shall submit Material Status reports on a monthly basis. This report shall show all purchase orders placed and scheduled to be placed including scheduled/actual dates of order placement and scheduled/actual dates of material and equipment deliveries. This report shall also include the name of the supplier for each purchase order and the associates detailed cost breakdown item number. Subcontractor shall provide Contractor a schedule for the Work and monthly update reports showing current progress of the work as well as a plan and schedule of the completion of their remaining work. Subcontractor shall familiarize itself with the Project schedule and other update requirements.

(c)    In the event the Subcontractor fails to comply or becomes disabled from complying with the provisions herein as to character or time of performance, including but not limited to payment for all materials furnished and Work and labor performed under this Subcontract, and the failure is not attended to within fifteen (15) days and corrected in thirty (30) days, after written request by the Contractor to the Subcontractor, the Contractor, by this Subcontract or otherwise, may without prejudice to any other right or remedy, terminate this Subcontract for default and take over and complete the performance of this Subcontract at the expense of the Subcontractor, or without terminating the Subcontract, take over the Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the situation at the expense of the Subcontractor.

(d)    The Subcontractor shall keep, on the Project site during the progress of the Work, a competent superintendent who shall be authorized representative of the Subcontractor. Directions and communications to the superintendent from the Contractor in connection with the Work shall be treated as directions and communications to the Subcontractor. Any items that are considered a non-compliance notice will be forwarded to the Subcontractor's main headquarters.

(e)     It is recognized that if Subcontractor becomes insolvent, or institutes or has instituted against it bankruptcy proceedings, or makes a general assignment for the benefit of creditors, of if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such event or events could impair or frustrate Subcontractor's performance of this Subcontract. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its receiver or court-appointed successor adequate assurances of future performance. Pending receipt of adequate assurances of performance and actual performance in accordance therewith. Contractor shall be entitled to take over the Work pursuant to the provisions of Subsection 6(c) above without notice to Subcontractor.

(f)     If the Prime Contract is terminated for the convenience of the Owner, the termination settlement under this Subcontract shall be as provided in the Prime Contract. The Subcontractor shall not be entitled to receive any greater amount than the Contractor may on behalf of the Subcontractor recover from the Owner for such termination.

(g)     Upon a determination by a court of competent jurisdiction that termination of Subcontractor or its successor in interest pursuant to any provision of this Subcontract was wrongful, such termination will be deemed converted to a termination for convenience and the Subcontractor's remedies shall be limited to those set forth in Subsection 6(e).

Section 7.     DELAYS.

(a)     In the event the Subcontractor's performance of this Subcontract is delayed or interfered with by acts of the Owner, Contractor or other subcontractors, it may request an extension of the time for the performance of same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delays or interference, except to the extent that the Prime Contract entitled the Contractor to compensation for such delays and then only to the extent of any amount that the Contractor may, on behalf of the Subcontractor recover from the Owner for such delays.

(b)     No allowance for an extension of time, for any cause whatever, shall be claimed by, or made to, the Subcontractor unless the Subcontractor shall have made written request upon the Contractor for such extension within five (5) days after the cause of such extension occurred, or, if the Prime Contract provides for a shorter period, within

sufficient time to permit the Contractor to give notice to the Owner or Owner's Representative within the time allowed by the Prime Contract for such notice.

(c)    No allowance for an extension of time shall, in any event, be made to the Subcontractor for delay by the Subcontractor in preparing drawings or in securing approval of the Owner or Owner's Representative thereto when such drawings are not properly prepared or when the Subcontractor, by the exercise of reasonable diligence and judgment, could have anticipated and avoided the delay.

Section 8.    LABOR.  The Subcontractor, in connection with all Work covered by this Subcontract, shall comply with and be bound by any labor agreements executed by the Contractor or on Contractor's behalf.  Failure at any time to comply with any of the provisions of such agreements will, at the option of the Contractor, provided failure is not attended to within fifteen days (15) and corrected in thirty (30) days after written request by the Contractor to the Subcontractor, be cause for immediate termination of this Subcontract for default and the Contractor shall have all of the rights contained in Section 6 with regard to such termination.  If, by reason of strikes, picketing or disputes of any nature between the Subcontractor and any individual, group or organization, the Subcontractor should be persistently, repeatedly, or for a period of five (5) consecutive days, unable to supply enough properly skilled workers or proper materials to execute the Work defined in this Subcontract, the Contractor may terminate the Subcontract for default and proceed in accordance with Section 6 hereof.

Section 9.    APPROVALS.  All drawings of the Subcontractor shall be submitted through the Contractor for approval of the Owner or Owner's Representative and all other communications between the Subcontractor and the Owner or Owner's Representative with respect to the Work shall be transmitted through the Contractor.

Section 10.    INSURANCE.  Prior to commencement of Work, Subcontractor shall procure and at all times thereafter maintain with insurers acceptable to Contractor the following minimum insurance protecting the Subcontractor, Owner and the Contractor against liability from damages because of injuries including death, suffered by persons, including employees of the Subcontractor, and liability from damages to property arising from and growing out of the Subcontractor=s operations, including its subcontractors' and suppliers' operations, in connection with the performance of this Subcontract.  If the terms of the Prime Contract require larger limits or additional coverage or both, Contractor reserves the right to require Subcontractor to provide, at Subcontractor's expense such larger limits or additional coverage or both.

<u>Limits</u>

47744v1                                   10

| | |
|---|---|
| (a)  In the U.S., Worker=s Compensation, in state(s) of operation, and where applicable, U.S. Longshoremen=s and Harbor Workers' Compensation Act and Jones Act coverages, Employer's Liability; | Statutory |
| (b)  Comprehensive General Liability Bodily Injury including personal injury | $5,000,000.00/occurrence- $10,000,000.00 aggregate |
| Property Damage | $5,000,000.00/occurrence- $10,000,000.00 aggregate or $10,000,000.00 combined single limit |
| Premises Operations, "X.C.U." where applicable, Products/Completed Operations, Contractual Liability, Broad Form Property Damage and Independent Contractors; | |
| (c)  Excess Umbrella Liability | $10,000,000.00/occurrence $10,000,000.00 aggregate |
| (d)  Comprehensive Automobile Liability (including owned, hired and non-owned vehicles) | |
| Bodily Injury | $1,000,000.00/person - $2,000,000.00/accident or |
| Property Damage | $2,000,000.00 combined single limit |

Subcontractor shall provide Contractor with certificates evidencing such insurance as outlined above prior to beginning any Work under this Agreement. Such certificates shall provide for thirty (30) days advance written notice to Contractor of cancellation, material change, reduction of coverage or non-renewal. Subcontractor shall cause its subcontractor(s) to procure insurance as outlined above. Subcontractor shall obtain policies or certificates for its subcontractor(s) and deliver them to Contractor, if requested to do so. All policies should be endorsed to add the Indemnified Parties and their

respective partners, directors, officers, employees, agents and representatives as set forth in Article 11 as Additional Insureds.

Section 11.    INDEMNIFICATION. The term AIndemnified Parties,@ whenever referred to in this Subcontract shall consist of the following parties including their officers, employees and agents:

1.    The City of New York;

2.    The New York City Department of Transportation;

3.    The Contractor; and

4.    Any other people required to be indemnified under the Prime Contract.

The Subcontractor further specifically obligates itself to the Contractor, Owner and any other party required to be indemnified under the Prime Contract, jointly and separately, in the following respects, to-wit:

(a)    to defend and indemnify them against and save them harmless from any and all claims, suits, liability, expense or damage for any alleged or actual infringement or violation of any patent or patented right, arising in connection with this Subcontract and anything done thereunder;

(b)    to defend and indemnify them against and same them harmless from any and all claims, suits or liability for damages to property including loss or use thereof, injuries to persons, including death, and from any other claims, suits or liability on account of acts or omissions of Subcontractor, or any of its subcontractors, suppliers, officers, agents, employees or servants, whether or not caused in part by the active or passive negligence or other fault of a party indemnified hereunder; provided, however, Subcontractor's duty hereunder shall not arise if such claims, suits or liability, injuries or death or other claim or suites are caused by the sole negligence of a party indemnified hereunder unless otherwise provided in the Prime Contract, Subcontractor's obligation hereunder shall not be limited by the provisions of any Workers' Compensation act or similar statute;

(c)    to pay for all materials furnished and Work and labor performed under this Subcontract, and to satisfy the Contractor thereupon whenever demand is made, and to defend and indemnify the Contractor, Owner and other indemnified parties

47744v1                                    12

against and save them and the premises harmless from any and all claims, suits or liens therefor by others than the Subcontractor;

      (d)    to obtain and pay for all permits, licenses and official inspections necessary for its Work, and to comply with all laws, ordinances and regulations bearing on the Work and the conduct thereof;

      (e)    the Subcontractor warrants and guarantees the Work covered by this Subcontract and agrees to make good, at its own expense, any defect in materials or workmanship which may occur or develop prior to the Contractor's release from responsibility to the Owner therefor; and

      (f)    the Subcontractor assumes toward the Contractor all obligations and responsibilities that the Contractor assumes toward the Owner and others, set forth in the Prime Contract, insofar as applicable, generally or specifically, to Subcontractor's Work;

The Subcontractor shall defend and indemnify the Contractor, Owner and other indemnified parties against, and save them harmless from, any and all loss, damages, costs, expenses and attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant of this Subcontract. Notwithstanding the above, Contractor, at is sole discretion, reserves the right to defend any one or all of the following: the Owner, other indemnified parties, Contractor=s surety and itself. Such election to defend by Contractor shall not in any way limit Subcontractor's responsibilities to indemnify and hold harmless as provided herein.

Section 12.   LIENS AND CLAIMS.  Subcontractor shall, as and when requested, furnish evidence satisfactory to the Contractor, Owner and Owner's Representative that all amounts due for labor and material furnished the Subcontractor in connection with performance of the Subcontract have been paid including union health, welfare and pension fund payments and payroll taxes. Such evidence shall be furnished in such form and manner as requested by Contractor and all statements relative thereto shall, if called for by Contractor, be made by sworn affidavit. Subcontractor shall furnish to Contractor releases of both rights and lien rights by persons who have furnished labor, material or other things in the performance of this Subcontract, it being agreed that payment money otherwise due Subcontractor need not be made by Contractor until such releases are furnished. Subcontractor shall deliver its Work free from all claims encumbrances and liens.

      (a)    Before each payment, upon demand of Contractor, Subcontractor shall furnish to Contractor an affidavit on a form satisfactory to Contractor indicating in

detail the unpaid obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract, to whom incurred, the amount due or to become due therefor, and, if demanded, procure the delivery to Contractor by the material supplier of duplicates of all material invoices and statements, and present receipts of all material invoices and statements, and present receipts, bills showing payment of all such obligations incurred and duly certified payrolls indicating full payment to each of its employees of wages earned during the preceding payroll periods. It is further provided that, prior to final payment, Subcontractor, if demanded, shall deliver to Contractor, in addition to the affidavits required, duly executed releases of liens from each of the persons/companies to whom obligations were incurred, together with a similar release executed by Subcontractor. Should Contractor pay the final payment or any part thereof without the presentation by Subcontractor of such release, then such payment, and the acceptance thereof, shall in itself constitute a release to Contractor by reason of any and all things done or performed or pertaining to or arising out of the relationship of the parties hereto as a result of this Subcontract, or the presence of Subcontractor on the site, whether in contract or tort;

      (b)    In the event at any time any obligations incurred by Subcontractor in connection with or as the result of the performance of this Subcontract are unpaid, if Subcontractor, after five (5) days' notice from Contractor, has not delivered to Contractor either a release, a receipt of payment in full or other evidence of payment satisfactory to Contractor, Contractor is authorized to make such payment directly out of any monies payable to Subcontractor. Notwithstanding the provisions of the Contract, if there shall be any lien, or other claim for monies due or to become due, Subcontractor shall immediately satisfy or bond same, or Contractor shall have the right to bond said lien or claim or otherwise discharge same and retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify Contractor against such lien or other claim, with interest, together with expenses incident to discharging such lien or claim or defending suit to enforce such lien or other claim, with interest, together with expenses incident to discharging such lienor claim or defending suit to enforce such lien or other claim, including any premiums charged for a bond and any attorneys' fees and disbursements, all of which the Subcontractor agrees to pay. Should Contractor give Subcontractor notice of any unpaid claim for obligations incurred by Subcontractor, Subcontractor shall be estopped from disputing liability for any such claim unless within five (5) days after such notice it indicates to Contractor, in writing, that there is some amount different than that demanded owing, or that there are no amounts owing. Should there prove to be any claim after all payments are made, Subcontractor shall refund to Contractor all monies that the latter may be compelled to pay in discharge and in defense of same. Any lien or other claim, until satisfied or withdrawn, shall preclude any payment or demand for any payment of said amount so claimed or demanded; and

47744v1                                                         14

(c)     It is specifically understood and agreed that the Subcontractor and Contractor acknowledge that there is a risk that Owner, in breach of its contract with Contractor, may make late payments or may, under certain circumstances such as lack of funding not make required payments to Contractor.  The parties furthermore acknowledge their agreement that they shall share the risk of same.  As a consequence of the foregoing understanding and consistent with that allocation of risk, the Subcontractor agrees that Contractor's receipt of payment from Owner on behalf of the Subcontractor's requisitions for payment (whether interim requisitions or final requisition, including retainage) shall be to the fullest extent provided by law, a condition precedent to the right of the Subcontractor to receive payment from Contractor.  In the event that Contractor is not receiving proper payment from Owner on account of the work of the Subcontractor such that Contractor is not required to make payment to the Subcontractor hereunder, Contractor may, in its sole discretion and to the extent it is legally able to do so, formally and in writing assign to the Subcontractor the rights of Contractor to pursue claims against Owner for the payment due to Contractor on behalf of the Subcontractor=s entitlement under the terms of this Subcontract which assignment Subcontractor shall be obliged to accept in full and complete liquidation of the obligations to payment of Contractor to Subcontractor hereunder.  The parties further acknowledge that the Subcontractor is entitled to pursue any and all rights to which it may be entitled under the New York Lien Law in the event that Contractor does not pay the Subcontractor amounts due hereunder, including non-payment resulting from delayed payments or non-payment by Owner to Contractor.  To the extent that this clause is inconsistent with such lien rights, this clause is deemed waived for such purpose only in the event that Contractor advises Subcontractor that Contractor is unable to pay Subcontractor by reason of Owner's non-payment to Contractor.  Subcontractor agrees that the filing of a lien in full accordance with the Lien Law and the complete prosecution of that lien claim to finality in the courts and collection therefrom, for the amount due to it shall be a condition precedent to the right of the Subcontractor to file an action in law or equity against Contractor or its surety in connection with the Project.  In the event that Subcontractor files a claim against any or all of Contractor's sureties, Subcontractor agrees to stay any proceedings against Contractor's sureties pending the resolution of its mechanic=s lien action to finality in the courts, including collection therefrom.  Furthermore, nothing herein is intended to limit or preclude the rights of the Contractor under other terms of this Subcontract to assert backcharges, set-offs, limits or other claims against the Subcontractor in regard to the matters addressed in this Clause or otherwise.

Section 13.    POSSESSION PRIOR TO COMPLETION.  Whenever it may be necessary for the Contractor to do so, the Contractor shall be permitted to occupy and/or use any portion of the Work which has been either partially or fully completed by the

47744v1                                      15

Subcontractor before final inspection and acceptance thereof by the Owner, but such use and/or occupation shall not relieve the Subcontractor of its guarantee of said Work nor of its obligation to make good at its own expense any defect in materials and/or workmanship which may occur or develop prior to Contractor's release from responsibility to the Owner.

Section 14.    OTHER CONTRACTS.  It is understood and agreed that the Work provided for in this Subcontract constitutes only a part of the Work being performed for the Owner by the Contractor and other subcontractors.  The Subcontractor, therefore, agrees to perform the Work called for in this Subcontract in such a manner that it will not injure, damage or delay any other Work performed by the Contractor to any other subcontractor or supplier, and further agrees to pay or reimburse the Contractor for any additional costs, damage or delay that may be caused to such other Work of the Contractor, subcontractors or suppliers, by the Subcontractor or by its agents or employees.

Section 15.    INDEPENDENT CONTRACTOR.  The Subcontractor specifically agrees that it is, or prior to the start of the Work will become, and will remain during the performance of this Subcontract, an independent contractor.

Section 16.    COMPLIANCE WITH LAW.  The Subcontractor agrees to fully comply with all applicable laws, ordinances and regulations.

Section 17.    SAFETY.  The Subcontractor shall take all reasonable safety precautions pertaining to its Work and the conduct thereof.  Without limit, the generality of the foregoing, it shall comply with all applicable laws, ordinances, rules, regulations and orders issued by any public or governmental body or authority, whether federal or otherwise, including, but not limited to, occupational safety and health legislation and, in addition, the safety measures called for the Contractor.  The failure of the Subcontractor to take all reasonable safety precautions shall be deemed by Contractor in its reasonable discretion to be a breach of this Subcontract subject to the termination provisions contained herein.

Section 18.    RESPONSIBILITY FOR INJURIES TO PERSONS AND PROPERTY

(a)    The Subcontractor shall be solely responsible for (1) all injuries (including death) to persons, including but not limited to employees of the Subcontractor and Indemnified Parties and (2) damage to property, including but not limited to property of the Indemnified Parties, the Contractor or the Subcontractor.  The liability hereunder

shall be limited to such injuries or damage occurring on account of, or in connection with, the performance of the Work, whether or not the occurrence giving rise to such injury or such damage happens at the Project Site or whether or not sustained by persons or to property while at the Project Site, but shall exclude injuries to such persons or damage to such property to the extent caused by the negligence of the Contractor or the Subcontractor.

(b)    The Subcontractor=s liability hereunder includes any injury (including death) or damage to property related to the performance of, including the failure to perform, miscellaneous and incidental Work.

(c)    The Subcontractor expressly acknowledges that it has reviewed the Contract Documents and if the Work be done without fault or negligence on the part of the Subcontractor, such Work will not cause any damage to the foundations, walls or other parts of adjacent, abutting or overhead buildings, railroads, bridges, structures or surfaces. PROTECTION OF WORK.  The Subcontractor specifically agrees that it is responsible for the protection of its Work until final completion and acceptance thereof by the Owner and that the Subcontractor will make good or replace, at no expense to the Contractor or the Owner, any damage to its Work which occurs prior to said final acceptance.

Section 19.    DISPUTES.

(a)    In case of any disputes between Subcontractor and the Contractor, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner both by the terms of the Prime Contract and by any and all decisions or determinations made thereunder by the party or board as authorized in the Prime Contract. It is agreed that in the event the Prime Contract contains a provision, hereinafter called "disputes" clause, whereby claims may be resolved under an administrative procedure or by arbitration, then as to any claims of Subcontractor for or on account of acts or omissions of the Owner or Owner's Representative which are not disposed of by agreement, the Contractor agrees to present to the Owner, in Contractor's name, all of Subcontractor's claims for additional monetary compensation or time extension; and to further invoke, on behalf, in advance of and even in the Prime Contract  for determining disputes.  Contractor shall have the option to present such claims on Subcontractor's behalf, in advance of and even without Subcontractor's written request, Subcontractor shall have full responsibility for preparation and presentation of such claims and shall ear all expenses thereof, including attorneys' fees.  Subcontractor agrees to be bound by the procedure and final determinations as specified in any such Disputes clause, and agrees that it will not take, or will suspend, any other action or actions with respect to any such

claims and will pursue no independent litigation with respect thereto, pending final determination under such Disputes clause. Subcontractor shall not be entitled to receive any greater amount from Contractor than Contractor is entitled to and actually does receive from the Owner on account of Subcontract's Work, less any markups or costs incurred by the Contractor and to which Contractor is otherwise entitled, and Subcontractor agrees that it will accept such amount, if any, received by Contractor from Owner as full satisfaction and discharge of all claims for or on account of acts or omissions of the Owner or Owner's Representative(s). Should the Owner determine that the work is not an extra, and awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and partial payment as payment in full. Contractor, however, at its sole and exclusive discretion, may appeal from any ruling or may institute a suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the work of the Subcontractor as permitted by the Prime Contract. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to Contractor, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by Contractor in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to Contractor and all expenses and attorneys fees and disbursements incurred by Contractor in prosecuting such appeal or suit. The Subcontractor agrees that no claim, invoice or payment requisition shall include any modifications to the Price, without an executed Change Order, pursuant to which such work is eligible for payment.

(b)     Subcontractor shall be bound by document's determination, made in good faith, as to apportionment of any amounts received from Owner for claimants, including Contractor and other subcontractors, whose work is affected by any act or omission of the Owner or Owner's Representative.

(c)     Should a dispute as to proper interpretation of this Subcontract, or Work or material performed or furnished hereunder arise which concerns the parties hereto only, or Subcontractor and other subcontractors or suppliers, but not the Owner or Owner's Representative, the same shall be decided by Contractor whose decision thereon shall be final and conclusive.

(d)     The Subcontractor shall proceed diligently with the Work, pending final determination pursuant to any Disputes clause or pursuant to any other action taken with respect to a claim or claims.

47744v1                                                     18

Section 20.    ATTORNEY FEES.  In the event either party institutes suit in court against the other party or against the surety of such party, in connection with any dispute or matter arising under this Subcontract, the prevailing party shall be entitled to recover reasonable attorney fees in addition to any other relief granted by the court.

Section 21.    TAXES.  Subcontractor shall pay all taxes, licenses and fees of every nature which may be imposed or charged by any governmental authority upon the labor, material, or other things used in the performance of the Work or upon the transaction between Contractor and Subcontractor.  Relating to the Work, Subcontractor hereby accepts exclusive liability for the payment of all taxes now or which may hereafter be imposed covering labor and/or materials to be furnished by Subcontractor hereunder including but not limited to sales tax, and any contributions under the New York State Unemployment Insurance Act, the Federal Social Security Act, and all legislation enacted either Federal, State, or Municipal, upon the payroll of employees engaged by him or materials purchased for the performance of this Subcontract, and agrees to meet all the requirements specified under the aforesaid Acts or legislation, or any acts or legislation which may hereafter be enacted affecting said labor and/or materials.  Subcontractor will furnish to Contractor any records Contractor may deem reasonably necessary to carry out the intent of said acts or legislation, and hereby authorizes Contractor to deduct the amount of such Taxes and contributions from any payments due Subcontractor and to pay same direct or take any precaution as may be deemed necessary to guarantee payment;  if after Contractor's receipt of written notice from the applicable taxing authority that such taxes or contributions are due and within thirty (30) days after receipt of such notice from Contractor, Subcontractor fails to pay same or provide Contractor with reasonable evidence refuting such obligation.

Section 22.    CONTRACTOR'S EQUIPMENT.  In the event that Subcontractor by rental, loan or otherwise, makes use of any of 's equipment, scaffolding, or other appliances, Subcontractor agrees to accept such "as is" and that such use shall be at the sole risk of Subcontractor and Subcontractor agrees to defend, hold harmless and indemnify Contractor against all claims of every nature arising from its use thereof.

Section 23.    FURNISHED MATERIAL.  In the event that the Contractor or Owner, or their suppliers, or subcontractors, elect to furnish material to the Subcontractor for use in connection with this Subcontract then the cost of handling, storing and installing such material shall be considered as included in the Subcontract price.  The Subcontractor shall be and become responsible for all such materials upon delivery to it, whether delivered F.O.B. point of origin or F.O.B. job site (except that any transportation charges paid by the Subcontractor, in the event of delivery F.O.B. point of origin, shall be reimbursed to Subcontractor) and shall pay all demurrage and storage charges which

47744v1                                          19

accrue after delivery. Furnished material lost or damaged after delivery, from any cause whatsoever, shall be replaced by or at the expense of the Subcontractor. Subcontractor shall, within forty-eight (48) hours after delivery of furnished materials, inspect the same and immediately report, in writing, to the Contractor any shortages, damages or defects therein which are reasonably observable by proper inspection. Failure to inspect and report as specified shall be treated as unqualified acceptance by Subcontractor of the material involved.

Section 24. EQUAL OPPORTUNITY. If the Prime Contract contains any provision which prohibits discrimination on the basis of race, color, religion, sex, or national origin, or if any law, regulation or order has any application thereto and is applicable to this Subcontract, then Subcontractor hereby agrees to comply with such provision, law, regulation or order. In the event that any such provision, law, regulation or order requires the physical attachment of specific wording to this Subcontract, then such attachments shall be furnished by the Contractor and shall be considered a part of this Subcontract by reference thereto or shall be physically attached thereto as called for by the Contractor.

Section 25. OWNER=S REPRESENTATIVE. The words "Owner's Representative" as used herein include Owner's design engineer, architect or any person or entity appointed by the Owner (including the Engineer, Architect, Project Manager and/or Commissioner as noted in the Prime Contract) to supervise the Work of the Contractor on behalf of the Owner.

Section 26. ASSIGNMENT. The Subcontractor shall obtain the written consent of the Contractor prior to assigning or subletting any of the Work, in whole or in part. Subcontractor may assign the proceeds of the Work after providing adequate assurances to Contractor that all its labor-suppliers and other creditors for the Work will be paid and upon obtaining the consent of Subcontractor=s surety and the acknowledgment of the assignee on forms provided by the Contractor.

Subject to any and all provisions of the Prime Contract's terms and conditions substituting "Subcontractor" for "Contractor" and "Contractor for Owner" or Authority, this Subcontract shall be governed by the laws of the State of New York without regard to choice of law or conflicts of law, and all disputes not subject to the Prime Contract, if any, shall be subject to the jurisdiction of the Supreme Court of New York, County of New York.

(a)    If the Contractor initiates any action against the Subcontractor in Federal Court or in New York State Court, service of process may be made on the

47744v1                                     20

Subcontractor either in person, wherever such Subcontractor may be found, or by registered mail addressed to the Subcontractor at its address as set forth in this Subcontract, or to such other address as the Subcontractor may provide to the Contractor in writing.

(b)     With respect to any action between the Contractor and the Subcontractor in New York State Court, that is not subject to the Prime Contract, the Subcontractor hereby expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of forum non conveniens, (ii) to remove to Federal Court; and (ii) to move for a change or venue to a New York State Court outside New York County.

(c)     With respect to any action between the Contractor or the Subcontractor in Federal Court, that is not subject to the Prime Contract, the action should be venued in the Southern District of New York, New York City Courthouse.  The Contractor expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the Southern District, New York City Courthouse.

(d)     If the underlying dispute is not subject to the Prime Contract and the Subcontractor commences any action against the Contractor in a court located other than in the State of New York, County of New York upon request of the Contractor, the Subcontractor shall either consent to a transfer of the action to a court of competent jurisdiction located in the State of New York, County of New York as above described or, if the court where the action is initially brought will not or cannot transfer the action the Subcontractor shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of competent jurisdiction in New York County as above stated.

Section 27.    PRIOR UNDERSTANDINGS OR REPRESENTATIONS.  The Contractor assumes no responsibility for any understandings or representations made by any of is officers or agents prior to the execution of this Subcontract, unless such understandings or representations by the Contractor are expressly stated in this Subcontract.

Section 28.    SEVERABILITY AND WAIVER.  The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision.  The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a

waive or relinquishment of such term, covenant, condition or right as respects further performance.

Subcontractor agrees to repair, replace or make good any damages, defects or faults to the extent resulting from defective Work Subcontractor performed or furnished which is not damaged by Contractor or its other subcontractors and suppliers, Owner or other parties, that may appear within one (1) year after the earlier of acceptance of the Work or beneficial use or occupancy of same by Contractor or Owner or for such additional period as may be required by Owner and/or the specifications relating to the work.

Section 29.    SETOFF.  If Subcontractor is, or hereafter begins performing any of the work hereunder and the unpaid balance of the Price becomes insufficient to complete such Work or compensate Contractor for any damages or deficiencies caused by the Subcontractor in the performance of the other Work, Subcontractor hereby consents and agrees to allow Contractor, in its sole discretion and judgment, to setoff any of Contractor=s claims against any amount due, or which may become due under this Subcontract or any other contract between Contractor and Subcontractor.  In such event Subcontractor shall continue to perform its obligation under the Subcontract.  No refusal or failure of Contractor to exercise its rights hereunder shall constitute the basis of any right or claim against Contractor.

Section 30.    PERFORMANCE OF WORK DURING THE PENDENCY OF DISPUTES.  Unless the parties hereto expressly agree otherwise in writing, in the event that a dispute shall arise under this Subcontract in connection with the Subcontract, including disputes related to payments to be made on any Requisition, or otherwise, Subcontractor shall continue during the pendency of such dispute to perform the Work and shall perform all other obligations required to be performed by it under this Subcontract as if no dispute shall have arisen.  During the pendency of any such dispute, and except as otherwise provided in this Subcontract, Subcontractor shall be entitled to receive payments from Contractor only on account of non-disputed items and payments on account of disputed items (except to the extent Contractor agrees on part of the disputed item) shall be deferred until the final resolution of the dispute.

Section 31.    CAPTIONS.  The captions at the beginning of each Section of this Subcontract are for convenience only and are to be given no weight in construing the provisions of this Subcontract.

Section 32.    NOTICES.  All notices shall be in writing addressed to the parties at the addresses set out in this Subcontract unless subsequently changed in conformance

with this notice provision and shall be considered as delivered on the third business day after the date of mailing if sent certified mail or when received in all other cases, including telecopy or other printed electronic medium or personal deliver.

Section 33.    INTEGRITY AND ETHICAL CONDUCT.  Contractor and Subcontractor acknowledge and understand that each is committed to have the Work performed in accordance with the highest ethical standards applicable to, or governing, the conduct of construction practices.  In furtherance thereof, Contractor and Subcontractor hereby agree to comply with and observe all applicable Federal, State and local laws, rules, regulations, requirements, trade standards and ethical guidelines governing said conduct, including those provided by Owner.

Section 34.    ADDITIONAL PROVISIONS. (Attach additional pages if necessary.)

See attached Additional Provisions which are made a part hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Subcontract by their proper officers or duly authorized agents.

By: _____          By: _____
          Contractor                                      Subcontractor

47744v1                                                    23

Exhibit 1
Page 1 of 2

# Odyssey Contracting Corp

### Truss and Towers

### The scope of work shall include but not be limited to the following:

* Contract value had initial base value of $10,000,000.00. A $500,000.00 deduct
  has been taken for the absence of a bond at this time.  A 6.5% deduct has been taken on the
  $9,500,000.00 sales value of the balance for the Project provided wrap-up program
* (619.17) Temp Concrete Barrier
* (10619.0599) Lighting for Temp Barrier
* (619.2104) Construction Zone Pavement Marking Stripes, Removable Tape
* (635.0103) Cleaning and Preparation of Pavement Surface Lines
* (687.0101) White Thermoplastic Reflectorized Pavement Stripes
* Limits of work : All Steel from the top of Upper roadway to top of Truss, including **all** Tower steel **(P.P. 77-47)**
* All confined Space with in Odyssey's limits of work
* Odyssey is to provide their own HSO and QA/QC (Nace #1 Cert. )
* Any air monitoring for blasting operation is the responsibility of Odyssey
* Any Platform and or Scaffolding needed for the work in question is the responsibility of Odyssey
* All waste handling, Hazardous and or Non- Hazardous is the responsibility of Odyssey (inc.all taxes)
* Odyssey is responsible for all of their own engineering for platform,Scaffolds and Containment.
* Odyssey is responsible for all of their own security.
* Odyssey must use MAB Paint
* Protection of all necklace lighting, cameras,light fixtures etc .(as per spec.)
* 39831.0601 Caulking to be paid at $4.00 per LF.
* Special attention to Noise Controll Requirements.
* All Medical testing and training is the responsibility of Odyssey
* Any and all permits is the responsibility of Odyssey
* Odyssey is to provide a rigid roof system along the South outer roadway and the North walkway for their work.
Usage of this system by Alpha Contracting for performance of work in Alphas Subcontract shall be granted
at no charge.
* There will be an add to the Contract value of $467,500.00 ~~for each phase that~~ a 100% performance &
payment bond is provided to L&L prior to commencement of ANY work within the scope of that phase
* Should a bond be provided once work has commenced, the value of the add will be proportionate
to the % of requisitioned work completed after the bond has been submitted relative to the total value of the
potential add of $467,500.00
* Odyssey will receive 4% mobilization after 10% of work is complete or if a payment & performance bond is
submitted prior to commencement of work L&L will forward 4% mobilization upon receipt from NYCDOT.
* A 6.5% deduct from the Contract has been instituted for wrap-up insurance. Any rebates received shall be
dispersed proportionately to Subcontract value relative to total prime contract value.
* Premiums associated with the furnishing of all performance and payment bonds will be the responsibility
of the Subcontractor.

Initial

Initial

Exhibit 1
Page 1 of 2

# Odyssey Contracting Corp

### Truss and Towers

#### The scope of work shall include but not be limited to the following:

Contract value had initial base value of $10,000,000.00. A $500,000.00 deduct
 has been taken for the absence of a bond at this time.  A 6.5% deduct has been taken on the
 $9,500,000.00 sales value of the balance for the Project provided wrap-up program
(619.17) Temp Concrete Barrier
(10619.0599) Lighting for Temp Barrier
(619.2104) Construction Zone Pavement Marking Stripes, Removable Tape
(635.0103) Cleaning and Preparation of Pavement Surface Lines
(687.0101) White Thermoplastic Reflectorized Pavement Stripes
Limits of work : All Steel from the top of Upper roadway to top of Truss, including **all** Tower steel **(P.P. 123-93)**
All work indicated in this Contract must be completed by August 1, 2005
All confined Space with in Odyssey's limits of work
Odyssey is to provide their own HSO and QA/QC (Nace #1 Cert. )
Any air monitoring for blasting operation is the responsibility of Odyssey
Any Platform and or Scaffolding needed for the work in question is the responsibility of Odyssey
All waste handling, Hazardous and or Non- Hazardous is the responsibility of Odyssey (inc.all taxes)
Odyssey is responsible for all of their own engineering for platform,Scaffolds and Containment.
Odyssey is responsible for all of their own security.
Odyssey must use MAB Paint
 Protection of all necklace lighting, cameras,light fixtures etc .(as per spec.)
 39831.0601 Caulking to be paid at $4.00 per LF.
 Special attention to Noise Controll Requirements.
 All Medical testing and training is the responsibility of Odyssey
 Any and all permits is the responsibility of Odyssey
 Odyssey is to provide a rigid roof system along the South outer roadway and the North walkway for their work.
 Usage of this system by Alpha Contracting for performance of work in Alphas Subcontract shall be granted
 at no charge.
 There will be an add to the Contract value of $467,500.00 for each phase that a 100% performance &
 payment bond is provided to L&L prior to commencement of ANY work within the scope of that phase
 Should a bond be provided once work has commenced, the value of the add will be proportionate
 to the % of requisitioned work completed after the bond has been submitted relative to the total value of the
 potential add of $467,500.00
 Odyssey will receive 4% mobilization after 10% of work is complete or if a payment & performance bond is
 submitted prior to commencement of work L&L will forward 4% mobilization upon receipt from NYCDOT.
 A 6.5% deduct from the Contract has been instituted for wrap-up insurance. Any rebates received shall be
 dispersed proportionately to Subcontract value relative to total prime contract value.
 Premiums associated with the furnishing of all performance and payment bonds will be the responsibility
 of the Subcontractor.

Initial    _____        Initial    _____

**Exhibit 1**
**Page 2 of 2**

## L&L Painting will provide the following.

* Maintenance and Protection of Traffic ( MPT will be coordinated with others )
* Engineer's office is the the responsibility of L&L Painting
* Progress Photos and Progress Video is the responsibility of L&L Painting
* Graffiti Removal is the responsibility of L&L Painting
* Community Notifacation is the responsibility of L&L Painting
* Job CPM is the responsibility of L&L Painting (Odyssey must submit their schedule)
* Job Project Manager by L&L Painting ( Odyssey must have their own supervision)
* Job Security to be provided by L&L Painting Co Inc. (not personal property)
* Storage yard to be provided by L&L.


Initial _____          Initial _____

**Exhibit 1**
**Page 2 of 2**

## L&L Painting will provide the following.

* Maintenance and Protection of Traffic ( MPT will be coordinated with others )
* Engineer's office is the the responsibility of L&L Painting
* Progress Photos and Progress Video is the responsibility of L&L Painting
* Graffiti Removal is the responsibility of L&L Painting
* Community Notifacation is the responsibility of L&L Painting
* Job CPM is the responsibility of L&L Painting (Odyssey must submit their schedule)
* Job Project Manager by L&L Painting ( Odyssey must have their own supervision)
* Job Security to be provided by L&L Painting Co Inc. (not personal property)
* Storage yard to be provided by L&L.


**Initial** _____          **Initial** _____

# *L&L Painting Co., Inc. v. Dep't of Transportation*

OATH Index No. 280/08, mem. dec. (Feb. 8, 2008)

On appeal, the CDRB determined that pursuant to contract clause placing absolute obligation on contractor to protect worksite from damage or loss, contractor was not entitled to costs associated with extra work caused by worksite fire.

---

## NEW YORK CITY OFFICE OF
## ADMINISTRATIVE TRIALS AND HEARINGS

## CONTRACT DISPUTE RESOLUTION BOARD

*In the Matter of*
## L&L PAINTING COMPANY, INC.
*Petitioner*
*-against-*
## DEPARTMENT OF TRANSPORTATION
*Respondent*

---

## <u>MEMORANDUM DECISION</u>

**ALESSANDRA F. ZORGNIOTTI,** *Administrative Law Judge*

**KENNETH JOCKERS,** *Deputy General Counsel, Mayor's Office of Contracts*

**FREDERIC S. BERMAN,** *Prequalified Panel Member*

Pending before the Contract Dispute Resolution Board ("Board") is the petition of L&L Painting Company ("L&L"), requesting additional compensation for work performed on a contract with respondent, Department of Transportation ("DOT") to paint the Queensboro Bridge. Petitioner seeks compensation for the cost of cleaning up, repairing, and replacing work damaged by a fire at the worksite on the bridge. Oral argument was held on December 20, 2007. The record was open until January 10, 2008, for the parties to submit post argument briefs. For the reasons below, the Board concludes that under the terms of the applicable contract, petitioner is not entitled to additional compensation.

## <u>BACKGROUND</u>

On January 12, 2004, the City of New York ("City") by DOT awarded L&L a contract to

paint the Queensboro Bridge.[1]  Work commenced two days later and is scheduled for completion in January 2009.  On August 10, 2004, L&L notified DOT by letter that, on the previous day, one of its subcontractors, in the presence of a DOT inspector, "discovered bare wires sparking on the lines running along the South Outer Roadway . . . prior to any work being performed in the area" (Pet. Ex. A vol. 1, doc. 3b).  It is unclear from the record where on the bridge the identified wires were located or whether DOT took any action in response to this notice.

During the night of October 18, 2005, a four alarm fire occurred on the bridge in the vicinity of where L&L and its subcontractors were performing blasting of steel and priming work needed before painting (Pet. Ex. A vol. 1, doc. 5).  At the time of the fire, L&L had completed blasting and applying a prime coat to certain areas of the bridge.  The fire destroyed some of the prime coat of paint, leaving steel exposed.  In addition, the fire damaged portions of containment structures placed by L&L.  According to a New York City Fire Department's report, the cause of the fire was electrical wiring (Pet. Ex. A vol. 1, doc. 5).

DOT issued a stop work order on October 19, 2005 (Pet. Ex. A vol. 1, doc. 1).  The stop work order was lifted on December 7, 2005, at which point work resumed.  L&L needed to re-blast the steel that had been exposed as a result of the fire, as well as reapply the prime coat to those areas.

On April 19, 2006, L&L requested a change order for an additional $5,220,418, to cover costs associated with the fire and stop work order (Pet. Ex. A vol. 1, doc. 3).  DOT denied the request on May 9, 2006, on the ground that L&L sought compensation for delay damages (Pet. Ex. A vol. 1, doc. 3).  L&L filed a notice of dispute on June 8, 2006, asserting that at least $1,263,336 of its claim was for cleanup, repair, and rework items caused by the fire, rather than for damages resulting from the stop work order (Pet. Ex. A vol. 3, doc. 0).  DOT's Commissioner did not respond to L&L's notice of dispute within the time frame specified in the Contract.  The non-response amounted to denial of the claim under Article 27.2 of the Contract.

L&L subsequently filed a notice of claim with the Comptroller dated September 7, 2006 (Pet. Ex. A vol. 1, doc. 0).  By letter dated October 10, 2006, the Comptroller notified L&L that it was bifurcating the claim into delay and non-delay claims (Pet. Ex. B).  The Comptroller indicated that the $1,263,336 for cleanup, repairs, and rework was a non-delay claim and subject

---

[1] Both parties provided a copy of the General Conditions of the Contract ("Contract").  The Board will refer to the relevant sections by Article and section number.

to the dispute resolution provisions of the Contract. The remaining portion of the claim, totaling $3,957,082 for idle equipment and labor during the suspension, as well as extended schedule and supervisory costs, was a delay claim, not subject to the dispute resolution provisions of the Contract and the Procurement Policy Board's rules, title 9 of the Rules of the City of New York ("PPB rules").

A settlement conference for the non-delay claim was held on June 19, 2007, but no settlement was reached. On July 3, 2007, the Comptroller denied L&L's non-delay claim, on the grounds that the fire resulted from an electrical short caused by L&L's rigging cables coming into contact with the electrical wiring of a roadway light fixture, which then ignited combustible plastic material surrounding the containment area, and that certain provisions of the Contract precluded recovery (Pet. Ex. C). L&L denies that it caused the fire, instead alleging that DOT failed to repair the faulty wiring it had been notified about.


## ANALYSIS

On August 1, 2007, petitioner filed the instant petition seeking: (1) an order striking the Comptroller's conclusions concerning the causation of the fire and/or an order granting a change order in the amount of $1,263,336; or alternatively, (2) a finding that the issue of causation is outside the Board's jurisdiction; or (3) leave to conduct discovery on the issue of causation. Respondent argues that pursuant to Article 7, section 1 of the Contract, petitioner has an absolute obligation to protect its work from damage and in case the work is damaged, petitioner is obligated to repair or replace it, up until final acceptance of its work. In reply, petitioner argues that Article 7, section 1 must be read with the indemnification sections 4 and 5, which in conjunction with General Obligations Law ("GOL") section 5-322.1, limit petitioner's obligation to bear the full cost of the additional repairs to the extent DOT was responsible for the fire. In essence, petitioner claims that there is an issue of fact concerning causation of the fire and that the claim cannot be determined pursuant to the PPB rules but should be adjudicated in Supreme Court to consider comparative negligence. We disagree.

The Board's authority to resolve disputes between the City and a vendor that arise by virtue of a contract between them is set forth in PPB rule 4-09. The parties agreed to this method of dispute resolution in Article 27 of the Contract. The PPB rules grant the Board authority to

hear claims "about the scope of work delineated by the contract, *the interpretation of contract documents, the amount to be paid for extra work or disputed work performed in connection with the contract*, the conformity of the vendor's work to the contract, and the acceptability and quality of the vendor's work . . . ." 9 RCNY § 4-09(a)(2) (Lexis 2008) (emphasis added). The Board's "decision must be consistent with the terms of the contract." 9 RCNY § 4-09(a)(4) (Lexis 2008).

The dispute whether petitioner is entitled to additional compensation for extra work performed because of the fire falls squarely within the Board's authority to determine. Moreover, to the extent resolution of this dispute involves interpretation of Article 7, sections 1, 4, and 5 of the Contract it is within the Board's jurisdiction. 9 RCNY § 4-09(a)(2). *See also Dart Mechanical Corp. v. Dep't of Sanitation*, OATH Index No. 1815/06, mem. dec. at 5 (Nov. 9, 2006), *aff'd*, Index No. 101494/07 (Sup. Ct. N.Y. Co. Oct. 10, 2007) (issue of contract interpretation is for Board to decide). The parties agree, correctly, that the Board does not have authority to consider the cause of the fire and it will not do so. It should also be noted that the Board is reviewing DOT's denial of L&L's claim for $1,263,336, and that the Board does not have jurisdiction to review findings made by the Comptroller. 9 RCNY § 4-09(g). *See also Kreisler Borg Florman General Construction Co. on behalf of A & F Fire Protection Co., Inc. v. Dep't of Design & Construction*, OATH Index Nos. 800/06, 801/06, 802/06, 803/06 and 1154/06, mem. dec. at 6 (Apr. 12, 2006) (Board reviews record analyzed by the agency head).

Turning to whether petitioner is entitled to additional compensation under the terms of the Contract we find that the plain language of Article 7, section 1 places an "absolute obligation" on L&L to protect its work against damage such as that caused by the fire and that, to the extent the work was damaged during the performance of the Contract, L&L is required to bear the cost of replacing or repairing it.

Article 7, section 1 provides:

> During the performance of the **Work** and up to the date of **Final Acceptance**, the **Contractor** shall be under an absolute obligation to protect the finished and unfinished **Work** against any damage, loss, injury, theft and/or vandalism and in the event of such damage, loss, injury, theft and/or vandalism, it shall promptly replace or repair such **Work**, whichever the **Resident Engineer** shall determine to be preferable. The obligation to deliver finished **Work** in strict accordance with the **Contract** prior to **Final Acceptance** shall be absolute and shall not be affected by the

**Resident Engineer's** approval of, or failure to prohibit, the **Means and Methods of Construction** used by the **Contractor**.

(Emphasis in original). Thus, when L&L entered into the Contract with the City to paint the Queensboro Bridge, it assumed the risk of replacing or repairing its work should it be damaged. It is undisputed that final acceptance of the work has not occurred and there has been no written determination of final acceptance by the DOT Commissioner as provided by Article 14 of the Contract. Accordingly, petitioner's obligation is "absolute" and there is no occasion to treat the repair and replacement work caused by the fire as "extra work" or to invoke the provisions of the Contract that apply to change orders, Articles 25 and 26.

A similar result involving the same absolute obligation provision of a contract was reached in *WDF, Inc. v. Dep't of Environmental Protection*, OATH Index No. 1078/06, mem. dec. (Apr. 26, 2006). In *WDF*, the petitioner entered into a contract with the Department of Environmental Protection ("DEP") to perform work at a sewage treatment facility. As a result of a flood in the facility, a large portion of the contractor's equipment and work suffered damage, requiring the contractor to repair and replace work that had already been completed. The contractor sought additional compensation from DEP, alleging that it had authorized a second contractor to cut holes in sewer walls, which resulted in the damage. Despite allegations that the City authorized the other contractor to cut such holes, the Board found that "pursuant to the clear terms of the parties' contract, and on the record as presented in this forum, petitioner has an absolute obligation to repair and replace damaged work and equipment." *Id.* at 1-2. *See also Dep't of Parks & Recreation v. Patsy Bello Nurseries, Inc.*, OATH Index No. 216/81, at 61, 82 (Jan. 28, 1982) (finding contractor's obligation to repair and replace vandalized trees was "absolute" under similar contract language).

Petitioner argues that the absolute obligation clause "is not broad enough to preclude L&L's extra work claim *to the extent the Fire is attributable to electrical deterioration and the City's own faulty electrical maintenance of the Bridge.*" Pet. Reply at 1-2 (emphasis in original). In support of the contention that causation is central to resolution of this claim, petitioner argues that Article 7, section 1 must be read with sections 4 and 5. Sections 4 and 5 are indemnification provisions which require L&L to indemnify and hold the City harmless against claims and judgments arising out of any operations of the contractor.[2] Each indemnification clause contains

---

[2] Article 7, sections 4 and 5 provide:

a proviso limiting the City's indemnification as provided by law. Petitioner cites to GOL section 5-322.1 as the applicable law, which provides that an:

> agreement or understanding in . . . a contract or agreement relative to the construction, alteration, repair or maintenance of a building [or] structure . . . purporting to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property contributed to, caused by or resulting from the negligence of the promisee, his agents or employees, or indemnitee, whether such negligence be in whole or in part, is against public policy and is void and unenforceable; . . . .

N.Y. Gen. Oblig. Law § 5-322.1(1). Petitioner argues that GOL section 5-322.1 precludes the City from receiving full indemnification for L&L's claim for extra work absent a showing that DOT was not negligent in causing the fire.[3]

Whether Article 7, sections 4 and 5 when read in conjunction with GOL section 5-

---

7.4    If any person or property sustains any loss, damage, cost, expense or injury arising out of the operations of the **Contractor** and/or its **Subcontractor** in the performance of this contract or from the **Contractor's** and/or its **Subcontractor's** failure to comply with any of the provisions of this contract or of the **Law**, the **Contractor** shall indemnify, defend and hold the **City**, its employees and agents harmless against any and all claims, liens, demands, judgments, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind of nature (including, without limitation, attorneys' fees and disbursements), known or unknown, contingent or otherwise, arising from or in any way related to such operations, or failure to comply with any of the provisions of this **Contract** or of the **Law**. Insofar as the facts and **Law** relating to any claim would preclude the **City** from being completely indemnified by the **Contractor**, the **City** shall be partially indemnified by the **Contractor** to the fullest extent provided by **Law**.

7.5.1    The **Contractor** shall defend at its own expense, indemnify and hold the **City** harmless from any and all claims (even if the allegations of the suit are without merit) or judgments for damages (including, but not limited to, delay damages from **Other Contractors**) and from costs and expenses to which the **City** may be subjected or which it may suffer or incur allegedly arising out of or in connection with any operations of the **Contractor** and/or its **Subcontractors**, or their failure to comply with the provisions of this **Contract** or of the **Laws**. Insofar as the facts and **Law** relating to any claim would preclude the **City** from being completely indemnified by the **Contractor**, the **City** shall be partially indemnified by the **Contractor** to the fullest extent provided by **Law**.

---

[3]  Petitioner's reliance on *WDF, Inc.*, OATH 1078/06, mem. dec., for the proposition that reading the absolute obligation clause with the indemnification clauses renders the former unenforceable is misplaced. Although the Board noted in *WDF* that the contract contained both an absolute obligation and an indemnification clause, the Board did not rely on the indemnification clause to decide the case. Instead it decided the case on the "unambiguous and enforceable" absolute obligation provision. *Id.* at 4. The Board's reference to the indemnification clause is *dicta* and was made outside the statutory framework of GOL section 5-322.1 which was not before the Board because *WDF* was not an indemnification case. Moreover, the reference was made to draw an analogy between the absolute obligation clause and historical indemnification cases which had interpreted similar contract language in the context of third-party claims. *WDF* does not set forth a rule that the absolute obligation clause and indemnification clause must be read together. It should also be noted that while the absolute obligation clauses in *WDF* and this case are identical, the indemnification clauses are different. The indemnification clause in *WDF* applied not only to damage to the persons and property of third parties, but also to damage to the City's property. Pet. Reply Ex. 1. Here, the indemnification clauses apply only to damage claims by third parties.

322.1(1) limit the City's right to indemnification in third-party actions if it has been negligent has no bearing on whether L&L is entitled to extra compensation from DOT because of the fire. As respondent correctly notes, the indemnification clauses and the absolute obligation clause are separate and distinct sections, applying to separate and distinct circumstances, with separate and distinct limitations. Sections 4 and 5, which have defined terms for the "Contractor" and the "City" in Article 2 of the Contract, control when there is a damage claim by a third party and there is a dispute whether the City or the contractor is responsible for defending the claim and compensating the third party for the damages. In contrast the absolute obligation clause in section 1 controls when there is loss or damage to a contractor's work and there is a dispute whether the contractor or the City is responsible for bearing the cost of replacing or repairing the damaged work.

There is no basis for applying theories of indemnification and contributory negligence to the absolute obligation clause. Petitioner does not argue that an absolute obligation clause violates public policy and this Board is unaware of any case law or statute that would suggest that such a clause is unenforceable. This provision is not uncommon in City contracts and has been a mainstay since at least 1961. *See Jones v. City of New York*, 29 Misc. 2d 369, 373, 221 N.Y.S.2d 553, 556 (City Ct. Bronx Co. 1961) (where City contract contained virtually identical absolute obligation language); *WDF*, OATH 1078/06, mem. dec. at 4 (same); *Patsy Bello Nurseries, Inc.*, OATH 216/81, at 61, 82 (same). Moreover, the Contract was entered into as part of an arm's length transaction between sophisticated contracting parties and is enforceable. *See Kalisch-Jarcho, Inc. v. New York*, 58 N.Y.2d 377, 384, 461 N.Y.S.2d 746, 749 (1983).

The purpose of the absolute obligation clause is to place the burden of securing the work until final acceptance by the City on the contractor who has dominion and control over the worksite during the period of construction. The clause clearly states that the contractor has an absolute obligation to protect the finished and unfinished work against any damage and that in the event of such damage that the contractor shall replace or repair such damage. This contract language is unambiguous and has "a definite and precise meaning" for which there is no reasonable basis for a difference of opinion. *Greenfield v. Philles Records Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569 (2002). When an "agreement on its face is reasonably susceptible of only one meaning," as Article 7, section 1 is here, "a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Id.* at 569-70, 750 N.Y.S.2d at 570. A court

reviewing almost the identical contract language found "[t]here is nothing ambiguous about article 7 . . . ." *Jones*, 29 Misc.2d at 373, 221 N.Y.S.2d at 557; *see also WDF, Inc.*, OATH 1078/06, mem. dec., at 9 ("We find the language of Article 7 . . . unambiguous and give it its plain meaning."). Contrary to petitioner's assertion, Article 7, section 1 does not provide for consideration of comparative negligence on the part of the City. Indeed, the absolute obligation clause would have little or no purpose if it were not read to place the risk of loss for damaged work on the contractor.

Nevertheless, contract provisions such as Article 7, section 1, which on their face impose an absolute obligation on one party and release the other party of all liability, are subject to limited exceptions if there is a showing of bad faith, gross negligence, or willful misconduct on the party being released. *See Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 554, 583 N.Y.S.2d 957, 963 (1992); *Kalisch-Jarcho, Inc.*, 58 N.Y.2d at 384-85, 461 N.Y.S.2d at 749-50. The courts have defined gross negligence as "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, USA Ltd. v. Jewelers Protection Services., Ltd.*, 81 N.Y.2d 821, 823-24, 595 N.Y.S.2d 381, 383 (1993). Here, petitioner has not alleged nor set forth any proof that the fire was a result of gross negligence or willful misconduct on the part of DOT. Although petitioner asserts that it submitted at least one letter to DOT advising that there were exposed wires on the bridge, even if it were these wires that led to the fire, DOT's failure to fix them does not rise to a level of gross negligence or willful misconduct. *See WDF*, OATH 1078/06, mem. dec. (no evidence of gross negligence by the City); *Fischbach & Moore, Inc. v. Dep't of Environmental Protection*, OATH Index Nos. 1808/01 & 141/02, mem. dec. at 9 (June 25, 2002) (nothing in the record supported a finding of bad faith on the part of the City). Just as Article 7, section 1 of the contract placed an absolute obligation on L&L to replace or repair any damaged work, it also placed the same obligation on the contractor to protect all finished or unfinished work from damage in the first place. Thus, if it was aware of faulty wiring on the worksite, L&L had an absolute responsibility to make sure that the wiring did not endanger the worksite and it cannot obtain extra compensation from DOT for damages resulting from its failure to do so.

This constitutes the final decision of the Board.   All panel members concur in this decision.

Alessandra F. Zorgniotti
Administrative Law Judge/Chair

Dated: February 8, 2008

APPEARANCES:

**THELEN REID BROWN RAYSMAN
& STEINER LLP**
*Attorneys for Petitioner*
**BY: CHARLES FASTENBERG, ESQ.**

**MICHAEL A. CARDOZO, ESQ.**
*Corporation Counsel of the City of New York,*
*Attorney for Respondent*
**BY: TERRYL A. SELLERS, ESQ.**

*Office copy*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
L&L PAINTING CO., INC. and
ODYSSEY CONTRACTING CORP.,

                                        Petitioners,

For An Order Pursuant to Article 78 of the CPLR,

        - Against -

THE CONTRACT DISPUTE RESOLUTION BOARD OF
THE CITY OF NEW YORK, THE CITY OF NEW YORK,
and THE CITY OF NEW YORK DEPARTMENT OF
TRANSPORTATION,

                                        Respondents.
-------------------------------------------------------------------------X

Index # 117508/06

**NOTICE OF APPEAL**

NEW YORK
COUNTY CLERK'S OFFICE

FEB 2 8 2008

NOT COMPARED
WITH COPY FILE

PLEASE TAKE NOTICE, that the above-named petitioners, L&L Painting Co., Inc. and

Odyssey Contracting Corp., hereby appeal to the Appellate Division of the New York Supreme

Court in and for the First Department, from a judgment/order in the above entitled action dated

January 14, 2008 in favor of the above-named respondents and denying the petition and entered in

the office of the Clerk of the County of New York on January 22, 2008, and this appeal is taken

from each and every part of that judgment/order as well as from the whole thereof.

Dated:        New York, New York
              February 28, 2008

                                        Chris Georgoulis
                                        Georgoulis & Associates PLLC
                                        Attorneys for Petitioners/Appellants
                                        L&L Painting Co., Inc. and Odyssey
                                        Contracting Corp.
                                        45 Broadway, 14th Floor
                                        New York, New York 10006
                                        (212) 425-7854

TO:    Michael Cardozo
       Corporation Counsel of the City of New York
       Attorneys for Respondents
       100 Church Street, Room 3-250
       New York, New York 10007
       (212) 788-0421

       Attn:   Robina M. Gumbs
               Assistant Corporation Counsel

u:\2007 cases\07-168\ntce\20080228 notice of appeal.docx

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------x

L&L PAINTING CO., INC. and ODYSSEY
CONTRACTING CORP.,

                               Petitioners,

For an Order Pursuant to Article 78 of the CPLR,

                      -against-

THE CONTRACT DISPUTE RESOLUTION BOARD OF
THE CITY OF NEW YORK, THE CITY OF NEW YORK,
and THE CITY OF NEW YORK DEPARTMENT OF
TRANSPORTATION,

                           Respondents.

-----------------------------------------------------------------------x

Index No. 117508/06

PRE-ARGUMENT
STATEMENT

**PLEASE TAKE NOTICE,** that Petitioners L&L Painting Co., Inc. and Odyssey

Contracting Corp., by their attorneys, Georgoulis & Associates PLLC, hereby submit the

following Pre-Argument Statement pursuant to Rule 600.17 of the Appellate Division, First

Department:

      1.      The title and Index Number of the action are as set forth in the caption above.

      2.      The full names of the original parties are set forth in the caption above.  There

have been no changes in the names of the parties.

      3.      The name, address and telephone number of counsel for appellants L&L Painting

Co., Inc. and Odyssey Contracting Corp. is:

                  Chris Georgoulis
                  Georgoulis & Associates PLLC
                  45 Broadway, 14th Floor
                  New York, New York 10006
                  212 425-7854

      4.      The name, address and telephone number of counsel for respondents is:

Robina M. Gumbs
Assistant Corporation Counsel
Corporation Counsel of the City of New York
100 Church Street, Room 3-250
New York, New York 10007
(212) 788-0421

5.      This cross-appeal is taken from the Supreme Court, New York County (Justice Marcy S. Friedman).

6.      The nature and object of the cause of action is: Article 78 petition to challenge determination by City of New York Contract Dispute Resolution Board which denied petition for additional compensation from City of New York Department of Transportation.

7.      The result reached in the court below was: The Supreme Court denied the petition.

8.      The ground for seeking reversal is that the Supreme Court, New York County erred in denying the petition.

9.      This is an appeal from a judgment/order.  There are no other related actions or proceedings and this appeal is on the full record

Dated: New York, New York
       February 28, 2008

GEORGOULIS & ASSOCIATES PLLC
Attorneys for Petitioners

By:
     Chris Georgoulis
45 Broadway, 14th Floor
New York, New York 10006
(212) 425-7854

TO:    NEW YORK COUNTY CLERK

Michael Cardozo
Corporation Counsel of the City of New York
Attorneys for Respondents
100 Church Street, Room 3-250
New York, New York 10007
(212) 788-0421

Attn:   Robina M. Gumbs
        Assistant Corporation Counsel

u:\2007 cases\07-168\brie\20080228 preargument statement.doc

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: **MARCY S. FRIEDMAN**                    PART _57_
                              *Justice*

I & L Painting                              INDEX NO    117508/06

              - v -                         MOTION DATE _____

                                            MOTION SEQ. NO    _01_

City                                        MOTION CAL. NO.  _____

The following papers, numbered 1 to _____ were read on this motion to/for _Art 78 petition_

                                                            PAPERS NUMBERED
                        Petition                            _____
Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...    1, 1c
Answering Affidavits — Exhibits _____    2, 2a - 2c
Replying Affidavits _____
                        Memos of Law                       m1 - m3

**Cross-Motion:** ☐ Yes  ☐ No

Upon the foregoing papers, it is ordered that this motion _petition is denied_
_as per accompanying decision/order dated 1-14-08_

F I L E D

JAN 22 2008

NEW YORK
COUNTY CLERK'S OFFICE

*(left margin, rotated)* MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Dated: _____ _1-14-08_

                              MARCY S. FRIEDMAN  *J.S.C.*

Check one:  ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – PART 57

PRESENT: Hon. Marcy S. Friedman, JSC

——————————————————— x

L & L PAINTING CO., INC., and ODYSSEY
CONTRACTING CORP.,

                    *Petitioners,*

For an Order Pursuant to Article 78 of the CPLR,

        -- against --

THE CONTRACT DISPUTE RESOLUTION
BOARD OF THE CITY OF NEW YORK, THE
CITY OF NEW YORK, and THE CITY OF NEW
YORK DEPARTMENT OF TRANSPORTATION,

            *Respondents.*

——————————————————— x

Index No : 117508/06

ORDER

    In this Article 78 proceeding, petitioners L&L Painting Co., Inc. and Odyssey Contracting

Corp. (collectively "petitioner" or "L&L") challenge a determination of the City of New York

Contract Dispute Resolution Board ("CDRB" or "Board"), dated July 27, 2006, which denied a

petition by L&L for additional compensation from respondent City of New York Department of

Transportation ("DOT") for work arising under a contract between L&L and DOT, pursuant to

which L&L contracted to remove lead-based paint from the Queensboro Bridge.

    The contract provides for petitioner to construct and install a scaffolding platform over

the roadways of the bridge in order to protect vehicles and pedestrians using the bridge while the

work is performed. The bridge has eight lanes (four lower and four upper) in the inner roadway

Page -1-

for vehicular traffic, and two outer roadways with one lane each for pedestrian and bicycle traffic. It is undisputed that the inner and outer roadways have different elevations. The dispute between the parties is over the height at which the platform must be installed over the roadway surfaces. The DOT claims that the contract requires the platform to be placed at a height of 14 feet above both the inner and outer roadway surfaces. Petitioner agrees that the contract requires the platform to be placed at a height of 14 feet above the 8 lanes of the inner roadway, but contends that the contract does not require placement of a platform at 14 feet above the two lanes of the outer roadways. Petitioner further contends that because the outer roadways are at a higher elevation than the lower lanes of the inner roadway and because there are electrical conduit cables and light posts that obstruct the outer roadways, the maximum vertical clearance over the outer roadways is substantially less than 14 feet, and falls between 8 feet 5 inches and 12 feet. Petitioner thus claims that installation of a platform with a 14 foot clearance over the outer roadways requires the relocation of existing power cables and thus constitutes "additional work" for which petitioner is entitled to compensation.

More particularly, the parties' dispute concerns the interpretation of a project drawing, Sheet No. 26 R, which was provided to bidders and governs the scope of work. Petitioner claims that Note 5 on Sheet No. 26 R, which states that "minimum vertical clearance of 14 feet shall be maintained above all roadways," is applicable only to the platform above the inner roadways, as shown by arrows limiting Note 5 to this area on the drawing of the cross-section of the bridge which is part of Sheet No. 26 R. According to petitioner, note 7, which states that "all protective shielding, platforms and containments shall be installed in accordance with approved shop drawings to the satisfaction of the contractor's engineer," is instead applicable to the outer

Page -2-

roadways, as shown by the arrows on the cross-section  Petitioner asserts that these limitations are confirmed by the facts that field measurements obtained by petitioner in connection with the bidding process confirmed that the clearance above the outer roadways was less than 14 feet, and that Sheet No. 26 R is a scaled drawing and clearly shows, when its measurements are multiplied by the stated scale, that the clearance above the outer roadways is only approximately 12 feet 6 inches. (See Pet.'s Memo. Of Law at 5-11 )  In opposition, respondents argue that petitioner's claim is barred by its failure to comply with a contractual provision that required it to clarify any ambiguities in the contract before submitting its bid. (Resps.' Memo. Of Law at 4.)  Respondents also characterize petitioner's interpretation of Note 7 as authorizing petitioner to "build and install structures based on an unapproved design, in contravention of DOT's directives, as long as its Engineer was satisfied with the resulting installation." Respondents contend that this interpretation, permitting petitioner unilaterally to determine the clearance over the outer roadways, is unreasonable. (Id. at 6.)

The CDRB decision ("Decision") which is challenged in this proceeding held, with one dissent, that "DOT produced a confusing and contradictory set of drawings," and that "the conflict between the drawing and its notes indeed created an ambiguity in the contract." (Decision at 4.) The Board also found that Note 7 "gives the contractor's engineer the ability to approve certain parts of the work, but only after the drawings are approved by the City." (Id. at 3-4.) The Board further noted that the City rejected petitioner's drawings providing for clearance of less than 14 feet for the portion of the platform over the outer roadways, and that "[t]here is nothing indicating that the contractor's engineer has complete authority to determine the height of the platform, particularly in light of the unequivocal language in Note 5." (Id. at 4.)   The

Page -3-

Board concluded that petitioner failed to comply with its obligation to clarify the ambiguity prior to bidding. (Id. at 6 )

The Rules of the City of New York, which govern resolution of disputes arising out construction contracts with the City, expressly provide that court review in an Article 78 proceeding of a CDRB decision "shall be limited to the question of whether or not the CDRB's decision was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion." (9 RCNY § 4-09[g][6].) This standard of review is consistent with that provided for by CPLR 7803 (3). In undertaking such review, the court may not substitute its judgment for that of a board or administrative agency and must uphold the board's or agency's determination if it has a rational basis. (See Matter of Pell v Board of Educ., 34 NY2d 222 [1974].)

Applying this standard, the court concludes that the CDRB Decision must be upheld. The court finds that there is a rational basis for the CDRB's determination that the parties' contract is ambiguous. It is well settled that in determining whether a contract is ambiguous the "initial question * * * is whether the agreement on its face is reasonably susceptible of more than one interpretation." (Chimart Assocs. v Paul, 66 NY2d 570, 573 [1986]; Nausch v Aon Corp., 283 AD2d 353 [1st Dept 2001].) Here, Note 5 requires a minimum clearance of 14 feet for platforms above "all roadways" without limitation. However, this Note appears on the drawings to be limited to the platforms above the inner roadways and, as petitioner itself claims, the measurements on the drawings show a clearance of substantially less than 14 feet above the outer roadways. There is thus a rational basis for the CDRB's finding that the drawings were confusing, and that the conflict between the drawings and the notes in Sheet No. 26 R created an

Page -4-

ambiguity

As petitioner acknowledges, paragraph 7(A) of the contract expressly imposes an obligation on prospective bidders to obtain interpretation of any patent ambiguity or inconsistency in the contract, and thus provides:

> Request for Interpretation or Correction. Prospective Bidders must examine the Contract documents carefully and before bidding must request of the Agency Chief Contracting Officer (the "ACCO") in writing for an interpretation or correction of every patent ambiguity, inconsistency or error therein which should have been discovered by a reasonably prudent bidder

The court is unpersuaded by petitioner's contention that the inconsistency in the contract, if any, was latent, not patent. Petitioner does not discuss authority construing these terms. However, there is substantial authority that a patent ambiguity is "one which appears on the face of the instrument" (58 NY Jur2d, Evidence and Witnesses § 588), and that a patent ambiguity may be found where there is an inconsistency or discrepancy between the terms of the contract. (See Thalle Constr. Co. v City of New York, 256 AD2d 157 [1st Dept 1998]; Interstate Gen. Govt. Contrs., Inc. v Stone, 980 F2d 1433 [Fed Cir 1992] ) In contrast, a latent ambiguity arises where the language of the contract is clear on its face and "suggests but a single meaning," but some extrinsic or collateral matter makes the meaning uncertain, as where the words of the contract could apply to two different things and parole evidence is necessary to show which of them was intended. (See 58 NY Jur 2d, Evidence and Witnesses § 587; Petrie v Trustees of Hamilton Coll., 158 NY 458 [1899][conveyance of named brook presented latent ambiguity where it was unclear which of two branches of the brook of that name was intended to be conveyed].)

Moreover, it is well settled, as the CDRB held, that where a contract requires a contractor to raise any ambiguities or any questions about the requirements of the job with the City before

submission of its bid and the contractor fails to do so, as here, the contractor will be bound by the City's interpretation of the contract [1] (E.g. Cipico Constr., Inc. v City of New York, 279 AD2d 416 [1st Dept 2001]; Thalle Constr. Co. v City of New York, 256 AD2d 157, supra; Lake Constr. & Dev. Corp. v City of New York, 211 AD2d 514 [1st Dept 1995]; Arnell Construc. Corp. v Board of Educ., 193 AD2d 640 [2d Dept 1993]. See also Acme Bldrs., Inc. v Facilities Dev. Corp., 51 NY2d 833 [1980] )

Contrary to petitioner's further contention, the CDRB Decision is not invalid because the CDRB did not specifically cite paragraph 7A of the contract or expressly find that the ambiguity was "patent." An agency's determination is not rendered invalid because it fails to set forth all of the evidence the agency considered, or all of the reasons on which it relied, in reaching the determination. (See Matter of Brookdale Hosp. Ctr. Tenants Assn. v Goldman, 99 AD2d 702 [1st Dept 1984]; Matter of Tenant's Advisory Comm. of Sky View Towers v Starr, 87 Misc 2d 93 [Sup Ct, Queens County 1976], affd 54 AD2d 701 [2d Dept], affd 42 NY2d 1044 [1977].) However, the determination must contain sufficient findings of fact to enable the reviewing court to determine whether there was a rational basis for the determination (See, Matter of Simpson v Wolansky, 38 NY2d 391 [1975]; Matter of Deutsch v Catherwood, 31 NY2d 487 [1973].) In the instant case, the CDRB's extensive discussion of the above-cited legal authorities concerning a contractor's obligation to request pre-bid clarification of ambiguities is sufficient to show that the CDRB adequately reviewed the parties' contract for ambiguities, and to support its finding that

---

[1] Petitioner alleges that it requested confirmation from the DOT at the pre-bid meeting of the dimensions of the tower portals (legs) above the outer roadways. But petitioner makes no showing that it requested clarification of the height at which the platform would be required to be erected above the outer roadways. (See Petition, ¶ 53.)

petitioner's failure to request clarification of the clearance required for outer roadways prior to the submission of its bid is fatal to its claim in this proceeding.

Petitioner's additional bases for challenge to the CDRB Decision are also without merit. Petitioner does not provide any factual support for its conclusory assertion that panel member Jockers, an attorney, lacked the requisite background experience to evaluate the parties' dispute over the proper interpretation of the contract. Petitioner also fails to establish that the CDRB should have afforded it equitable relief from the 14 foot clearance requirement based on its claim that such clearance was unnecessary because an errant truck would be unlikely to be able to enter the outer roadways. The court has considered petitioner's remaining contentions and finds them to be without merit.

It is accordingly hereby ORDERED that the petition is denied.

This constitutes the decision and order of the court.

Dated: New York, New York
       January 14, 2008

                                        MARCY FRIEDMAN, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
_____
LETICIA VALLE and ANTHONY EMANUEL as Co-
Administrators of the Estate of JULIO ALBERTO
ORTEGA-MONCADA, deceased,

                     Plaintiffs,

            -against-

TOWER PAINTING CO. INC.,
LONG ISLAND CESSPOOL CO., INC.,
ODYSSEY CONTRACTING CORP.,
ODYSSEY CONTRACTING, LLC, SAFESPAN, INC.,
ALPHA PAINTING & CONSTRUCTION CO., INC.,
L & L PAINTING CO., INC.,
L & L PAINTING & CONSTRUCTION, INC. and
URBITRAN ASSOCIATES, INC.,
4650 Washington Ad
Washington Pa 15304 Defendants.
_____

Index No.

7767/2008

Plaintiffs designate Queens County
as the place of trial.

**SUMMONS**

Plaintiff's residence:
25-21 Astoria Boulevard
2nd Floor
Astoria, New York 11102

County of Queens

The basis of venue is: Plaintiff's
residence

**To the above named Defendants:**

    **You are hereby summoned** to answer the complaint in this action, and to serve a copy of
your answer or, if the complaint is not served with this summons, to serve a notice of appearance on
the plaintiff's attorney(s) within twenty days after the service of this summons exclusive of the day
of service where service is made by delivery upon you personally within the state, or within 30 days
after completion of service where service is made in any other manner.  In case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

Dated:    New York, New York
          March 25, 2008

                                    SULLIVAN PAPAIN BLOCK
                                      McGRATH & CANNAVO PC.

                   By:

                                    Andrew J. Carboy
                                    Attorneys for Plaintiff
                                    120 Broadway
                                    New York, New York 10271
                                    (212) 732-9000

2008 MAR 26  P 3:19
QUEENS COUNTY
CLERKS OFFICE
RECEIVED

**Defendants' addresses:**

**TOWER PAINTING CO. INC.**
625 MAIN ST WESTBURY, NEW YORK, 11590

**LONG ISLAND CESSPOOL CO., INC.**
62 ROBBINS AVE.
BROOKLYN, NEW YORK, 11702

**ODYSSEY CONTRACTING CORP.**
2435 West Pike Street
Houston, Pennsylvania 15342

1650 Washington Road
Washington, Pennsylvania 15301

c/o CT Corporation System
1633 Broadway
New York, New York 10019

**ODYSSEY CONTRACTING, LLC**
181 W OLD COUNTRY RD
HICKSVILLE, NEW YORK, 11801

**SAFESPAN, INC.**
252 FILLMORE AVENUE
TONAWANDA, NEW YORK, 14150

**ALPHA PAINTING & CONSTRUCTION CO., INC.**
6800 QUAD AVENUE
BALTIMORE, MARYLAND, 21237-2402

**L & L PAINTING CO., INC.**
900 SOUTH OYSTER BAY ROAD
HICKSVILLE, NEW YORK, 11801

**L & L PAINTING & CONSTRUCTION, INC.**
422 EAST 93RD STREET
BROOKLYN, NEW YORK, 11212

**URBITRAN ASSOCIATES, INC.**
71 WEST 23RD STREET
NEW YORK, NEW YORK, 10010

FILED WITH THE CLERK OF THE COURT ON _____

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------------------X
LETICIA VALLE and ANTHONY J. EMANUEL as
Co-Administrators of the Estate of Julio Alberto
Ortega-Moncada, deceased,

                     Plaintiffs,

           -against-


TOWER PAINTING CO, INC.,
LONG ISLAND CESSPOOL CO., INC.,
ODYSSEY CONTRACTING CORP.,
ODYSSEY CONTRACTING, LLC, SAFESPAN, INC.,
ALPHA PAINTING & CONSTRUCTION CO., INC.,
L & L PAINTING CO., INC.,
L & L PAINTING & CONSTRUCTION, INC. and
URBITRAN ASSOCIATES, INC.

                    Defendants.
-----------------------------------------------------------------------X

Index No.:

77 67/08

**VERIFIED
COMPLAINT**

       Plaintiffs, Leticia Valle and Anthony J. Emanuel, as co-Administrators of the Estate

of Julio Alberto Ortega-Moncada, deceased, by their attorneys, SULLIVAN PAPAIN

BLOCK McGRATH & CANNAVO P.C., as and for their Verified Complaint herein,

respectfully set forth and allege:


## FIRST CAUSE OF ACTION

      1.    Plaintiffs, LETICIA VALLE and ANTHONY J. EMANUEL, were appointed

co-Administrators of the Estate of Julio Alberto Ortega-Moncada, deceased,

("decedent") pursuant to the decree of the Surrogate's Court, Queens County dated

April 19, 2007.

1

11.    That at all times hereinafter mentioned, defendant ODYSSEY CORP. was a corporation doing business in the State of New York.

12.    That at all times hereinafter mentioned, defendant ODYSSEY CORP. maintained its offices at 2435 West Pike Street Houston, Pennsylvania 15342.

13.    That at all times hereinafter mentioned, defendant ODYSSEY CONTRACTING, LLC. ("ODYSSEY LLC") was a domestic corporation duly authorized and existing pursuant to the laws of the State of New York.

14.    That at all times hereinafter mentioned, defendant ODYSSEY LLC was a corporation doing business in the State of New York.

15.    That at all times hereinafter mentioned, defendant ODYSSEY LLC maintained its offices at 181 West Old Country Road, Hicksville, New York 11801.

16.    That at all times hereinafter mentioned, defendant SAFESPAN, INC., ("SAFESPAN") was a domestic corporation duly authorized and existing pursuant to the laws of the State of New York.

17.    That at all times hereinafter mentioned, defendant SAFESPAN was a corporation doing business in the State of New York.

18.    That at all times hereinafter mentioned, defendant SAFESPAN maintained its offices at 252 Fillmore Avenue, Tonawanda, New York 14150.

19.    That at all times hereinafter mentioned, defendant ALPHA PAINTING & CONSTRUCTION CO., INC., ("ALPHA") was a domestic corporation duly authorized and existing pursuant to the laws of the State of New York.

20.    That at all times hereinafter mentioned, defendant ALPHA was a corporation doing business in the State of New York.

3

☑ 005/039

21.    That at all times hereinafter mentioned, defendant ALPHA maintained its offices at 6800 Quad Avenue, Baltimore, Maryland 21237-2402.

22.    That at all times hereinafter mentioned, defendant L & L PAINTING CO., INC., ("L & L PAINTING") was a domestic corporation duly authorized and existing pursuant to the laws of the State of New York.

23.    That at all times hereinafter mentioned, defendant L & L PAINTING was a corporation doing business in the State of New York.

24.    That at all times hereinafter mentioned, defendant L & L PAINTING maintained its offices at 900 South Oyster Bay Road, Hicksville, New York. 11801

25.    That at all times hereinafter mentioned, defendant L & L PAINTING & CONSTRUCTION, INC., ("L & L PAINTING/CONSTRUCTION") was a domestic corporation duly authorized and existing pursuant to the laws of the State of New York.

26.    That at all times hereinafter mentioned, defendant L & L PAINTING/CONSTRUCTION was a corporation doing business in the State of New York.

27.    That at all times hereinafter mentioned, defendant L & L PAINTING/ CONSTRUCTION maintained its offices at 422 East 93rd Street, Brooklyn, New York 11212.

28.    That at all times hereinafter mentioned, defendant URBITRAN ASSOCIATES, INC., ("URBITRAN") was a domestic corporation duly authorized and existing pursuant to the laws of the State of New York.

29.    That at all times hereinafter mentioned, defendant URBITRAN was a corporation doing business in the State of New York.

4

30.    That at all times hereinafter mentioned, defendant URBITRAN maintained its offices at 71 West 23rd Street, New York, New York 10010.

## FIRST CAUSE OF ACTION

31.    At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, in the County of New York, City of New York and State of New York, was and is a public thoroughfare, including the eastbound outer roadway appurtenant thereto.

32.    On or about March 28, 2006, decedent JULIO ALBERTO ORTEGA-MONCADA was lawfully present on and about the aforementioned roadway, which was purportedly closed to and supposed to be closed to vehicular traffic.

33.    On or about March 28, 2006, a motor vehicle operated by Brandon Colon, named as a defendant in a related action arising out of the same occurrence described herein, (13523/07 Supreme Court of Queens County), struck the decedent.  This occurrence was the consequence of dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions existing upon the Queensboro Bridge and the roadways leading thereto, all resulting from the acts and omissions of the defendants named herein.

34.    That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant TOWER entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

35.    That at all times herein mentioned, defendant TOWER obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways

5

leading thereto.

36.    That at all times herein mentioned, defendant TOWER was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

37.    That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant TOWER, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

38.    At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant TOWER, its agents, servants and/or employees.

39.    That at all times herein mentioned, defendant TOWER, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

40.    That at all times herein mentioned, defendant TOWER, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

41.    That at all times herein mentioned, defendant TOWER, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

42.    That at all times herein mentioned, defendant TOWER, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge,

the roadways leading thereto, and the work, labor and services performed thereat.

43.     That at all times herein mentioned, it was the duty of defendant TOWER, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

44.     That at all times herein mentioned, it was the duty of defendant TOWER., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

45.     That at all times herein mentioned, it was the duty of defendant TOWER to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

46.     That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

47.     That at all times herein mentioned, defendant TOWER, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

48.     That at all times herein mentioned, defendant TOWER, its servants,

agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

49.    The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant TOWER, its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant TOWER, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway;   failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across  a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

50.    That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant LIC entered into an agreement with the City of New York relative to

8

certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

51.    That at all times herein mentioned, defendant LIC obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

52.    That at all times herein mentioned, defendant LIC was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

53.    That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant LIC, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

54.    At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant LIC, its agents, servants and/or employees.

55.    That at all times herein mentioned, defendant LIC, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

56.    That at all times herein mentioned, defendant LIC, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

57.    That at all times herein mentioned, defendant LIC, its servants, agents,

9

permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

58.    That at all times herein mentioned, defendant LIC, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

59.    That at all times herein mentioned, it was the duty of defendant LIC, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

60.    That at all times herein mentioned, it was the duty of defendant LIC., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

61.    That at all times herein mentioned, it was the duty of defendant LIC to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

62.    That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

63.    That at all times herein mentioned, defendant LIC, its servants, agents,

10

permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

64. That at all times herein mentioned, defendant LIC, its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

65. The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant LIC, its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant LIC, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway; failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards;

11

and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

66. That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant ODYSSEY CORP. entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

67. That at all times herein mentioned, defendant ODYSSEY CORP. obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

68. That at all times herein mentioned, defendant ODYSSEY CORP. was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

69. That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

70. At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant ODYSSEY CORP., its agents, servants and/or employees.

71. That at all times herein mentioned, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

72.    That at all times herein mentioned, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

73.    That at all times herein mentioned, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

74.    That at all times herein mentioned, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

75.    That at all times herein mentioned, it was the duty of defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

76.    That at all times herein mentioned, it was the duty of defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

77.    That at all times herein mentioned, it was the duty of defendant ODYSSEY

CORP. to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

78.    That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

79.    That at all times herein mentioned, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

80.    That at all times herein mentioned, defendant ODYSSEY CORP., its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

81.    The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant ODYSSEY CORP., its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant ODYSSEY CORP., among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway;    failed to install proper barriers,

14

warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

82.    That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant ODYSSEY LLC entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

83.    That at all times herein mentioned, defendant ODYSSEY LLC obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

84.    That at all times herein mentioned, defendant ODYSSEY LLC was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

85.    That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro

Bridge and on the roadways leading thereto.

86.    At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant ODYSSEY LLC, its agents, servants and/or employees.

87.    That at all times herein mentioned, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

88.    That at all times herein mentioned, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

89.    That at all times herein mentioned, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

90.    That at all times herein mentioned, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

91.    That at all times herein mentioned, it was the duty of defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and

16

services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

92.    That at all times herein mentioned, it was the duty of defendant ODYSSEY LLC., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

93.    That at all times herein mentioned, it was the duty of defendant ODYSSEY LLC to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

94.    That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

95.    That at all times herein mentioned, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

96.    That at all times herein mentioned, defendant ODYSSEY LLC, its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

97.    The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant ODYSSEY LLC, its agents, servants

17

and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant ODYSSEY LLC, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway; failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

98.     That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant SAFESPAN entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

99.     That at all times herein mentioned, defendant SAFESPAN obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the

☑ 020/039                                                                04/09/2008 12:33 FAX 7247452220

roadways leading thereto.

100. That at all times herein mentioned, defendant SAFESPAN was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

101. That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

102. At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant SAFESPAN, its agents, servants and/or employees.

103. That at all times herein mentioned, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

104. That at all times herein mentioned, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

105. That at all times herein mentioned, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

106. That at all times herein mentioned, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge,

021/039

the roadways leading thereto, and the work, labor and services performed thereat.

107. That at all times herein mentioned, it was the duty of defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

108. That at all times herein mentioned, it was the duty of defendant SAFESPAN., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

109. That at all times herein mentioned, it was the duty of defendant SAFESPAN to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

110. That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

111. That at all times herein mentioned, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

20

112.    That at all times herein mentioned, defendant SAFESPAN, its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

113.    The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant SAFESPAN, its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant SAFESPAN, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway;   failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across  a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

114.    That at all times herein mentioned, and on/or prior to the 28th day of March

023/038

2006, defendant ALPHA entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

115.   That at all times herein mentioned, defendant ALPHA obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

116.   That at all times herein mentioned, defendant ALPHA was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

117.   That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant ALPHA, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

118.   At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant ALPHA, its agents, servants and/or employees.

119.   That at all times herein mentioned, defendant ALPHA, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

120.   That at all times herein mentioned, defendant ALPHA, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

121.    That at all times herein mentioned, defendant ALPHA, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

122.    That at all times herein mentioned, defendant ALPHA, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

123.    That at all times herein mentioned, it was the duty of defendant ALPHA, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

124.    That at all times herein mentioned, it was the duty of defendant ALPHA., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

125.    That at all times herein mentioned, it was the duty of defendant ALPHA to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

126.    That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

23

127. That at all times herein mentioned, defendant ALPHA, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

128. That at all times herein mentioned, defendant ALPHA, its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

129. The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant ALPHA, its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant ALPHA, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway;  failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across  a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the

24

roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

130.   That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant L & L PAINTING entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

131.   That at all times herein mentioned, defendant L & L PAINTING obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

132.   That at all times herein mentioned, defendant L & L PAINTING was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

133.   That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

134.   At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant L & L PAINTING, its agents, servants and/or employees.

135.   That at all times herein mentioned, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees maintained the Queensboro

04/08/2008 12:40 FAX 7247458220

Bridge and the roadways leading thereto.

136.   That at all times herein mentioned, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

137.   That at all times herein mentioned, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

138.   That at all times herein mentioned, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

139.   That at all times herein mentioned, it was the duty of defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

140.   That at all times herein mentioned, it was the duty of defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

26

141. That at all times herein mentioned, it was the duty of defendant L & L PAINTING to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto.

142. That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

143. That at all times herein mentioned, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

144. That at all times herein mentioned, defendant L & L PAINTING, its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

145. The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant L & L PAINTING, its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant L & L PAINTING, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps

leading to the eastbound outer roadway;  failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across  a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles, including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

146.   That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant L & L PAINTING/CONSTRUCTION entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

147. That at all times herein mentioned, defendant L & L PAINTING/CONSTRUCTION obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

148. That at all times herein mentioned, defendant L & L PAINTING/CONSTRUCTION was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

149. That on/or about the 28th day of March, 2006, and/or for a period of time

prior thereto, defendant L & L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

150.    At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant L & L PAINTING/CONSTRUCTION, its agents, servants and/or employees.

151.    That    at    all    times    herein    mentioned,    defendant    L    &    L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

152.    That    at    all    times    herein    mentioned,    defendant    L    &    L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

153.    That    at    all    times    herein    mentioned,    defendant    L    &    L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

154.    That    at    all    times    herein    mentioned,    defendant    L    &    L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

155.   That at all times herein mentioned, it was the duty of defendant L & L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

156.   That at all times herein mentioned, it was the duty of defendant L & L PAINTING/CONSTRUCTION., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

157.   That at all times herein mentioned, it was the duty of defendant L & L PAINTING/CONSTRUCTION to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading thereto

158.   That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

159.   That at all times herein mentioned, defendant L & L PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and

30

adequate condition and repair.

160.   That    at    all    times    herein    mentioned,    defendant    L    &    L
PAINTING/CONSTRUCTION, its servants, agents, permittees, contractors and/or
employees failed to provide for the safety, protection and well being of persons lawfully
upon the Queensboro Bridge.

161.   The aforementioned occurrence took place as a result of the negligence,
carelessness and recklessness of the defendant L & L PAINTING/CONSTRUCTION, its
agents, servants and/or employees in the ownership, operation, maintenance,
management and control of the Queensboro Bridge, in particular, in its designation of
closed off areas located on and around the Queensboro Bridge, in that defendant L & L
PAINTING/CONSTRUCTION, among other things: failed to direct and/or control
vehicular traffic, including the vehicle operated by Brandon Colon, away from the
subject portion of the Queensboro Bridge that was supposed to have been closed to
vehicular traffic; reopened access points and ramps leading to the eastbound outer
roadway; failed to install proper barriers, warnings, and signs to prevent motorists from
entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and
across  a portion of the Queensboro Bridge that was supposed to have been closed to
vehicular traffic; failed to prevent access by motor vehicles, including the one operated
by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have
been closed to traffic, through the use of sufficient barricades, fences, traffic cones,
barrels, signage, flashing lights and other control devices; and negligently, carelessly,
and recklessly informing pedestrians that the roadway was closed to motor vehicles

without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

162.   That at all times herein mentioned, and on/or prior to the 28th day of March 2006, defendant URBITRAN entered into an agreement with the City of New York relative to certain work, labor and/or services to be performed upon the Queensboro Bridge and on the roadways leading thereto.

163.   That at all times herein mentioned, defendant URBITRAN obtained a permit to perform work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

164.   That at all times herein mentioned, defendant URBITRAN was the supervisor relative to certain work, labor and services being performed upon the Queensboro Bridge and on the roadways leading thereto.

165.   That on/or about the 28th day of March, 2006, and/or for a period of time prior thereto, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees performed certain work, labor and services upon the Queensboro Bridge and on the roadways leading thereto.

166.   At all times hereinafter mentioned, the Queensboro or 59th Street Bridge, including the eastbound outer roadway appurtenant thereto, and all approaches to the eastbound outer roadway, including the entrance ramps, was operated, managed, and controlled by the defendant URBITRAN, its agents, servants and/or employees.

167.   That at all times herein mentioned, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees maintained the Queensboro Bridge and the roadways leading thereto.

168.    That at all times herein mentioned, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees managed the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

169.    That at all times herein mentioned, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees controlled the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

170.    That at all times herein mentioned, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees supervised the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat.

171.    That at all times herein mentioned, it was the duty of defendant URBITRAN, its servants, agents, permittees, contractors and/or employees to maintain the Queensboro Bridge, the roadways leading thereto, and the work, labor and services performed thereat in reasonably safe, suitable and adequate condition, and this duty included: maintenance and protection of traffic; maintenance and protection of pedestrians; traffic control; traffic access; and traffic redirection.

172.    That at all times herein mentioned, it was the duty of defendant URBITRAN., its servants, agents, permittees, contractors and/or employees to provide for the safety, protection and well being of persons lawfully present or upon the Queensboro Bridge, its roadways and its walkways, including pedestrians.

173.    That at all times herein mentioned, it was the duty of defendant URBITRAN to provide and/or ensure the use of reasonably safe, suitable and adequate safety equipment, safeguards, apparatus and/or instrumentalities for use in conjunction with work being performed upon the Queensboro Bridge and the roadways leading

thereto

174.   That on the 28th day of March 2006 and for a period of time prior thereto, there existed dangerous, defective, hazardous, unguarded, unprotected, unsupervised and unsafe conditions upon the Queensboro Bridge and the roadways leading thereto.

175.   That at all times herein mentioned, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees failed to maintain the Queensboro Bridge and the roadways leading thereto, and the work, labor and services performed thereat in a reasonably safe, suitable and adequate condition and repair.

176.   That at all times herein mentioned, defendant URBITRAN, its servants, agents, permittees, contractors and/or employees failed to provide for the safety, protection and well being of persons lawfully upon the Queensboro Bridge.

177.   The aforementioned occurrence took place as a result of the negligence, carelessness and recklessness of the defendant URBITRAN, its agents, servants and/or employees in the ownership, operation, maintenance, management and control of the Queensboro Bridge, in particular, in its designation of closed off areas located on and around the Queensboro Bridge, in that defendant URBITRAN, among other things: failed to direct and/or control vehicular traffic, including the vehicle operated by Brandon Colon, away from the subject portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; reopened access points and ramps leading to the eastbound outer roadway;  failed to install proper barriers, warnings, and signs to prevent motorists from entering a closed roadway; allowed Brandon Colon to operate a motor vehicle onto and across  a portion of the Queensboro Bridge that was supposed to have been closed to vehicular traffic; failed to prevent access by motor vehicles,

including the one operated by Brandon Colon, to a portion of the Queensboro Bridge that was supposed to have been closed to traffic, through the use of sufficient barricades, fences, traffic cones, barrels, signage, flashing lights and other control devices; and negligently, carelessly, and recklessly informing pedestrians that the roadway was closed to motor vehicles without providing them the sufficient safeguards; and by failing to inform pedestrians, such as Plaintiffs' decedent, that vehicles had access to the closed roadway.

178.   As a result of the aforedescribed acts and omissions, the decedent sustained severe and serious personal injuries, terror of impending death, pre-impact terror, and conscious pain and suffering.

179.   Decedent sustained a serious injury within the meaning of Sec. 5102 of the insurance law and/or economic loss greater than that set forth in Sec. 5102 of the insurance law.

180.   The limitations on liability set forth in CPLR Section 1601 do not apply.

181.   The limitations on liability set forth in CPLR Section 1601 do not apply by reason of one or more of the exemptions set forth in CPLR Section 1602, including but not limited to subdivision 7.

182.   That by reason of the foregoing, the plaintiff's decedent sustained serious damages in a sum in excess of the jurisdictional limits of this Court.

## SECOND CAUSE OF ACTION

183.   Plaintiff repeats and reiterates paragraphs 1 through 182 as if specifically set forth herein.

184.   As a result of the defendants' negligence and recklessness JULIO ALBERTO ORTEGA-MONCADA, died on March 28, 2006.

## VERIFICATION

STATE OF NEW YORK    )
                     ) SS.:
COUNTY OF NEW YORK  )

ANDREW J. CARBOY being duly sworn, deposes and says:

I am a member of the law firm of SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO P.C., attorneys for the plaintiffs herein.

I have read the foregoing COMPLAINT and know the contents thereof.    Upon information and belief, I believe the matters alleged therein to be true.

The reason this Verification is made by me and not by plaintiffs is that plaintiffs herein reside in a county other than the one in which my law firm maintains its offices.

The source of my information and the grounds for my beliefs are communications, papers, reports and investigations contained within the office file.


Dated:  New York, New York
        March 26, 2008


                                    _____
                                    ANDREW J. CARBOY

37

Index No.                              Year 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

LETICIA VALLE, and ANTHONY EMANUEL, as Co-Administrators of the
Estate of JULIO ALBERTO ORTEGA-MONCADA, Deceased,

Plaintiffs,

-against-

TOWER PAINTING CO., INC., ET AL.,

Defendants.

---

**SUMMONS AND VERIFIED COMPLAINT**

---

SULLIVAN PAPAIN BLOCK McGRATH & CANNAVO P.C.
Attorneys for PLAINTIFFS

120 BROADWAY
NEW YORK, NEW YORK 10271
(212) 732-9000

---

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State,
certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed
document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not
obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are
not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential
claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

Dated:...............................            Signature ...........................................................

                                              Print Signer's Name.............................................

---

*Service of a copy of the within*                                              *is hereby admitted.*

Dated:

                                                    ..........................................................
                                                    *Attorney(s) for*

---

*PLEASE TAKE NOTICE*

☐        *that the within is a (certified) true copy of a*
NOTICE OF    *entered in the office of the clerk of the within-named Court on*                    20
ENTRY

☐        *that an Order of which the within is a true copy will be presented for settlement to the*
NOTICE OF    *Hon.*
SETTLEMENT    *at*                                  *, one of the judges of the within-named Court,*
        *on*                          20        *, at*                    *M.*

Dated:

SULLIVAN PAPAIN BLOCK McGRATH & CANNAVO P.C.
Attorneys for

To:

120 BROADWAY